# Declaration of Sirena P. Castillo

## DECLARATION OF SIRENA P. CASTILLO

I, Sirena P. Castillo, hereby declare and state as follows:

1.      I am a partner with the law firm of Manatt, Phelps & Phillips, LLP, counsel for Plaintiffs J.L., M.V.B., M.D.G.B., and J.B.A. (collectively, "Plaintiffs") in the above-captioned action.  I am a member of the bar of the State of California and admitted to practice in the Northern District of California.  I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction and Motion for Leave to Proceed Using Pseudonyms.  I have personal knowledge of the facts set forth herein and, if called as witness, could and would testify competently thereto.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the USCIS Policy Manual, current as of July 26, 2018, *available at* https://www.uscis.gov/policymanual/HTML/PolicyManual.html (last accessed August 13, 2018).

3.      Attached hereto as **Exhibit B** is a true and correct copy of a September 12, 2006 U.S. Citizenship and Immigration Services Interoffice Memorandum from Acting Associate Director of Domestic Operations, Michael Aytes, regarding an update to Chapter 22 to the Adjudicator's Field Manual, available at https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2006/afm_ch22_091206r.pdf (last accessed August 13, 2018).

4.      Attached hereto as **Exhibit C** is a true and correct copy of an April 25, 2018 Politico article by Ted Heeson, titled *USCIS Explains Juvenile Visa Denials*, with an April 24, 2018 statement from USCIS spokesperson Jonathan Withington to Politico appended thereto, *available at* https://www.politico.com/newsletters/morning-shift/2018/04/25/travel-ban-at-scotus-182935 (last accessed August 13, 2018).

5.      Attached hereto as **Exhibit D** is a true and correct copy of an April 18, 2018 New York Times article by Liz Robbins titled, *A Rule is Changed for Young Immigrants, and Green Card Hopes Fade*, *available at* https://www.nytimes.com/2018/04/18/nyregion/special-immigrant-juvenile-status-trump.html (last accessed August 13, 2018).

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

1

DECL.OF SIRENA P. CASTILLO ISO MOTION FOR
PRELIMINARY INJUNCTION AND MOTION FOR
LEAVE TO PROCEED USING PSEUDONYMS

6.      Attached hereto as **Exhibit E** is a true and correct copy of a June 28, 2018 Policy Memorandum from the Office of the Director for the U.S. Citizenship and Immigration Services titled, *Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens, available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-28-PM-602-0050.1-Guidance-for-Referral-of-Cases-and-Issuance-of-NTA.pdf (last accessed August 13, 2018).

7.      Attached hereto as **Exhibit F** is a true and correct copy of a July 13, 2018 Policy Memorandum from the Office of the Director for the U.S. Citizenship and Immigration Services titled, *Issuance of Certain RFEs and NOIDs; Revisions to Adjudicator's Field Manual (AFChapter 10.5(a), Chapter 10.5(b)), available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/AFM_10_Standards_for_RFEs_and_NOIDs_FINAL2.pdf (last accessed August 13, 2018).

8.      Attached hereto as **Exhibit G** is a true and correct copy of a January 17, 2018 Memorandum from the James R. McHenry of the Office of the Director for the  Executive Office for Immigration Review titled, *Case Priorities and Immigration Court Performance Measures, available at* https://www.justice.gov/eoir/page/file/1026721/download (last accessed August 13, 2018).

9.      Attached hereto as **Exhibit H** is a true and correct copy of a December 11, 2015 report by Citizenship and Immigration Services Ombudsman, Maria Odom, titled, *Ensuring Process Efficiency and Legal Sufficiency in Special Immigrant Juvenile Adjudications, available at* https://www.dhs.gov/sites/default/files/publications/CISOMB%20SIJ%20Recommendation%202015_2.pdf (last accessed August 13, 2018).

10.      Attached hereto as **Exhibit I** is a true and correct copy of a March 2, 2017 THINK PROGRESS article by Esther Yu His Lee, titled *ICE agents detained an undocumented immigrant moments after she spoke out against them, available at* https://thinkprogress.org/ice-

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

2

DECL.OF SIRENA P. CASTILLO ISO MOTION FOR
PRELIMINARY INJUNCTION AND MOTION FOR
LEAVE TO PROCEED USING PSEUDONYMS

1    agents-detained-an-undocumented-immigrant-moments-after-she-spoke-out-against-them-

2    41e50a54978a/ (last accessed August 13, 2018).

3         11.    Attached hereto as **Exhibit J** is a true and correct copy of a June 30, 2017

4    document published by U.S. Dept. of Health & Human Services, titled "Unaccompanied Alien

5    Children Released to Sponsors by State" , *available at*

6    https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-

7    state (last accessed August 13, 2018).

8         12.    Attached hereto as **Exhibit K** is a true and correct copy of a July 10, 2018 CBS

9    Sacramento article by Lenor Abrams, titled *Hate Crimes on the Rise in California, Especially*

10   *Against Latinos*, *available at* https://sacramento.cbslocal.com/2018/07/10/latino-hate-crimes-

11   california/ (last accessed August 13, 2018).

12        I declare under penalty of perjury pursuant to the laws of the United States that the

13   foregoing is true and correct.  Executed this 14th day of August at Los Angeles, California.

14

15                                            _Sirena Castillo_

16                                            Sirena P. Castillo

17

18

19

20

21

22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

3

DECL.OF SIRENA P. CASTILLO ISO MOTION FOR
PRELIMINARY INJUNCTION AND MOTION FOR
LEAVE TO PROCEED USING PSEUDONYMS

# EXHIBIT A

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 6 of 199

# USCIS Policy Manual

Current as of **May 23, 2018**

# Volume 6 - Immigrants

## Part J - Special Immigrant Juveniles

### Chapter 1 - Purpose and Background

**A. Purpose**

Congress initially created the special immigrant juvenile (SIJ) classification to provide humanitarian protection for abused, neglected, or abandoned child immigrants eligible for long-term foster care. This protection evolved to include children who cannot reunify with one or both parents because of abuse, neglect, abandonment, or a similar basis under state law. While there is no longer a requirement that a child be found eligible for long-term foster care, a juvenile court finding that reunification with one or both parents is not viable is still required for SIJ classification.[1]

Children in a variety of different circumstances may be eligible for SIJ classification, including but not limited to:

- Children who have been abused prior to their arrival in the United States, or while in the United States;

- Children in federal custody with the U.S. Department of Health and Human Services, Office of Refugee Resettlement, Unaccompanied Children's Services Program;[2] or

- Children in the state child welfare system in the custody of a state agency (for example, foster care), or in the custody of a person or entity appointed by a state or juvenile court.

**B. Background**

Congress first established the SIJ immigrant visa classification in 1990. Since then, Congress has enacted several amendments. The table below provides an overview of major legislation related to SIJ classification.

| Special Immigrant Juvenile Classification: Acts and Amendments |
|---|

| Acts and Amendments | Key Changes |
|---|---|
| **The Immigration Act of 1990**[3] | • Established an SIJ classification for children declared dependent upon a juvenile court in the United States, eligible for long-term foster care, and for whom it would not be in their best interest to return to their country of origin |
| **Miscellaneous and Technical Immigration and Nationality Amendments of 1991**[4] | • Provided that children with SIJ classification were considered paroled for the purpose of adjustment of status to lawful permanent residence<br><br>• Provided that foreign national children cannot apply for admission or be admitted to the United States in order to obtain SIJ classification |
| **The Immigration and Nationality Technical Corrections Act of 1994**[5] | • Expanded eligibility from those declared dependent on a juvenile court to children whom such a court has legally committed to, or placed under the custody of, a state agency or department |
| **The 1998 Appropriations Act**[6] | • Limited eligibility to children declared dependent on the court because of abuse, neglect, or abandonment<br><br>• Provided that children are eligible only if the Attorney General (later changed to the Secretary of the Department of Homeland Security) expressly consents to the juvenile court order serving as a precondition to the grant of status<br><br>• Prohibited juvenile courts from determining the custody status or placement of a child who is in the custody of the federal government, unless the Attorney General (later changed to the Secretary of the Department of Health and Human Services) specifically consents to the court's jurisdiction |
| **Violence Against Women Act of 2005**[7] | • Prohibited compelling an SIJ petitioner to contact the alleged abuser (or family member of the alleged abuser) at any stage of applying for SIJ classification |
| **The Trafficking Victims Protection and** | • Removed the need for a juvenile court to deem a child eligible for long-term foster care and replaced it with a requirement that the juvenile court find that |

| Reauthorization Act (TVPRA 2008)[8] | reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under state law |
|---|---|
| | • Expanded eligibility to include children whom a juvenile court has placed under the custody of a person or entity appointed by a state or juvenile court |
| | • Provided age-out protections so that SIJ classification may not be denied to anyone, based solely on age, who was under 21 years of age on the date that he or she properly filed the SIJ petition, regardless of the petitioner's age at the time of adjudication |
| | • Simplified the consent requirement: The Secretary of Homeland Security now consents to the grant of SIJ classification instead of expressly consenting to the juvenile court order |
| | • Altered the "specific consent" function for those children in federal custody by vesting this authority with the Secretary of Health and Human Services, rather than the Secretary of the Department of Homeland Security |
| | • Added a timeframe for adjudication: USCIS shall adjudicate SIJ petitions within 180 days of filing |

**C. Legal Authorities**

- INA 101(a)(27)(J); 8 CFR 204.11 [9] – Special immigrant status for certain children declared dependent on a juvenile court (special immigrant juvenile)

- INA 203(b)(4) – Certain special immigrants

- INA 204(a)(1)(G)(i) – Petitioning procedure

- INA 245(h) – Adjustment of special immigrant juveniles

- INA 287(h) – Protecting abused juveniles

- 8 CFR 205.1(a)(3)(iv) – Reasons for automatic revocation

- 8 CFR 205.2 – Revocation on notice

**Footnotes**

1. There is nothing in the Immigration and Nationality Act (INA) that allows or directs juvenile courts to rely upon provisions of the INA or otherwise deviate from reliance upon state law and procedure in issuing state court orders.

2. See Section 462 of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2202 (November 25, 2002).

3. See Pub. L. 101-649 (November 29, 1990).

4. See Pub. L. 102-232 (December 12, 1991).

5. See Pub. L. 103-416 (October 25, 1994).

6. See Pub. L. 105-119 (November 26, 1997).

7. See Pub. L. 109-162 (January 5, 2006).

8. See Pub. L. 110-457 (December 23, 2008).

9. Certain portions of the regulations have been superseded. This part provides up-to-date guidance.

# Chapter 2 - Eligibility Requirements

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 10 of 199

## A. Determining Eligibility

The special immigrant juvenile (SIJ) classification is available to children who have been subject to state juvenile court proceedings related to abuse, neglect, abandonment, or a similar basis under state law. If a juvenile court has made certain findings, under state law, on dependency or custody, parental reunification, and the best interests of the child, then the child may be eligible for SIJ classification.

USCIS determines if the petitioner meets the requirements for SIJ classification by adjudicating a Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360).[1] USCIS' adjudication of the SIJ petition includes review of the petition, the juvenile court order (or orders), and supporting evidence to determine if the petitioner is eligible for SIJ classification. USCIS generally defers to the court on matters of state law and does not go behind the juvenile court order to reweigh evidence and make independent determinations about abuse, neglect, or abandonment.

## B. General

A petitioner must satisfy the following requirements to qualify for SIJ classification:

| General Eligibility Requirements for SIJ Classification |
| --- |
| Physically present in the United States |
| Unmarried |
| Under the age of 21 on the date of filing the Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360) |
| Juvenile court order (or orders) issued in the United States that meets the specified requirements |
| U.S. Department of Homeland Security consent |
| U.S. Department of Health and Human Services (HHS) consent, if applicable |

## C. Age-out Protections

In general, a "child" is an unmarried person under 21 years of age for purposes of SIJ classification.[2] USCIS considers the petitioner's age at the time the SIJ petition is filed when determining whether the petitioner has met the age requirement.[3]

If a petitioner was under 21 years of age on the date of the proper filing of Form I-360, USCIS cannot deny SIJ classification solely because the petitioner is older than 21 years of age at the time of adjudication.

## D. Juvenile Court Order

To be eligible for SIJ classification, a juvenile court in the United States must have issued order (or orders) with the following findings:

- Dependency or Custody – Declares the petitioner dependent on the court, or legally commits or places the petitioner under the custody of either a state agency or department, or a person or entity appointed by a state or juvenile court; [4]

- Parental Reunification – Declares, under the state child welfare law, that the petitioner cannot reunify with one or both of the petitioner's parents prior to aging out of the juvenile court's jurisdiction due to abuse, neglect, abandonment, or a similar basis under state law; and

- Best Interests – Finds that it would not be in the petitioner's best interest to be returned (to a placement) in the petitioner's, or his or her parent's, country of nationality or last habitual residence.

### 1. Dependency [5] or Custody

The petitioner must be the subject of a juvenile court order that declares him or her dependent on a juvenile court, or legally commits to or places the petitioner under the custody of either an agency or department of a state, or a person or entity appointed by a state or juvenile court. Placing the petitioner "under the custody of" a person requires physical custody. A qualifying court-appointed custodial placement could be with one parent, if reunification with the other parent is found to be not viable due to that parent's abuse, neglect, or abandonment of the petitioner.

Court-ordered dependency or custodial placements that are intended to be temporary generally do not qualify for the purpose of establishing eligibility for SIJ classification. [6] A court-appointed custodian that is acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent, [7] is not considered a custodian for purposes of establishing SIJ eligibility. [8]

### 2. Parental Reunification [9]

The juvenile court must find that reunification with one or both parents is not viable due to abuse, neglect, abandonment, or a similar basis under the relevant state child welfare laws. Lack of viable reunification generally means that the court intends its finding that the child cannot reunify with his or her parent (or parents) remains in effect until the child ages out of the juvenile court's jurisdiction. [10] The temporary unavailability of a child's parent does not meet the eligibility requirement that family reunification is not viable. However, actual termination of parental rights is not required.

The findings must be based upon the person (or persons) who is the petitioner's parent (or parents) [11] under state law. If the juvenile court order establishes that the person (or persons) is the petitioner's parent (or parents), USCIS generally considers this requirement met. However, if the record does not establish that the person (or persons) is the petitioner's parent (or parents), USCIS may request additional evidence. For example, if the findings are based on a father not listed on the petitioner's birth certificate, a determination that the claimed father is the father under state law should be established in the juvenile court order.

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 12 of 199

**3. Best Interests**

Juvenile courts do not have the authority to make decisions on the removal or deportation of a child to another country. However, it must be determined by the juvenile court (or in administrative proceedings recognized by the juvenile court) that it would not be in the best interest of the petitioner to be returned to the country of nationality or last habitual residence of the petitioner or his or her parents. Accordingly, this requires a determination by the juvenile court that a placement in the child's, or his or her parents', country of nationality or last habitual residence is not in the child's best interest.

While the standards for making best interests determinations may vary between states, a best interests determination generally involves the deliberation that courts undertake under state law when deciding what types of services, actions, and orders will best serve a child, as well as a deliberation regarding who is best suited to take care of a child.[12] The court's finding that a particular custodial placement is the best alternative available to the petitioner in the United States does not necessarily establish that a placement in the petitioner's country of nationality would not be in the child's best interest.[13] USCIS defers to the juvenile court in making this determination and as such does not require the court to conduct any analysis other than what is required under state law.

**4. Validity of Order**

*Issued under State Law*

The juvenile court order must have been properly issued under state law to be valid for the purposes of establishing eligibility for SIJ classification. This includes the need for the juvenile court to follow their state laws on jurisdiction.[14] For example, a juvenile court may not be able to take jurisdiction and issue a dependency or custody order for a juvenile who is 18 years of age or older even though the juvenile may file his or her petition with USCIS until the age of 21. There is nothing in USCIS guidance that should be construed as instructing juvenile courts on how to apply their own state law.

*Continuing Jurisdiction*

In general, the petitioner must remain under the jurisdiction of the juvenile court at the time of the filing and adjudication of the SIJ petition, subject to some exceptions discussed below. If the petitioner is no longer under the jurisdiction of the juvenile court for a reason related to their underlying eligibility for SIJ classification, the petitioner is not eligible for SIJ classification. This may include cases in which the petitioner is no longer under the jurisdiction of the court because:

- The court vacated or terminated its findings that made the petitioner eligible because of subsequent evidence or information that invalidated the findings; or

- The court reunified the petitioner with the parent with whom the court previously deemed reunification was not viable because of abuse, neglect, abandonment, or a similar basis under state law.

However, this requirement does not apply if the juvenile court jurisdiction ended solely because:

- The petitioner was adopted, or placed in a permanent guardianship; or

- The petitioner was the subject of a valid order that was terminated based on age before or after filing the SIJ petition (provided the petitioner was under 21 years of age at the time of filing the SIJ petition). [15]

A petitioner with a juvenile court order who moves to the jurisdiction of a different juvenile court may need to either submit evidence that the petitioner is still under the jurisdiction of the court that issued the order or submit a new court order.

A juvenile court order does not necessarily terminate because of a petitioner's move to another court's jurisdiction. In general, a court maintains jurisdiction when it orders the child placed in a different state or makes a custody determination and the legal custodian relocates to a new jurisdiction. [16] If, however, a child relocates to a new jurisdiction and is not living in a court ordered placement or with the court ordered custodian, then the petitioner must submit:

- Evidence that the court is still exercising jurisdiction over the petitioner; or

- A new juvenile court order from the court that has jurisdiction. [17]

If the original order is terminated due to the relocation of the child but another order is issued in a new jurisdiction, USCIS considers the dependency or custody to have continued through the time of adjudication of the SIJ petition, even if there is a lapse between court orders.

### 5. USCIS Consent

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA 2008) [18] simplified but did not remove the Department of Homeland Security (DHS) consent requirement. In order to consent, USCIS must review the juvenile court order to conclude that the request for SIJ classification is bona fide, which means that the juvenile court order was sought to obtain relief from abuse, neglect, abandonment, or a similar basis under state law, and not primarily or solely to obtain an immigration benefit. [19] The court ordered dependency or custodial placement of the child is the relief being sought from the juvenile court, and the factual basis of each of the required findings is evidence that the request for SIJ classification is bona fide.

USCIS relies on the expertise of the juvenile court in making child welfare decisions and does not reweigh the evidence to determine if the child was subjected to abuse, neglect, abandonment, or a similar basis under state law. In order to exercise the statutorily mandated DHS consent function, USCIS requires that the juvenile court order or other supporting evidence contain or provide a reasonable factual basis for each of the findings necessary for classification as a SIJ. The evidence needed does not have to be overly detailed, but must confirm that the juvenile court made an informed decision in order to be considered "reasonable." USCIS generally consents to the grant of SIJ classification when the order includes or is supplemented by a reasonable factual basis for all of the required findings.

USCIS recognizes that there may be some immigration motive for seeking the juvenile court order. For example, the court may make findings in separate hearings and the petitioner may request an order that compiles the findings of several orders into one order to establish eligibility for SIJ

classification. A special order issued to help clarify the findings that were made so that USCIS can determine the petitioner's eligibility for SIJ classification does not mean that the order is not bona fide.

## E. HHS Consent

If a petitioner is currently in the custody of the U.S. Department of Health and Human Services (HHS) and seeks a juvenile court order that also alters[20] his or her custody status or placement, HHS must consent to the juvenile court's jurisdiction. HHS consent is not required if the order simply restates the petitioner's current placement.

## F. Inadmissibility and Waivers

Grounds of inadmissibility do not apply to the adjudication of the SIJ petition.[21] Therefore, a petitioner does not need to apply for a waiver of any applicable grounds of inadmissibility in order to be eligible for SIJ classification.

## G. Family Members

Unlike some other immigrant visa petitions, SIJ classification does not allow the petitioner's family members to be included on the petition as derivative beneficiaries. SIJ petitioners that have adjusted status to that of a lawful permanent resident may petition for qualifying family members through the family-based immigration process. However, a petitioner who adjusts status as a result of an SIJ classification may not confer an immigration benefit to his or her natural or prior adoptive parents.[22] This prohibition also applies to a non-abusive, custodial parent, if applicable.

## Footnotes

1.
   USCIS also adjudicates the Application to Register Permanent Residence or Adjust Status (Form I-485), which determines eligibility for adjustment of status to lawful permanent residence. See Volume 7, Adjustment of Status, Part F, Special Immigrant-Based (EB-4) Adjustment, Chapter 7, Special Immigrant Juvenile [7 USCIS-PM F.7].

2.
   USCIS interprets the use of the term "child" in Section 235(d)(6) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA 2008), Pub. L. 110-457, 122 Stat. 5044, 5080 (December 23, 2008), to refer to the definition of child in INA 101(b)(1), which states that a child is an unmarried person under 21 years of age.

3.
   Section 235(d)(6) of the TVPRA 2008, Pub. L. 110-457, 122 Stat. 5044, 5080 (December 23, 2008), provides age-out protection to SIJ petitioners.

4. For information on which state courts USCIS considers a juvenile court, see Chapter 3, Documentation and Evidence, Section A, Juvenile Court Orders and Administrative Documents, Subsection 1, Qualifying Juvenile Court Proceedings [6 USCIS-PM J.3(A)(1)].

5. This requires that the petitioner has been declared dependent upon a juvenile court located in the United States in accordance with state law governing such declarations of dependency, while he or she is in the United States and under the jurisdiction of the court. See 8 CFR 204.11(c)(3). For an example of state law governing declarations of dependency, see California Welfare and Institutions Code Section 300.

6. USCIS generally requires that the court order be valid at the time of filing and must determine that the court intends that the child will not reunify with at least one parent until the child reaches the age of majority. See 8 CFR 204.11(c)(5). See Subsection 2, Parental Reunification [6 USCIS-PM J.2(D)(2)].

7. See Black's Law Dictionary (10th ed. 2014) (defining "in loco parentis").

8. A department or agency of a State, or an individual or entity appointed by a State court or juvenile court located in the United States, acting in loco parentis, shall not be considered a legal guardian for purposes of this section or section 462 of the Homeland Security Act of 2002 (6 U.S.C. 279). See Section 235(d)(5) of the TVPRA 2008, Pub. L. 110-457, 122 Stat. 5044, 5080 (December 23, 2008).

9. The TVPRA 2008 replaced the need for a juvenile court to deem a juvenile eligible for long-term foster care with a requirement that the juvenile court find reunification with one or both parents not viable. The term "eligible for long-term foster care" is defined at 8 CFR 204.11(a), as requiring that family reunification no longer be viable and that this determination would be expected to remain in place until the child reached the age of majority. USCIS interprets the TVPRA changes as a clarification that petitioners do not need to be eligible for or placed in foster care and that they may be reunified with one parent or other family members. However, USCIS requires that the reunification no longer be a viable option with at least one parent, and USCIS maintains that the court's determination is meant to be in place until the child reaches the age of majority. See 8 CFR 204.11(a). See Section 235(d)(1)(A) of TVPRA 2008, Pub. L. 110-457, 122 Stat. 5044, 5079 (December 23, 2008).

10. For example, when parental reunification is no longer the goal of the child welfare authority's plan for a permanent living situation for the child (known as a "permanency plan").

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 16 of 199

11.

The term "parent" does not encompass a step-parent unless the step-parent is recognized as the petitioner's legal parent under state law, such as when a step-parent has adopted the petitioner.

12.

See U.S. Department of Health and Human Services, Child Welfare Information Gateway, Determining the Best Interests of the Child.

13.

See 58 FR 42843-01, 42848 (August 12, 1993).

14.

For an order to be considered an eligible juvenile court order, the court must have jurisdiction under state law to make judicial determinations about the care and custody of juveniles. See 8 CFR 204.11(a). See *Perez-Olano v. Holder*, Case No. CV 05-3604 (C.D. Cal. 2005) at paragraph 8.

15.

See *Perez-Olano v. Holder*, Case No. CV 05-3604 (C.D. Cal. 2005).

16.

Some states have adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) and the Interstate Compact for the Placement of Children (ICPC). The UCCJEA is a Uniform Act drafted by the National Conference of Commissioners on Uniform State Laws. The UCCJEA is effective only upon adoption by state legislatures. See Sections 201-204 of UCCJEA available at the Uniform Law Commission website on UCCJEA. ICPC is a binding contract between member jurisdictions. The ICPC establishes uniform legal and administrative procedures governing the interstate placement of children. Each state and the District of Columbia have enacted the provisions of the ICPC under state law.

17.

See 8 CFR 204.11(c)(5).

18.

See Pub. L. 110-457 (December 23, 2008).

19.

See INA 101(a)(27)(J)(iii) (consent requirement). See H.R. Rep. No. 105-405, at 130 (1997).

20.

    See *Perez-Olano v. Holder*, Case No. CV 05-3604 (C.D. Cal. 2005).

21.

    For discussion on the applicability of inadmissibility grounds to SIJ-based applicants for adjustment of status, see Volume 7, Adjustment of Status, Part F, Special Immigrant-Based (EB-4) Adjustment, Chapter 7, Special Immigrant Juvenile [7 USCIS-PM F.7].

22.

    See INA 101(a)(27)(J)(iii)(II).

# Chapter 3 - Documentation and Evidence

A petitioner seeking special immigrant juvenile (SIJ) classification must submit all of the following documentation to USCIS:

- Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360); [1]

- A copy of the petitioner's birth certificate or other evidence of the petitioner's age; [2]

- Copies of the juvenile court order (or orders) and administrative document (or orders), as applicable, that establish eligibility and evidence of the factual basis for the juvenile court's findings; and

- A copy of U.S. Department of Health and Human Services (HHS) consent, if applicable.

The petitioner may file Form I-360 alone or concurrently with his or her Application to Register Permanent Residence or Adjust Status (Form I-485), if there is an immigrant visa currently available for the SIJ immigrant classification and he or she is otherwise eligible. [3]

## A. Juvenile Court Orders and Administrative Documents

### 1. Qualifying Juvenile Court Proceedings

A juvenile court is defined as a U.S. court having jurisdiction under state law to make judicial

determinations about the custody and care of children.[4] The title and the type of court that may meet the definition of a juvenile court will vary from state to state. Examples of state courts that may meet this definition include: juvenile, family, dependency, orphans, guardianship, probate, and delinquency courts.

The juvenile court may make the required determination that it is not in the petitioner's best interest to be returned (to a placement) in the petitioner's or his or her parent's country of nationality or last habitual residence. However, other judicial or administrative bodies authorized or recognized by a juvenile court may also make this required determination. If a particular juvenile court establishes or endorses an alternate process for a best interest determination, a finding from that process may satisfy this requirement.

### 2. Findings [5]

The juvenile court order (or orders) must provide the required findings regarding dependency or custody, parental reunification, and best interests. These findings may be made in a single juvenile court order or in separate juvenile court orders. The order (or orders) should use language establishing that the specific findings (conclusions of law) were made under state law. The order (or orders) should not just mirror or cite to immigration law and regulations. The juvenile court order may use different legal terms than those found in the INA as long as the findings have the same meaning as the requirements for SIJ classification.[6]

There is nothing in USCIS guidance that should be construed as instructing juvenile courts on how to apply their own state law. Juvenile courts should follow their state laws on issues such as when to exercise their authority, evidentiary standards, and due process.

The language of the order may vary based on individual state child welfare law. If a juvenile court order makes the findings based upon a state law similar to abuse, neglect, or abandonment,[7] the petitioner must establish that the nature and elements of the state law are indeed similar to the nature and elements of laws on abuse, neglect, or abandonment. Petitioners are encouraged to submit the juvenile court's findings of how the basis is similar to abuse, neglect, or abandonment and copies of the relevant laws.

### 3. Factual Basis and USCIS Consent

Template orders that simply recite the immigration statute or regulatory language are generally not sufficient. Orders that have the necessary findings or rulings and include, or are supplemented by, the factual basis for the court's findings (for example, the judicial findings of fact) are usually sufficient to establish eligibility. If a petitioner cannot obtain a court order that includes facts that establish a factual basis for all of the required findings, USCIS may request evidence of the factual basis for the court's findings.

USCIS does not require specific documents to establish the factual basis or the entire record considered by the court. However, the burden is on the petitioner to provide the factual basis for the court's findings. Examples of documents that a petitioner may submit to USCIS that may support the factual basis for the court order include:

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 19 of 199

- Any supporting documents submitted to the juvenile court, if available;

- The petition for dependency or complaint for custody or other documents which initiated the juvenile court proceedings;

- Affidavits summarizing the evidence presented to the court and records from the judicial proceedings; and

- Affidavits or records that are consistent with the findings made by the court.

**4. Supporting Evidence**

The order or supporting evidence should specifically indicate:

- With whom the child is placed (for example, the name of the person, or entity, or agency if the child is adjudicated dependent) and the factual basis for this finding;

- Which of the specific grounds (abuse, neglect, abandonment, or similar basis under state law) apply to which of the parent (or parents) and the factual basis for the court's findings on non-viability of parental reunification; and

- The factual basis for the determination that it is not in the petitioner's best interest to return to (a placement in) the petitioner's or his or her parents' country of nationality or last habitual residence (for example, addressing family reunification with family that remains in the child's country of nationality or last habitual residence).

## B. Limitations on Additional Evidence

USCIS is mindful that there are often confidentiality rules that govern disclosure of records from juvenile-related proceedings. For this reason, officers generally do not request information or documents from sources other than the SIJ petitioner or his or her legal representative.[8]

Children often do not share personal accounts of their family life with an unknown adult until they have had the opportunity to form a trusting relationship with that adult. Therefore, officers exercise careful judgment when considering statements made by children at the time of initial apprehension by immigration or law enforcement officers to question the findings made by the juvenile court.

Additionally, the juvenile court may make child welfare placement, custody, and best interest decisions that differ from the child's stated intentions at the time of apprehension. However, if there is significant contradictory information in the file that the juvenile court was likely not aware of or that may impact whether a reasonable factual basis exists for the court's findings, officers may request additional evidence from the petitioner or his or her legal representative.

However, officers may not require or request an SIJ petitioner to contact the person or family members of the person who allegedly abused, neglected, or abandoned the SIJ petitioner.[9]

**Footnotes**

1.
   See Instructions for Form I-360. There is no fee to file Form I-360 to seek SIJ classification.

2.
   For more information on evidence that can be used to provide proof of age see 8 CFR 204.11(d)(1).

3.
   For information on SIJ-based adjustment of status, see Volume 7, Adjustment of Status, Part F, Special Immigrant-Based (EB-4) Adjustment, Chapter 7, Special Immigrant Juvenile [7 USCIS-PM F.7].

4.
   See 8 CFR 204.11(a).

5.
   The term "findings" refers to the conclusions of law.

6.
   See 101(a)(27)(J).

7.
   For example, under Connecticut law, a child may be found "uncared for" if the child is "homeless" or if his or her "home cannot provide the specialized care that the physical, emotional or mental condition of the child requires." See Conn. Gen. Stat. Ann. section 46b-120(9). "Uncared for" may be similar to abuse, neglect, or abandonment because children found "uncared for" are equally entitled to juvenile court intervention and protection. The outcomes for children found "uncared for" are the same as they are for children found abused, neglected, or abandoned. See Conn. Gen. Stat. Ann. section 46b-120(8),(9); 121(a).

8.
   USCIS Fraud Detection and National Security (FDNS) officers conducting fraud investigations follow separate FDNS procedures on documentation requests.

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 21 of 199

9.
   See Violence Against Women Act of 2005, Pub. L. 109-162 (January 5, 2006), codified at INA 287(h).

# Chapter 4 - Adjudication

## A. Jurisdiction

USCIS has sole jurisdiction over petitions for special immigrant juvenile (SIJ) classification.[1] Provided the petitioner is otherwise eligible, classification as an SIJ establishes eligibility to apply for adjustment of status.[2]

## B. Expeditious Adjudication

USCIS generally adjudicates SIJ petitions within 180 days.[3] The 180-day timeframe begins on the Notice of Action (Form I-797) receipt date. If the petitioner has not submitted sufficient evidence to establish his or her eligibility for SIJ classification, the clock stops the day USCIS sends a request for additional evidence and resumes the day USCIS receives the requested evidence from the petitioner.[4]

The 180-day timeframe applies only to the initial adjudication of the SIJ petition. The requirement does not extend to the adjudication of any motion or appeal filed after a denial of a SIJ petition.

## C. Interview

### 1. Determining Necessity of Interview

USCIS has discretion to interview SIJ petitioners for the purposes of adjudicating the SIJ petition.[5] USCIS recognizes the vulnerable nature of SIJ petitioners and generally conducts interviews of SIJ petitioners when an interview is deemed necessary. USCIS conducts a full review of the petition and supporting evidence to determine whether an interview may be warranted. USCIS will generally not require an interview if the record contains sufficient information and evidence to approve the petition without an in-person assessment. However, USCIS retains the discretion to interview SIJ petitioners for the purposes of adjudicating the SIJ petition, as appropriate.

### 2. Conducting the Interview

Given the vulnerable nature of SIJ petitioners and the hardships they may face because of the loss of parental support, USCIS strives to establish a child-friendly interview environment if an interview is scheduled. During an interview, officers avoid questioning the petitioner about the details of the

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 22 of 199

abuse, neglect, or abandonment suffered, because these issues are handled by the juvenile court. Officers generally focus the interview on resolving issues related to the eligibility requirements, including age.

The petitioner may bring a trusted adult to the interview in addition to an attorney or representative. The trusted adult may serve as a familiar source of comfort to the petitioner, but should not interfere with the interview process or coach the petitioner during the interview. Given potential human trafficking and other concerns, officers assess the appropriateness of the adult's attendance in the interview and observe the adult's interaction with the child. When appropriate, the officer may interview the child without that adult present.

## D. Requests for Evidence

Additional evidence may be requested at the discretion of the officer if needed to determine eligibility.[6] To provide petitioners an opportunity to address concerns before issuing a denial, officers generally issue a Request for Evidence (RFE) or a Notice of Intent to Deny (NOID), where the evidence is insufficient to approve the petition. The officer may request additional evidence for reasons such as, but not limited to:

- The record lacks the required dependency or custody, parental reunification, or best interest findings;

- It is unclear if the order was made by a juvenile court or in accordance with state law;

- The evidence provided does not establish a reasonable factual basis for the findings;

- The record contains evidence or information that directly and substantively conflicts with the evidence or information that was the basis for the court order; or

- Additional evidence is needed to determine eligibility.

## E. Decision

### 1. Approval

The Secretary of Homeland Security must consent to the grant of SIJ classification. The Department of Homeland Security (DHS) delegates this authority to USCIS. Therefore, USCIS approval of the SIJ petition is evidence of DHS consent. USCIS notifies petitioners in writing upon approval of the petition.[7]

### 2. Denial

If the petitioner does not provide necessary evidence or does not meet the eligibility requirements, USCIS may deny the Form I-360 petition. If USCIS denies the SIJ petition, USCIS provides the

petitioner with a written denial which includes a detailed basis for the denial.[8]An SIJ petitioner may appeal an adverse decision or request that USCIS reopen or reconsider a USCIS decision.[9]The denial notice includes instructions for filing a Notice of Appeal or Motion (Form I-290B).

**3. Revocation**

*Automatic Revocation*

An approved SIJ petition is automatically revoked as of the date of approval if any one of the circumstances below occurs before USCIS issues a decision on the petitioner's application for adjustment of status:[10]

- Marriage of the petitioner;

- Reunification of the petitioner with one or both parents by virtue of a juvenile court order,[11] where a juvenile court previously deemed reunification with that parent, or both parents, not viable due to abuse, neglect, abandonment, or a similar basis under state law;[12]or

- Reversal by the juvenile court of the determination that it would not be in the petitioner's best interest to be returned (to a placement) in the petitioner's, or his or her parent's, country of nationality or last habitual residence.

USCIS issues a notice to the petitioner of such revocation of the SIJ petition.[13]

*Revocation on Notice*

In addition, USCIS, with notice, may revoke an approved petition for SIJ classification for good and sufficient cause such as fraud.[14]In these instances, USCIS issues a Notice of Intent to Revoke (NOIR) and provides the petitioner an opportunity to offer evidence in support of the petition and in opposition to the grounds alleged for revocation of the approval.[15]

**Footnotes**

1. 
   See Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360).

2. 
   See Application to Register Permanent Residence or Adjust Status (Form I-485). Generally, an applicant may only apply to USCIS for adjustment of status if there is a visa number available for the special immigrant classification (EB-4), and the applicant is not in removal proceedings. If an SIJ is in removal proceedings, the immigration court must terminate the proceedings before USCIS can adjudicate the adjustment application. Conversely, the applicant may seek adjustment of status with the immigration court based on USCIS' approval of the SIJ petition. For more information, see Volume 7, Adjustment of Status, Part A, Adjustment of Status Policies and Procedures [7 USCIS-PM A], Part B, 245(a) Adjustment [7 USCIS-PM B], and Part F, Special Immigrant-Based (EB-4) Adjustment, Chapter 7, Special Immigrant Juveniles [7 USCIS-PM F.7].

3.

See Section 235(d)(2) of the Trafficking Victims Protection and Reauthorization Act of 2008 (TVPRA 2008), Pub. L. 110-457, 122 Stat. 5044, 5080 (December 23, 2008).

4.

See 8 CFR 103.2(b)(10).

5.

See 8 CFR 103.2(b)(9).

6.

See 8 CFR 103.2(b)(8).

7.

See 8 CFR 103.2(b)(19).

8.

See 8 CFR 103.3(a).

9.

See 8 CFR 103.3. See 8 CFR 103.5.

10.

See 8 CFR 205.1(a)(3)(iv).

11.

Revocation will not occur, however, where the juvenile court places the petitioner with the parent who was not the subject of the nonviable reunification determination.

12.

TVPRA 2008 replaced the need for a juvenile court to deem a juvenile eligible for long-term foster care with a requirement that the juvenile court find reunification with one or both parents not viable. The term "eligible for long-term foster care" is defined at 8 CFR 204.11(a) as requiring that family reunification no longer be viable. USCIS

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 25 of 199

interprets this change as clarifying that the child does not need to be eligible for or placed in foster care. USCIS also views this change as modifying the regulation that requires auto-revocation upon the termination of the beneficiary's eligibility for long-term foster care. A petition will be revoked if reunification with the parent is now viable where a juvenile court previously deemed reunification with that parent not viable. See Section 235(d)(1)(A) of TVPRA 2008, Pub. L. 110-457, 122 Stat. 5044, 5079 (December 23, 2008).

13.
See 8 CFR 205.1(b).

14.
See INA 205 and 8 CFR 205.2.

15.
See 8 CFR 205.2(b).

# Chapter 5 - Appeals, Motions to Reopen, and Motions to Reconsider

## A. General

A petitioner may submit a Notice of Appeal or Motion (Form I-290B), with the appropriate filing fee or a request for a fee waiver, to file:[1]

- An appeal with the Administrative Appeals Office (AAO);

- A motion to reconsider a USCIS decision (made by the AAO, a field office, or a service center); or

- A motion to reopen a USCIS decision (made by the AAO, a field office, or a service center).

The petitioner must file the appeal or motion within 30 days of the denial or dismissal, or 33 days if the denial or dismissal decision was sent by mail.[2] If the appeal relates to a revocation of an approved special immigrant juvenile (SIJ) petition, the appeal must be filed within 15 calendar days after service of the decision, or 18 days if the decision was sent by mail.[3] There is no exception to the filing period for appeals and motions to reconsider.

For a motion to reopen, USCIS may excuse the petitioner's failure to file before this period expires where the petitioner demonstrates that the delay was reasonable and beyond his or her control.[4]

## B. Requirements for Perez-Olano Litigation Class Members[5]

*Perez-Olano v. Holder* is a class-action lawsuit filed on behalf of certain foreign national juveniles who may have been eligible for SIJ classification or SIJ-based adjustment of status but whose SIJ petition or adjustment application was denied or revoked for certain reasons. Certain persons whose petition for SIJ classification[6] or SIJ-based application for adjustment of status[7] was denied or revoked on or after May 13, 2005, may be eligible to file a motion to reopen the denied or revoked SIJ petition or SIJ-based application for adjustment of status.

A class action member may file a motion to reopen if his or her SIJ petition or SIJ-based application for adjustment of status was denied or revoked on account of:

- Age if, at the time the class member filed a complete petition for SIJ classification, he or she was under 21 years of age;

- Dependency status if, at the time the class member filed a complete petition for SIJ classification, he or she was the subject of a valid dependency order that was subsequently terminated based on age; or

- Specific consent, if the petitioner did not receive a grant of HHS specific consent before going before the juvenile court and the court order did not alter the petitioner's HHS custody status or placement.

There is also a stipulation to the settlement agreement involving cases in which SIJ petitions or SIJ-based applications for adjustment of status were denied, terminated, or revoked on or after December 15, 2010 because the applicant's state court dependency order had expired at the time of the filing. The requirements and process for a class member to request that his or her case be reopened under the stipulation differ from requirements under the original Settlement Agreement.[8]

Under the stipulation, USCIS will not deny, revoke, or terminate an SIJ petition or SIJ-based adjustment of status if, at the time of filing the SIJ petition, the applicant:

- Is or was under 21 years of age, unmarried, and otherwise eligible; and

- Is the subject of a valid dependency order or was the subject of a valid dependency order that was terminated based on age prior to filing.

## Footnotes

1.
   See 8 CFR 103.3. See 8 CFR 103.5.


2.
   See 8 CFR 103.3(a)(2)(i). See 8 CFR 103.5(a)(1)(i). See 8 CFR 103.8(b).

3.

See 8 CFR 205.2(d) (revocation appeals) and 8 CFR 103.8(b) (effect of service by mail).

4.

See 8 CFR 103.5(a)(1)(i).

5.

See *Perez-Olano v. Holder*, Case No. CV 05-3604 (C.D. Cal. 2005).

6.

See Petition for Amerasian, Widow(er), or Special Immigrant (Form I-360).

7.

See Application to Register Permanent Residence or Adjust Status (Form I-485).

8.

See Updated Implementation of the Special Immigrant Juvenile Perez-Olano Settlement Agreement, issued June 25, 2015.


# Chapter 6 - Data

USCIS compiles and makes available to the public annual reports disclosing the number of special immigrant juvenile (SIJ) petitions received, approved, and denied.[1] The number includes the filing and adjudication of SIJ petitions under the Settlement Agreement, as well as the filing and adjudication of regularly filed SIJ petitions. To ensure accuracy of information, officers must promptly enter all decisions on all petitions and motions related to SIJ into the relevant systems.

### Footnotes

1.

See the USCIS website for Data Set: Form I-360 Petition for Special Immigrant Juveniles.

Case 5:18-cv-04914-NC    Document 7-6    Filed 08/14/18    Page 28 of 199

# Appendices

# Updates

## POLICY ALERT – Special Immigrant Juvenile Classification and Special Immigrant-Based Adjustment of Status

October 26, 2016

U.S. Citizenship and Immigration Services (USCIS) is issuing policy guidance regarding the special immigrant juvenile (SIJ) classification and special immigrant-based (EB-4) adjustment of status, including adjustment based on classification as a special immigrant religious worker, SIJ, and G-4 international organization or NATO-6 employee or family member, among others.

# EXHIBIT B



**U.S. Department of Homeland Security**

20 Massachusetts Avenue, NW
Washington, DC  20529

HQPRD70/23.12

# Interoffice Memorandum

To:     REGIONAL DIRECTORS
        SERVICE CENTER DIRECTORS
        NATIONAL BENEFIT CENTER
        DIRECTOR, OFFICER DEVELOPMENT TRAINING FACILITY, GLYNCO
        DIRECTOR, OFFICER DEVELOPMENT TRAINING FACILITY, ARTESIA

FROM:    Michael Aytes /s/
         Acting Associate Director, Domestic Operations
         U.S. of Citizenship and Immigration Services
         Department of Homeland Security

Date:  September 12, 2006

SUBJECT: *AFM* Update: Chapter 22: Employment-based Petitions (AD03-01).

This memorandum revises Chapter 22 to the *Adjudicator's Field Manual* (*AFM*) by adding several new chapters and by revising and re-designating the existing chapters. Chapter 22 pertains to the adjudication of employment-based (EB) immigrant visa petitions for EB-1 through EB-5 classification.

Questions regarding this memorandum should be directed through channels to Alexandra Haskell in the Business and Trade Branch of Service Center Operations.  This new *AFM* Chapter will be included in the next "I-Link" release.  Accordingly, the *AFM* is revised as follows:

☞   1. The *AFM* **Table of Contents** for Chapter 22 is revised to read:

**Chapter 22.  Employment-based Petitions, Entrepreneurs and Special Immigrants.**

22.1   Prior Law and Historical Background
22.2   Employment-based Petitions (Forms I-140)
22.3   Special Immigrant Cases
22.4   Employment Creation Entrepreneur Cases

Memorandum for Regional Directors, et al.                                        2
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03-01).

☞   2. Chapter 22 of the *AFM* is revised to read:

**Chapter 22. Employment-based Petitions, Entrepreneurs and Special Immigrants.**

22.1   Prior Law and Historical Background
22.2   Employment-based Petitions (Forms I-140)
22.3   Special Immigrant Cases
22.4   Employment Creation Entrepreneur Cases

**References:**
Law: 203(b) and 204(a), (b), and (c)
Regulations: 8 CFR 204.5, 205.1, 205.2, and 20 CFR 656

**22.1 Prior Law and Historical Background.**

**(a) <u>Pre-1952 Act</u>.** The requirement of filing a petition to bring workers into the U.S. evolved out of a legislative desire to exercise control over immigration that might negatively affect the American labor market.  Restriction of immigration to protect the American labor market is a relatively recent concern of the legislature.  In fact, initial federal controls over immigration formulated in 1875 sought to do no more than bar the admission of certain types of "undesirable" persons.  In general, no numerical restraints of any kind were enacted until the quota acts of 1921 and 1924.  Even with major revisions of the immigration laws in 1924 and as recently as 1952, with certain exceptions, there was still no firmly established policy of "protecting the job market."

**(b) <u>The Act of June 27, 1952</u>.**  Under the Act of 1952, aliens subject to the labor exclusion of 212(a)(14) of the Act were admissible *unless* the Secretary of Labor made a prescribed disqualifying certification.  At that time, the control was meant as an emergency measure that could be invoked in a time of economic stress or crisis.

In the original 1952 Act, section 203(a)(1) stated:  "to qualified quota immigrants whose services are determined by the Attorney General to be needed urgently in the United States because of the high education, technical training, specialized experience, or exceptional ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States."  Ch. 477, Title II, Ch. 1, section 203, 66 Stat. 178 (June 27, 1952)(as amended).

**(c) <u>The 1965 Amendments</u>.**  By legislative amendment in 1965, the Act of 1952 was dramatically altered, abandoning the "national origins" concept and instituting separate numerical limits for Eastern and Western Hemisphere immigrants, dividing immigrants into:

- immediate relatives,
- special immigrants, and
- other immigrants - including all the "preference" classifications.

Immediate relative and certain special immigrants were not restricted by numerical limitations, but all preference immigrants were numerically limited. The 1965 amendments introduced a new control barring the entry of certain classes of immigrants unless they first obtain a certification from the Department of Labor (DOL) that their coming to the United States would not adversely affect American labor.

1965--Subsec. (a). Pub. L. 89-236 substituted provisions setting up preference priorities and percentage allocations of the total numerical limitation for the admission of qualified immigrants, consisting of unmarried sons or daughters of U.S. citizens (20 percent); husbands, wives, and unmarried sons or daughters of alien residents (20 percent plus any unused portion of class 1); members of professions, scientists, and artists (10 percent), married sons or daughters of U.S. citizens (10 percent plus any unused portions of classes 1-3); brothers or sisters of U.S. citizens (24 percent plus any unused portions of classes 1 through 4); skilled or unskilled persons capable of filling labor shortages in the United States (10 percent); refugees (6 percent); otherwise qualified immigrants (portion not used by classes 1 through 7); and allowing a spouse or child to be given the same status and order of consideration as the spouse or parent, for provisions spelling out the preferences under the quotas based on the previous national origins quota system. Subsec. (b). Pub. L. 89-236 authorized issuance of quota immigrant visas under the previous national origins quota system in the order of filing in the first calendar month after receipt of notice of approval for which a quota number was available.

**(d) <u>1976 Amendments</u>.** Subsec. (a)(27). Pub. L. 94-571, enacted on 10/10/1976, struck out the subparagraph (A) provision defining the term "special immigrant'' to include an immigrant born in any independent foreign country of the Western Hemisphere or in the Canal Zone and the spouse and children of any such immigrant, if accompanying, or following to join him and restricting issuance of an immigrant visa until consular officer was in receipt of a determination made by the Secretary of Labor pursuant to former provisions of section 1182(a)(14) of this title; and redesignated as subparagraphs (A) to (D) and former subparagraphs (B) to (E).

Prior to this change all natives of the Western Hemisphere had to be special immigrants or immediate relatives. They were not eligible for preference immigrant status until this change. The change was effective January 1, 1977 (the first month more than 60 days from date of enactment-10/20/1976). [**<u>Historical note</u>**: under the Act and Regulations in effect from 1965 until 1977, an exemption from the labor certification requirement for Western Hemisphere would be obtained by establishing that one had a child who was a U.S. citizen. One established a priority date for IV issuance by filing a form that verified the existence of the U.S. citizen child (Note: adjustment of status was prohibited for Western Hemisphere natives even as immediate relatives).]

Memorandum for Regional Directors, et al.                                                    4
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

**(e) IMMACT 90 and Subsequent Legislation.**  The Immigration Act of 1990 (IMMACT 90) divided the preference categories into 2 groups (family-based and employment-based) and expanded the number of employment-based categories from two (the former third and sixth preferences) to three classifications.  Those three classifications were further divided into subcategories dealing with specific groups of immigrant workers.  IMMACT 90 also placed numerical limits on several special immigrant classifications and added new provisions for entrepreneurs.  The classifications under IMMACT 90 include:

- First preference or "priority workers" under section 203(b)(1) of the Act (discussed in Chapter 22.2(b) of this field manual)
    - Aliens with extraordinary ability
    - Outstanding professors and researchers
    - Certain multinational executives and managers

- Second preference under section 203(b)(2) of the Act (discussed in Chapter 22.2(c) of this field manual)
    - Members of the professions holding advanced degrees
    - Aliens of exceptional ability

- Third preference under section 203(b)(3) of the Act (discussed in Chapter 22.2(d) of this field manual)
    - Skilled workers
    - Professionals
    - Other workers

- Fourth preference or "certain special immigrants" under section 203(b)(4) of the Act (discussed in Chapter 22.3 of this field manual)
    - Ministers of religion & other religious worker cases as defined in section 101(a)(27)(C) of the Act
    - Employees of U.S. Government Abroad defined in section 101(a)(27)(D) of the Act
    - Panama Canal Zone Employees defined in sections 101(a)(27)(E), (F) and (G) of the Act
    - Foreign Medical Doctors defined in section 101(a)(27)(H) of the Act
    - International Organization Employees defined in section 101(a)(27)(I) of the Act
    - Juvenile Court Dependents defined in section 101(a)(27)(J) of the Act
    - U.S. Armed Forces Members defined in section 101(a)(27)(K) of the Act
    - NATO personnel defined in section 101(a)(27)(L) of the Act; and
    - International broadcast personnel defined in section 101(a)(27)(M) of the Act.

**Note 1:** Although not included in section 101(a)(27) of the Act at the time of the enactment of IMMACT 90, the "L" and "M" special immigrant classifications are

Memorandum for Regional Directors, et al.                                                    5
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

subject to the numerical limitation of section 203(b)(4) of the Act.

**Note 2:** The Special Immigrant classifications defined in sections 101(a)(27)(A) (returning lawful permanent residents) and 101(a)(27)(B) (certain former citizens of the U.S.) of the Act are not numerically restricted and are not included in the fourth preference categories. Because these classifications do not require a petition, they are not discussed in this field manual chapter, but are instead included in the discussions in Chapter 23 of this field manual.

• Fifth Preference or "employment creation immigrants" under section 203(b)(5) of the Act (discussed in Chapter 22.4 of this field manual)
  – Entrepreneurs or investors

### 22.2 Employment-based Immigrant Visa Petitions (Form I-140)

In an employment-based immigrant visa petition, an employer must demonstrate to USCIS that the alien beneficiary is a foreign national qualified for the immigrant classification sought. If the immigrant petition is based on an underlying certified labor certification application, the employer must demonstrate that the alien beneficiary is qualified for the position certified by the Department of Labor (DOL). However, as discussed in more detail later in this Chapter, there are several immigrant classifications that do not require the employer to first obtain labor certification. In addition, in certain classifications, the alien beneficiary is able to self-petition for the classification sought. Below is a discussion of the initial steps that should be taken when adjudicating all employment-based immigrant petitions. A more detailed discussion of the specific immigrant classifications follows.

**(a) Adjudication Procedures.** Detailed procedures for the receipting and adjudicating of Form I-140 are set forth in the I-140 Standard Operating Procedures (I-140 SOPs).

(1) Form. Employment-based petitions seeking classification under section 203(b)(1), section 203(b)(2), or section 203 (b)(3) of the Act are filed on Form I-140 (Immigrant Petition for Alien Worker) with the appropriate fee as specified in 8 CFR 103(a)(7).

(2) Filing. Form I-140 must be filed with the appropriate Service Center as specified in the instruction to that form. If an immigrant visa is available for the petition's priority date (see section (c) of this chapter), and the beneficiary is otherwise eligible for adjustment of status, an Application to Register Permanent Residence or Adjust Status (Form I-485) may be filed concurrently with the I-140 petition.

(3) Initial Processing. Regardless of the classification sought, there are several common steps taken to initiate processing of the petition:

Memorandum for  Regional Directors, et al.                                    6
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- Verify that the fee has been paid;
- Verify that the signature in Part 8 matches the petitioner's name in Part 1;
- Check the classification in Part 2.  Some classifications allow that the alien or anyone on the alien's behalf may file the petition; others require that the employer file it. Check at this point to see that the petition has been filed by the correct person;
- Review the documentation to see that the alien qualifies for the classification requested and that any required labor certification is attached.  If documents are missing or insufficient to establish eligibility for the classification, process and issue a request for evidence (RFE) as provided for in 8 CFR 103.2(b)(8).  Be sure your request is as specific as possible to eliminate future additional RFEs.

**(b) General Adjudication Issues.** The issues discussed in this subchapter pertain to the adjudication of I-140 petitions in general.  Additional information on section 203(b)(1) (first employment-based preference) issues is contained in subchapter 22.2(c) of this field manual; additional information on section 203(b)(2) (second employment-based preference) issues is contained in subchapter 22.2(d) of this field manual; and additional information on section 203(b)(3) (third employment-based preference) issues is contained in subchapter 22.2(e) of this field manual.

  **(1) [5 USC 552(b)(2) and 5 USC 552(b)(7)(E)]**

  **(2) Job Offers.** In most cases, the beneficiary of an I-140 petition must be the recipient of a job offer from an employer in the United States.  As evidence of the job offer, most petitioners who file EB-2 and EB-3 immigrant I-140 petitions must first obtain an individual labor certification from the Department of Labor (DOL). In other cases where the alien is eligible for Schedule A blanket labor certification, labor certification applications are submitted to USCIS with the I-140 petition.  In relatively few cases (those involving aliens seeking classification under section 203(b)(1)(A), as well as those seeking classification under section 203(b)(2) who qualify for a "national interest waiver"), an individual labor certification from DOL and a job offer are not required (see subchapter 22.2(d) of this field manual).

  **(3) Labor Certifications.**  A significant percentage of employment-based immigrant visa petitions are based on labor certification applications approved by the DOL. In adjudicating such petitions, please note that DOL does not generally review the alien beneficiary's qualifications for the position when adjudicating a labor certification application; this authority and responsibility rests with USCIS.  Thus, adjudicators must assess these immigrant petitions to ensure that the position offered is the same or similar position that was certified by the DOL and that the alien beneficiary meets the qualifications for the position.   Below is a detailed

Memorandum for  Regional Directors, et al.                                         7
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

description of the labor certification application process.

(A) <u>Applicability</u>.   Priority workers under section 203(b)(1) are not required to be the beneficiaries of approved labor certifications issued by the DOL; however, aliens seeking immigrant visas pursuant to sections 203(b)(2) or 203(b)(3) generally must be the beneficiaries of approved labor certifications. The DOL regulations regarding permanent labor certifications, 20 CFR 656, are found immediately following section 204 of the Act in your law books.

(B) <u>Individual Labor Certifications</u>.   In general, U.S. employers filing EB-2 and EB-3 employment-based I-140 petitions must first obtain an approved labor certification application from DOL on behalf of the foreign worker.  An approved labor certification application demonstrates that:  (1) the employer tested labor market in the geographic area where the permanent job offer is located to establish that there are no able, qualified, and available U.S. workers who are willing to accept the permanent job offer; and (2) the employment of the alien will not adversely affect the wages and working conditions of similarly employed U.S. workers.  (See 212(a)(5)(A) and (D) and 203(b)(3)(C) of the Act.)  DOL has established procedures for obtaining labor certifications under 20 CFR part 656.  20 CFR part 656 was amended by the DOL PERM final rule published on December 27, 2004, which took effect on March 28, 2005 (69 FR 77326).  Labor certification applications are approved and issued by DOL only after the U.S. employer has complied with DOL advertising and recruiting requirements and has established that there are no able, qualified, and available U.S. workers for the position and has rejected any U.S. job applicants for valid job-related reasons.  Approved labor certifications issued by DOL are certified with an official DOL certification stamp and may have a Letter of Labor Certification Determination attached to the front page of the document.

(C) <u>Labor Certifications Filed with DOL Prior to March 28, 2005.</u>  Prior to the effective date of the new PERM regulation (March 28, 2005), U.S. employers filed the Application for Alien Employment Certification, Form ETA-750, in order to obtain an approved labor certification.  The Form ETA-750 has two parts.  Part A focuses on the details of the position being certified and describes the name and address of the U.S. employer, the location of the job opportunity, the proffered wage for the position and the minimum education, training, or experience requirements to successfully perform the duties of the position.  Part B focuses on the alien beneficiary and contains his or her name, date of birth, address, and describes his or her education, training and work history.  A valid, approved Form ETA-750 must be signed by the U.S. employer in Part A and the alien beneficiary in Part B, contain the DOL certification stamp, and be signed and dated by the DOL certifying officer in the endorsements section on the front page on Part A of the form.

Memorandum for  Regional Directors, et al.                                                8
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

<u>Implementation of PERM Labor Certification System</u>  DOL's permanent labor certification system (PERM) implemented on March 28, 2005 effectively eliminated the old labor certification system whereby employers had an option of filing labor certification applications under supervised recruitment or reduction in recruitment rules.  The PERM application Form ETA-9089, which can be filed electronically or by mail, replaced the Form ETA-750, and is designed to expedite the labor certification process.  DOL's National Processing Centers strive to adjudicate electronically filed PERM applications in approximately 30 – 45 days (please note that not all PERM applications are processed within this timeframe, and in certain cases, processing takes substantially longer than the 30 – 45 day period); those applications filed by mail may take significantly longer to process.  At the time of the implementation of the PERM system, DOL had approximately 365,000 pending labor certification applications that were filed under the old paper-based permanent labor certification process, some of which were filed as long ago as April of 2001.   DOL devised the following backlog reduction strategy to address the backlog of Form ETA-750 labor certifications still pending as of March 28, 2005:

- DOL created Backlog Reduction Centers tasked with collecting and processing all of the Form ETA-750 labor certification applications that were pending with the State Workforce Agencies (SWAs) and DOL Regional Offices on or before March 27, 2005.  The applications were shipped to the backlog reduction centers where information from the Form ETA-750 was entered into a national tracking system for labor certifications (a process that is still on-going) in order to process them according to DOL guidelines set forth in 20 CFR 626 prior to March 28, 2005.  To every extent possible, the pending Form ETA-750 labor certification applications are processed on a first-in-first-out principal; however, due to a variety of factors, DOL processes some cases out of turn.

- U.S. employers who have not already had a job order placed by the SWA for the original application may withdraw the pending Form ETA-750 labor certification application and re-file under the new PERM system.  The PERM filing will retain the priority date of the original filing if DOL determines that all of the elements relating to the job opportunity and the alien beneficiary on the newly filed Form ETA-9089 labor certification application are identical to the elements specified on the Form ETA-750 (with the exception of the prevailing wage determination.)  If the new PERM application is not "identical" to the original filing, the PERM application will be assigned a new priority date.

Memorandum for  Regional Directors, et al.                                            9
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

(D) Labor Certifications filed with DOL on or after March 28, 2005.  Pursuant to
20 CFR 656.17, the Application for Permanent Employment Certification (Form
ETA-9089) replaced the Application for Alien Employment Certification (Form
ETA-750) on March 28, 2005.   Form ETA-9089 contains all of the pertinent
information detailing the specifics of the job offer and the alien beneficiary that
were contained in the ETA-750 Part A and Part B.   The ETA-9089 may be filed
with DOL through the mail or it may be filed electronically.  To be valid, the Form
ETA-9089 must be signed by the U.S. employer in Section N, the alien beneficiary
in Section L, and the form Preparer, if any, in Section M; contain the DOL
certification stamp; and be signed and dated by the DOL certifying officer in
Section "O." of the form.

**Exception:** Employers filing applications on behalf of aliens to be employed as
professional athletes on professional team sports will continue to use special
procedures that were put in to place prior to the implementation of the PERM
regulations.  They will continue to file their applications using the Form ETA-750
and must file the applications at DOL-ETA's national office in Washington, DC.
The Form ETA-750 is still available on the DOL-ETA website.

U.S. employers commonly, and mistakenly, believe that an approved labor
certification means that DOL has also certified that the alien beneficiary named
on the labor certification qualifies for the position.  This is not accurate, as the
authority to determine qualifications for nonimmigrant and immigrant
classifications rests with USCIS.  An approved labor certification means that the
petitioning employer made a good faith effort to test the labor market and
demonstrated to DOL that there were no qualified, able, and available U.S.
workers for the position.  DOL requires a statement of qualifications of the alien
and supporting documentation to:

• Help ensure that the procedure for seeking labor certification is actually based
  on a need for the services of a specific individual, thereby eliminating the
  possibility that petitioners or agents will apply for "blanket type" certifications
  in advance for unknown individuals, just in case an actual need for someone
  arises, and

• Help guarantee that the proposed job description on the offer of employment
  submitted by the petitioner is not tailored to the specific skills, education, or
  experience of the alien beneficiary, thereby calling into question whether a
  bona fide job opportunity actually exists.

You must determine whether the beneficiary has met the minimum education,
training, and experience requirements of the labor certification at the time the
application for labor certification was filed with DOL.  You cannot approve a

Memorandum for Regional Directors, et al.                                             10
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

petition for a preference classification if the beneficiary was not fully qualified for the preference by the priority date of the labor certification (See *Matter of Katigbak*, 14 I. & N. Dec. 45 (R.C. 1971) and *Matter of Wing's Tea House*, 16 I. & N. Dec. 158 (Acting R.C. 1977).

**(4)  Schedule A Blanket Labor Certifications and Petitions.**  Schedule A is a list of pre-certified occupations codified in 20 CFR 656.10 and 20 CFR 656.22 in the pre-PERM regulations and in 20 CFR 656.5 and 656.15 in the PERM regulations for which the Secretary of the Department of Labor previously has determined that there are not sufficient U.S. workers who are able, willing, qualified and available and that the wages and working conditions of U.S. workers similarly employed will not be adversely affected by the employment of aliens in such occupations. The IMMACT '90 amendments to the Immigration and Nationality Act (Act) gave separate visa classifications to some groups that previously were included in Schedule A.  As a result, DOL eliminated these groups from Schedule A, leaving only Group I, registered nurses and physical therapists, and Group II, aliens of exceptional ability.  Under the PERM regulations, the Schedule A, Group II designation is limited to aliens of exceptional ability in the sciences or arts (656.5(b)(1)) and aliens of exceptional ability in the performing arts (656.5(b)(2)).  Because the PERM regulations changed various aspects of the Schedule A evidence requirements, the discussion below separately discusses the requirements for pre-PERM and post-PERM filings based on a filing date either before or beginning with March 28, 2005 (the effective date of the PERM regulations) and then provides some policy guidance that applies regardless of filing date.

(A) Petitions Filed Prior To March 28, 2005:

In order to apply for certification under Schedule A for petitions filed before March 28, 2005, the petitioner should complete and submit:

- The Form I-140 petition, with appropriate filing fees,

- An uncertified Form ETA-750 A and B, in duplicate, signed in the original by an authorized official of the petitioning entity and by the alien,

- A copy of the notice sent to an applicable collective bargaining unit, or a copy of the posted notice posted with attestation of posting for at least ten consecutive calendar days (see general discussion below concerning posting locations and related issues), and

- Evidence of the alien's qualifications:

Memorandum for Regional Directors, et al.                                    11
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

> o  For Form I-140 petitions filed for <u>registered nurses</u>, an unrestricted
>    permanent license to practice nursing in the state of intended
>    employment, CGFNS certificate issued by the Commission on Graduates
>    of Foreign Nursing Schools or evidence that the alien has passed the
>    National Council Licensure Examination for Registered Nurses (NCLEX-
>    RN), administered by the National Council of State Boards of Nursing.
>
> o  For Form I-140 petitions filed for <u>physical therapists</u>, a permanent license
>    to practice in the state of intended employment or a letter or statement,
>    signed by an authorized state physical therapy licensing official in the
>    state of intended employment, stating that the beneficiary is qualified to
>    take that state's written licensing examination for physical therapists.
>
> o  For Form I-140 petitions filed for Schedule A Group II for aliens of
>    <u>exceptional ability</u>, evidence of widespread acclaim and international
>    recognition accorded the alien by recognized experts in the alien's field
>    and evidence that alien's prior and intended work requires exceptional
>    ability.

For Form I-140 petitions filed before March 28, 2005, the pre-PERM DOL
regulations at 20 CFR 656.22(b)(2) and 656.20(g)(1) required that an employer
provide notice of the position(s) it seeks to fill under Schedule A, Group I or II, to
the bargaining representative or, if there is no such representative, to the
employer's employees via a notice that must be posted for at least 10
consecutive days at the facility or location of the employment.

In order to be in compliance with DOL's notification requirements, the notice must
be posted for at least 10 consecutive calendar days. The notice must be clearly
visible and unobstructed while posted and be posted in conspicuous places,
where the employer's U.S. workers can readily read the posted notice on their
way to or from their place of employment. The notice must contain a description
of the job and rate of pay and state that the notice is being provided as a result of
the filing of an application for permanent alien labor certification for the relevant
position. The notice must also state that any person may provide documentary
evidence bearing on the Schedule A labor certification application to the
appropriate DOL Certifying Officer of holding jurisdiction over the location where
the alien beneficiary will be physically working.

In the absence of evidence supporting a petition filed before March 28, 2005,
adjudicators should issue a request for evidence (RFE) that requests evidence of
compliance with DOL's notification requirements in the form of a notice of posting
that conforms to the conditions noted above.  If all posting requirements are met
and the notice has been posted the requisite 10 days prior to the date of the RFE

Memorandum for Regional Directors, et al.                                    12
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

response, the posting will be considered timely for adjudication purposes. Issuing an RFE for this documentation is preferable to the issuance of a notice of intent to deny (NOID), to minimize the impact on Service Center resources as opposed to the more resource intense process for the issuance of an NOID.  Note: the issuance of an RFE specified in this memorandum supercedes the guidance provided in the December 23, 2004 memorandum instructing USCIS officers to issue a NOID.

(B) Petitions Filed On Or After March 28, 2005:

DOL Regulations Effective March 28, 2005: On December 27, 2004, DOL published a final rule, Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System, which significantly restructures the permanent labor certification process.  This final rule deletes the current language of 20 CFR part 656 and replaces the part in its entirety with new regulatory text, effective on March 28, 2005.  Many of the evidentiary requirements relating to Schedule A petitions have been changed as of that date.

Pursuant to new 20 CFR 656.10 and 20 CFR 656.15, in order to apply for certification under Schedule A for petitions filed on or after March 28, 2005, the petitioner should complete and submit:

- The Form I-140 petition, with appropriate filing fees,

- An uncertified Form ETA-9089, in duplicate, signed in the original by an authorized official of the petitioning organization, the alien, and the representative, if any,

- A wage determination issued by the State Workforce Agency (SWA) having jurisdiction over the proposed area where the job opportunity exists or by the SWA having jurisdiction over the petitioner's headquarters if the prevailing wage will be derived from the area of the employer's headquarters in the situation of roving employees.

- A copy of the notice sent to an applicable collective bargaining unit, or a copy of the notice posted with attestation of posting for at least ten consecutive business days within the period between 30 and 180 days preceding the petition filing (see general discussion below concerning posting locations and related issues), and

- Copies of any and all in-house media, whether electronic or printed, in accordance with the normal procedures used in the employer's organization

Memorandum for  Regional Directors, et al.                                13
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

for the recruitment of similar positions to the position specified in the Form 9089.

- Evidence of the alien's qualifications:

  o For petitions filed for <u>registered nurses</u>, a full unrestricted permanent license to practice nursing in the state of intended employment; CGFNS certificate issued by the Commission on Graduates of Foreign Nursing Schools; or evidence that the alien has passed the National Council Licensure Examination for Registered Nurses (NCLEX-RN), administered by the National Council of State Boards of Nursing.

  o For petitions filed for <u>physical therapists</u>, a permanent license to practice in the state of intended employment or, a letter or statement, signed by an authorized state physical therapy licensing official, stating that the beneficiary is qualified to take that state's written licensing examination for physical therapists.

  o For petitions filed for Schedule A Group II for aliens of <u>exceptional ability</u>, evidence of widespread acclaim and international recognition accorded the alien by recognized experts in the alien's field and evidence that alien's prior and intended work requires exceptional ability.

<u>New Labor Certification Form</u>: Pursuant to the new 20 CFR 656.17, the Application for Permanent Employment Certification (ETA Form 9089) has replaced the Application for Alien Employment Certification (Form ETA-750). In support of Schedule A, Form I-140 petitions, the Form 9089 should be provided in duplicate, signed in the original by an authorized official of the petitioning entity, the alien, and the representative, if any. In the event that the Form I-140 petition is approved, one copy of the Form ETA-9089 must be forwarded by USCIS to the Chief, Division of Foreign Labor Certification, identifying the occupation, the Immigration Officer who made the determination, and the date of the determination. See 20 CFR 656.15(f).

<u>State Prevailing Wage Determination</u>: In accordance with 20 CFR 656.15(b)(i), the Form 9089 provided with the Form I-140 from the petitioning employer must be accompanied by a prevailing wage determination issued by the SWA having jurisdiction over the proposed area where the job opportunity exists. See 20 CFR 656.40 and 20 CFR 656.41.  The petitioner will request a prevailing wage determination from the appropriate SWA using the form required by the state where the job opportunity exists. (See general discussion below concerning posting and prevailing wage locations).

Memorandum for  Regional Directors, et al.                                           14
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

A completed SWA form must reflect the date on which the SWA made the prevailing wage determination in order for it to be valid for purposes of being submitted to USCIS together with the Form 9089 in support of a Form I-140 petition.  A properly completed SWA form, in all cases, must specify on its face the validity of the prevailing wage, and the date on which the SWA made the determination, which may not be less than 90 days or more than 1 year from the date of the SWA determination.  The Form I-140 must be filed within this timeframe in order for the prevailing wage determination to be valid.  Adjudicators should notify their supervisors in the event the SWA determination is valid for less than 90 days from the date of issuance, and the supervisor will contact the Department of Labor, Employment and Training Administration (ETA) for further guidance.  The purpose of the validity date for the prevailing wage determination is to ensure that the prevailing wage determination is reflective of the wages being offered for comparable positions in the location where the job offer exists at the time that the Form I-140 petitioner recruits the alien worker.

For the purposes of evaluating the validity of the petitioner's proffered wage, be advised that the past practice of allowing a 5 percent variance of the wage actually paid relative to the prevailing wage has been eliminated by the enactment of the H-1B Visa Reform Act of 2004, contained in Public Law 108-447.  This Act amended the INA (Section 212(p)(3), 8 USC 1182(p)(3)) by specifying that "…the prevailing wage required to be paid pursuant to 212(a)(5)(A), (n)(1)(A)(i)(II) and (t)(1)(A)(i)(II) shall be 100 percent of the wage determined pursuant to those sections." Therefore, for petitions filed after March 28, 2005, the prevailing wage to be paid must be no less than 100 percent of the prevailing wage determination.

Labor Application Notice: In order to comply with 20 CFR 656.10(d), the petitioner must give notice of the filing of the Application for Permanent Employment Certification and be able to document that notice was provided to either:

1.  The bargaining representative(s) (if any) of the employer's employees in the occupational classification for which certification of the job opportunity is sought in the employer's location(s) in the area of intended employment, (documentation of this may consist of a copy of the letter that was sent to the bargaining representative(s) and a copy of the Application for Permanent Employment), or

2.  If there is no such bargaining representative, by posted notice to the employer's employees at the facility or physical location of the employment. Such notice:

Memorandum for  Regional Directors, et al.                                    15
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- must be posted for at least 10 consecutive <u>business</u> days (Monday through Friday, regardless of whether the facility operates seven days a week);

- must be clearly visible and unobstructed while posted; and

- must be posted in conspicuous places within the location of the job where the employer's U.S. workers can readily read the posted notice on their way to or from their place of employment.

The documentation requirement in support of the I-140 petition may be satisfied by providing a copy of the posted notice and an attestation executed by an authorized official of the employer that identifies the physical location(s) where the notice was posted and the date of publishing.

PERM rules also require that the employer publish the notice in all in-house media, whether electronic or print, that the employer normally uses to announce similar positions within the employer's organization.  The Form I-140 petition for Schedule A must include the employer's attestation of such in-house publication. The attestation may be, but need not be, provided in the same document as the proof of worksite posting.

The notice must state that it is being provided as a result of the filing of a petition for the relevant position. (The DOL regulations refer to an application for labor certification, which technically is also filed, and notices referring to a labor certification application to DOL rather than a petition to USCIS are equally acceptable).  It must also state that any person may provide documentary evidence bearing on the Schedule A labor certification application to the DOL Certifying Officer holding jurisdiction over the location of the proposed employment. (At one point, USCIS guidance reflected that the notice should drive complaints to USCIS; thus, such notices should be accepted as sufficient).

Pursuant to 20 CFR 656.10(d)(3)(iv), such notice must be posted between <u>30 days and 180 days prior to the filing of the Form I-140 petition</u>.  The last day of the posting must fall at least 30 days prior to filing in order to provide sufficient time for interested persons to submit, if they so choose, documentary evidence bearing on the application.  Adjudicators should deny the Form I-140 and any concurrently filed I-485 in instances where the notice was not posted between 30 and 180 days prior to the filing of the petition.

(C) <u>Special Considerations For All Schedule A Petitions</u>:

   (i)  <u>Household Workers</u>

Memorandum for  Regional Directors, et al.                                      16
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

In the case of a private household, notice is required only if the household employs one or more U.S. workers at the time the application for labor certification is filed.

(ii)  Minimum Requirements

Remember that qualifying for Schedule A means only that the labor certification requirement has been met.  You must make a separate determination on the alien's qualification for the specific visa classification requested using the evidence described above. The "minimum requirements" in Schedule A cases as listed in Item 14 and 15 of Part A of the ETA-750 for petitions filed before March 28, 2005 and in Item H of the ETA-9089 for petitions filed on or after March 28, 2005 may not be a true reflection of the actual education, training and experience needed to perform the job. In many cases a Schedule A petitioner will give the particular alien's qualifications rather than actual minimum requirements, and, because the labor certification form is sent directly to USCIS, this will not be reviewed first by DOL and corrected through DOL involvement. This point is important because many classifications require that the petitioner establish that the position <u>requires</u> a person of a particular caliber.  As long as the ***duties*** shown on the labor certification application are appropriate for a position that requires licensure as a registered nurse, licensure as a physical therapist or performance of a worker of exceptional ability, the petition should not be denied and a request for evidence need not be sent to confirm the precise minimum job requirements.

(iii)  Separate Posted Notices for Every Occupation or Job Classification

A separate notice must be posted for every *occupation or job classification* that will be the subject of a Schedule A petition, but not for every nurse or physical therapist Schedule A petition. Thus, for example, separate notices would be posted for an attending nurse and a supervisory nurse (i.e., nurses having different job duties and wage rates).  An employer can satisfy notice of filing requirements with respect to several nurses in each of these job classifications with a single posting, as long as the posting complies with the regulation for each application (e.g., contains the appropriate prevailing wage and was posted for the requisite period of time).

(iv) Posting and Prevailing Wage Locations.

All Schedule A petitions must each meet specific notice of posting requirements which are described below.  Effective February 15, 2006, the

location of the intended employment for notification purposes will be determined as follows:

(A) ***If the employer knows where the Schedule A employee will be placed:***

The employer must post the notice at the work-site(s) where the employee will perform the work ***and*** publish the notice internally using in-house media--whether electronic or print--in accordance with the normal internal procedures used by the employer to notify its employees of employment opportunities in the occupation in question.  The prevailing wage indicated in the notice will be the wage applicable to the area of intended employment where the worksite is located.

(B) ***If the employer currently employs relevant workers at multiple locations and does <u>not</u> know where the Schedule A employee will be placed:***

The employer must post the notice at the work-site(s) of ***all*** of its locations or clients (i.e., clients under contract to the staffing employer at the time the employer seeks to post a timely notice of filing for a Schedule A employee) where relevant workers currently are placed, ***and*** publish the notice of filing internally using electronic and print media according to the normal internal procedures used by the employer to notify its employees of employment opportunities in the occupation in question.  The prevailing wage will be derived from the area of the staffing agencies' headquarters.

(C) ***If the work-site(s) is unknown and the employer has no current locations or clients:***

The application would be denied based on the fact that this circumstance indicates no *bona-fide* job opportunity exists.  The employer cannot establish an actual job opportunity under this circumstance.  A denial is consistent with established policy in other foreign labor certification programs where certification is not granted for jobs that do not exist at the time of application.

In support of the petition, the employer may provide a copy of one posting notice, supported by a list of all locations where the notice was posted and dates of posting in each location, rather than a copy of each notice in support of the petition.

**Exception:** If, on March 20, 2006, the I-140 is pending or was denied and a

Memorandum for Regional Directors, et al.                                                    18
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

      timely filed motion to reopen or reconsider is pending, and the employer
timely posted a notice but not in correct location(s) of intended employment
as described above, adjudicators should issue an RFE to allow the employer
to comply with DOL's notification requirements.  If all posting requirements
are met and the notice has been posted the requisite 10 business days prior
to the date of the RFE response, the posting will be considered timely for
adjudication purposes.  For all petitions filed <u>after</u> March 20, 2006 (or motions
to reopen filed <u>after March 20, 2006</u>, to reopen a petition that was <u>filed and
denied</u> after March 28, 2005), employers must comply with the posting
requirements set forth above.

      (v) <u>Sample Notice of Posting</u>.

      There is no specific form that petitioning employers must use to comply with
the notice of posting requirements for Schedule A petitions.  The following is a
<u>sample</u> notice of posting which petitioners may elect to use for their posting
notices.  USCIS worked with DOL to develop the sample as a customer
service convenience.  Adjudicators should accept posting notices that are
modeled after the sample, but should not require use of the sample.
Petitioning employers may use other forms as long as they comply with the
DOL regulations.  Petitions already approved should not be reopened and
revoked for failure to comply with posting requirements.

---

**SAMPLE NOTICE OF FILING OF APPLICATION UNDER THE U.S. DEPARTMENT OF LABOR'S
PERMANENT LABOR CERTIFICATION PROGRAM**

An application concerning the employment of one or more alien workers for the following permanent
position will be filed with the Department of Labor (for non-schedule A positions) or with the Department
of Homeland Security (for Schedule A positions). This Notice of Filing will be posted for 10 consecutive
business days, ending between 30 and 180 days before filing the permanent labor certification application.

**POSITION TITLE:**      _____

**POSITION DUTIES:**      _____
                                     _____
                                     _____

Memorandum for Regional Directors, et al.                                          19
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

**RATE OF PAY:**          $_____ per _____

The employer will pay or exceed the prevailing wage, as determined by the U.S.
Department of Labor


**LOCATION OF EMPLOYMENT:** _____


This notice is provided in compliance with 20 CFR 656.10(d). Any person may provide documentary
evidence bearing on the application to the Certifying Officer of the U.S. Department of Labor holding
jurisdiction over the location of the proposed employment. Contact information for these offices can be
found on the Internet at www.foreignlaborcert.doleta.gov/foreign/contacts.asp.


This notice is being provided to workers in the place of intended employment by the following means:

☐          Posting a clearly visible and unobstructed notice, for at least ten (10) consecutive business days,
           in conspicuous location(s) in the workplace, where the employer's U.S. workers can readily read
           the posted notice, including but not limited to locations in the immediate vicinity of the wage and
           hour notices.

## *AND*

☐          Publishing the notice in any and all in-house media, whether electronic or printed, in accordance
           with the normal procedures used for the recruitment of similar positions in the employer's
           organization.


**DATE POSTED:**          _____

**DATE REMOVED:**         _____

**LOCATIONS WHERE THE NOTICE WAS POSTED:** _____

**MEANS OF IN-HOUSE NOTICE, if applicable:**        _____

**EXPLANATION OF ANY LACK OF IN-HOUSE NOTICE:** _____
_____
_____


I attest, under penalty of perjury, that the above notice was provided as shown.


_____          _____
**[PRINTED NAME AND TITLE]**                  **[SIGNATURE]**


**DATE:** _____

Memorandum for Regional Directors, et al.                                    20
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### (5) **Successor in Interest**.

On March 17, 1992, the Agency entered into an agreement with the DOL that the Agency (now USCIS) will make determinations regarding successor in interest on I-140s when a labor certification has already been issued. Successor in interest occurs when the prospective employer of an alien (and the entity that filed the certified labor certification application form) has undergone a change in ownership, such as an acquisition or merger, or some other form of change such as corporate restructuring or merger with another business entity, and the new or merged, or restructured entity assumes substantially all of the rights, duties, obligations, and assets of the original entity.  The petitioner must submit evidence of the change in ownership, the restructuring of the organization, or merger (usually by the submission of a contract or agreement).  The petitioner must also submit evidence that the predecessor company had the ability to pay the wage at the time the application for labor certification was filed and, of course, that the successor company continues to have that ability.

Some corporate changes that occur may not involve a successor in interest.  For example, a mere change in a Company's name or physical location without other organizational changes might not require the filing of a new or amended petition. However, when the physical location of proposed employment appears to have moved beyond the metropolitan statistical area (MSA) of the employment location specified on the labor certification application, if necessary, you may request advice from the Employment and Training Administration regarding the application of the definition of "area of intended employment" for purposes of continued validity of an approved labor certification.

The submission of a new original labor certification in support of the Form I-140 petition is required when any of the following conditions exist:

(a) The petitioner has not established that it is a successor in interest;

(b) The predecessor company did not have the ability to pay the proffered wage as of the time of filing the labor certification application;

(c) The successor company does not have the ability to pay the proffered wage; or

(d) The labor certification is not valid for the new physical location of the alien beneficiary's proposed employment or there has been any other material change in the job opportunity covered by the original labor certification.

Memorandum for  Regional Directors, et al.                                                      21
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Adjudicators should issue an RFE to the petitioner if the petitioner has failed to satisfy in its petition that it is in fact a qualified successor in interest.  The RFE should explain why the labor certification that was originally provided in support of the petition is not valid for the proffered position, based on one or more of the reasons outlined above.  If the petitioner does not provide a new original labor certification or sufficient evidence to overcome the concerns outlined in the RFE, then the petition should be denied.

**(6)  Request for Substitution.**

On occasion, employers will request that a new alien be substituted for the alien listed on an individual labor certification because, for example, the original beneficiary named on the approved labor certification application no longer intends to work for the petitioning employer.  In such substitution filings, the petitioning employer will file an immigrant petition on behalf of the new employee based on the approved labor certification, seeking to retain the priority date of the original labor certification filing.  The priority date for a petition that is supported by a labor certification substitution is the earliest date the certification was accepted for processing by the DOL.  Labor certifications substitutions are allowed ONLY if the original beneficiary named on the approved labor certification, or any previously substituted alien, have not obtained an employment-based immigrant visa (or adjustment of status) based on that labor certification application.

The substituted beneficiary must have met all of the minimum education, training, or experience requirements as stated in Part A of the original individual labor certification at the earliest time the original labor certification application was submitted to the state employment office or to DOL.

For individual labor certifications filed with the Department of Labor prior to March 28, 2005, a new form ETA-750, Part B signed by the substituted alien must be included with the petition.  For individual labor certifications filed with the Department of Labor on or after March 28, 2005, a new Form ETA-9089 signed by the substituted alien must be included with the petition.

Additionally a written notice of withdrawal of any pending or approved Form I-140 initially submitted for the original beneficiary or any previously substituted alien must be included, as well as a photocopy of the Form I-797 receipt and/or approval notice, if available.

**Note:  [5 USC 552(b)(2) and 5 USC 552(b)(7)(E)]**

**(7)  Submission of a Photocopy of Labor Certification.** Ordinary legible copies of

Memorandum for Regional Directors, et al.                                        22
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

documents are generally acceptable; however, you may request that the original of a document be submitted when necessary.  The original labor certification must be submitted unless it has already been filed with another petition (a situation commonly encountered when adjudicating a labor certification substitution filing).

**(8) Issuance of a Duplicate Labor Certification.**  If the original labor certification has been lost, DOL will not issue a duplicate labor certification to the petitioner but will issue a duplicate directly to USCIS for Form ETA-750 labor certification applications filed prior to March 28, 2005 and to a Consular officer or an Immigration officer for Form ETA-9089 labor certifications filed on or after March 28, 2005, only after notice is given to USCIS or by the petitioner and upon request by USCIS to DOL.

**(9) Duplicate Labor Certification Requests for Labor Certifications Filed Prior to March 28, 2005:**  DOL will only provide duplicate labor certifications at the written request by USCIS for labor certifications filed prior to March 28, 2005.  You should only make the request to DOL if it is in conjunction with an I-140 petition being filed with USCIS where the original labor certification has been irretrievably lost or destroyed.  The duplicate labor certification must be retained as part of the record of the Form I-140 petition after it is received from DOL, and should not be forwarded to the petitioner or the petitioner's representative. (For example, you would **not** make such a request to DOL if the petitioner's attorney requested a duplicate labor certification in general correspondence to USCIS, merely because he or she wants a copy for his or her records.)  Also, you should be alert to the possibility that the original was not, in fact, lost or destroyed, but rather used on behalf of another alien.  If another alien has been substituted on a labor certification that the petitioner claims has been lost or denied, the request for a duplicate labor certification should be denied.

A request for duplicate Form ETA-750 labor certification should be made on USCIS letterhead and should include:

1. Attorney name;
2. Petitioner's name;
3. Beneficiary's name;
4. ETA case number;
5. Priority Date;
6. An annotation reflecting that the case was filed on Form ETA-750;
7. Proper fee, signature and all required supporting documents;
8. A print screen showing that the case has been certified.
9. As a courtesy to DOL, reason(s) for requesting that the Service Center secure a duplicate, approved labor certificate from DOL, e.g. "Case was certified, original approved labor certificate was never received in the mail."

Memorandum for  Regional Directors, et al.                                    23
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

The duplicate labor certification request should be sent to the DOL Backlog Reduction Center with jurisdiction over the location where the beneficiary is to be employed, (either the Philadelphia Processing Center or the Dallas Processing Center.)  A list of each processing center's area of jurisdiction, mailing address, and phone/fax numbers can be accessed at http://atlas.doleta.gov/foreign/contacts.asp.

**(10) Duplicate Labor Certification Requests for Labor Certifications Filed on or after March 28, 2005:**

DOL will provide duplicate labor certifications at the request of a Consular or Immigration officer, an alien, employer, or an alien's or employer's attorney or agent for labor certifications filed on or after March 28, 2005.  The written request for a duplicate labor certification must be made to the DOL National Processing Center where the labor certification was issued, (either the Atlanta Processing Center or the Chicago Processing Center), and must include documentary evidence that a visa application or visa petition has been filed, and must include the U.S. Consular Office or USCIS case tracking number that is associated with the visa application or visa petition.  DOL will only send the duplicate labor certification to a Consular or Immigration officer, regardless of who makes the request.  (See 20 CFR 656.30(e))  A list of each national processing center's area of jurisdiction, mailing address, and phone/fax numbers can be accessed at http://atlas.doleta.gov/foreign/contacts.asp.

A request for duplicate Form ETA-9089 labor certification should be made on USCIS letterhead and should include:

1. Attorney name;
2. Petitioner's name;
3. Beneficiary's name;
4. ETA case number;
5. Priority Date;
6. An annotation reflecting that the case was filed on Form ETA-9089;
7. Proper fee, signature and all required supporting documents;
8. A print screen showing that the case has been certified.
9. As a courtesy to DOL, reason(s) for requesting that the Service Center secure a duplicate, approved labor certificate from DOL, e.g. "Case was certified, original approved labor certificate was never received in the mail."

**(11) Invalidation of a Labor Certification.**

DOL regulations at 20 CFR 656.30(d) provide:

Memorandum for Regional Directors, et al.                                    24
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

"(d) After issuance labor certifications are subject to invalidation by the INS [now USCIS] or by a Consul of the Department of State upon a determination, made in accordance with those agencies' procedures or by a Court, of fraud or willful misrepresentation of a material fact involving the labor certification application.  If evidence of such fraud or willful misrepresentation becomes known to a RA [DOL Regional Administrator] or to the [DOL] director, the RA or Director, as appropriate, shall notify in writing the INS [now USCIS] or State Department, as appropriate. A copy of the notification shall be sent to the regional or national office, as appropriate, of the Department of Labor's Office of Inspector General."

The DOL does not invalidate labor certifications. However, USCIS (or DOS) may invalidate a labor certification if fraud or willful misrepresentation is discovered. The term "fraud or willful misrepresentation" has the same meaning here as it does in section 212(a)(6)(C) of the Act, and you should apply the same standards here as you would in a removal case.  If you invalidate the labor certification under this provision, you should then deny the corresponding I-140 petition due to the lack of a valid labor certification.

**Note 1:** You do not need to issue a separate notice of invalidation of the labor certification; the inclusion of the reasons for, and the finding of, invalidation in the denial of the I-140 petition is sufficient.  In other words, you must explain what fraud or willful misrepresentation of a material fact is contained in the labor certification.  You should annotate the labor certification "INVALIDATED BY USCIS - SEE DECISION DATED [insert date of I-140 decision]" and forward "for your information" copies of the I-140 denial notice and the annotated invalidated labor certification to the appropriate DOL processing center.  The mailing addresses for the DOL processing centers are posted at the www.doleta.gov website.

**Invalidated Form ETA-750 applications** should be sent to the appropriate DOL Backlog Elimination Centers based on the location of the employment opportunity specified on the form as follows:

**Philadelphia Backlog Processing Center:** Alabama, Connecticut, Delaware, Florida, Georgia, Kentucky, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Vermont, Virgin Islands, Virginia, Washington, DC, West Virginia.

**Dallas Backlog Processing Center:** Alaska, Arizona, Arkansas, California, Colorado, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana,

Memorandum for Regional Directors, et al.                                    25
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wisconsin, Wyoming.

**Invalidated Form ETA-9089 applications** should be sent to the appropriate DOL Perm National Processing Centers based on the location of the employment opportunity specified on the form as follows:

**Atlanta National Processing Center:** Alabama, Connecticut, Delaware, Florida, Georgia, Kentucky, Maine, Maryland, Massachusetts, Mississippi, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Tennessee, Vermont, Virgin Islands, Virginia, Washington, DC, West Virginia.

**Chicago National Processing Center:** Alaska, Arizona, Arkansas, California, Colorado, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, Wisconsin, Wyoming.

> **Note 2:** Although you cannot <u>invalidate</u> a labor certification due to inaccuracies which do not rise to the level of fraud or willful misrepresentation, before you approve an I-140 petition you must be satisfied that all of the information contained in the petition (which includes the supporting labor certification) is true. If you find that the labor certification contains significant inaccuracies, you may deny the petition due to the petitioner's failure to meet his or her burden of proof, even if you cannot establish fraud or willful misrepresentation.

## (c) <u>Assessing the Petitioner's Ability to Pay the Required Wage</u>

The regulations require that any petition that requires a job offer be accompanied by evidence that the U.S. employer had the ability to pay the proffered wage at the time the labor certification application was filed and continuing until the beneficiary obtains permanent residence.

> **Note:** Establishing that the employer has the <u>ability</u> to pay the proffered wage is different from establishing that the employer <u>is already</u> paying the proffered wage. A petition may still be approved if the employer can demonstrate the financial ability to pay the required wage and the intent to do so once the Form I-485 is approved or the beneficiary immigrates, even if the petitioner is not paying that wage when it files the Form I-140, or the beneficiary has not yet been employed by the petitioner.

8 CFR 204.5(g)(2) requires that the evidence be in the form of annual reports, federal

Memorandum for Regional Directors, et al.                                                26
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

tax returns, or audited financial statements.  In a case where the prospective employer employs 100 or more workers, you may accept a statement from a financial officer of the organization regarding its ability to pay the proffered wage.

In appropriate cases, the petitioner can submit or USCIS may request additional evidence such as profit/loss statements, bank account records, or personnel records. The burden remains on the petitioner to establish its ability to pay the wage. Depending on corporate structure, acceptable evidence can include:

- **Publicly traded corporations** - annual reports are sufficient if they contain detailed financial information, such as audited or reviewed financial statements issued by an independent accounting firm..

- **Privately held corporations** - audited or reviewed financial statements from an independent accounting firm.

- **Partnerships** - audited or reviewed financial statements from an independent accounting firm.

- **Non-profit institutions** - a letter from an inside financial officer is sufficient for large, well-established institutions.  Documentary evidence of the non-profit's financial status may be required for institutions that are not as well-established.

  Sometimes companies will operate at a loss for a period of time to improve their business position in the long run.  A prime example of that would be research and development costs on a product line that is not expected to generate revenue for several years. In those instances the documentation should fully explain the sources of funding for the entity (or unit) and the expected profit potential. Whether the company can demonstrate it has the ability to pay the alien the wages described in the petition will depend on the specific facts presented.  You should exercise discretion in requesting evidence of ability to pay.  In the case of large well-known corporations and other well-known entities such as universities that have established records of filing petitions with USCIS, the financial information contained on the petition is usually sufficient.

**(d) <u>Priority Dates</u>.**

The priority date is used in conjunction with the Visa Bulletin issued by the Department of State (DOS) to determine when the beneficiary can apply for adjustment of status or for an immigrant visa abroad.  Determining the correct priority date for an immigrant visa petition is very important.  Of equal importance is making sure that the Form I-140 approval notice carries the correct date.  Another USCIS office or DOS may use the information on the approval notice to make a determination on the beneficiary's eligibility

to file an application for adjustment or for a visa.  Issuance of an incorrect approval notice can create problems for USCIS, other DHS entities, consular posts, petitioners, and alien beneficiaries.

**(1) Determining the Priority Date.**

In general, if a petition is supported by an individual labor certification issued by DOL, the priority date is the earliest date upon which the labor certification application was filed with DOL.  In those cases where the alien's priority date is established by the filing of the labor certification, once the alien's Form I-140 petition has been approved, the alien beneficiary retains his or her priority date as established by the filing of the labor certification for any future Form I-140 petitions, unless the previously approved Form I-140 petition has been revoked because of fraud or willful misrepresentation.  This includes cases where a change of employer has occurred; however, the new employer must obtain a new labor certification if the classification requested requires a labor certification (see the section on successor in interest).

(A) Schedule A Labor Certifications.  The priority date for a petition supported by a Schedule A designation, or for a petition approved for a classification which does not require a labor certification, is the date the Form I-140 petition is filed with USCIS.

(B) Individual Labor Certifications Filed with DOL Prior to March 28,2005: The priority date for a petition supported by a Form ETA-750 labor certification filed with DOL prior to March 28, 2005, is the earliest date the application for labor certification, Form ETA-750, was accepted by any office in the employment service system of DOL.

(C) Individual Labor Certifications Filed with DOL on or after March 28, 2005: The priority date for a petition supported by a Form ETA-9089 labor certification filed with DOL on or after March 28, 2005, is the earliest date the application for labor certification is filed with the ETA Processing Center.

(D) Re-filed Individual Labor Certifications During PERM Transition:  The priority date for a petition supported by a Form ETA-9089 labor certification that was filed with DOL on or after March 28, 2005 as a re-filed labor certification application after a withdrawal of a previously filed Form ETA-750 will be the filing date that DOL specifies in Section "O." of the Form ETA-9089.  Please Note:  As part of the implementation of the PERM labor certification system DOL is allowing U.S. employers who have not already had a job order placed by the SWA for labor certification applications that were filed prior March 28, 2005, to withdraw the pending Form ETA-750 labor certification application and re-file under the new

Memorandum for  Regional Directors, et al.                                               28
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

PERM system.  The new labor certification will be assigned a new priority date unless all of the elements relating to the job opportunity and the alien beneficiary on the newly filed Form ETA-9089 labor certification application are identical to the elements specified on the Form ETA-750 (with the exception of the prevailing wage determination.)  DOL will examine the previously filed Form ETA-750 and compare it with the newly filed Form ETA-9089 to make that determination and will annotate the correct priority date in Section "O." of the Form ETA-9089.

(E) Incorrect or Disputed Priority Date Assignments by DOL for Labor Certifications Filed with DOL on or after March 28, 2005: There may be instances where the petitioner indicates that DOL erred by assigning a new priority date on the Form ETA-9089 even though a request for the treatment of the newly-filed Form ETA-9089 as a re-file was requested by the petitioning employer.  In other cases, Section O. of the Form ETA-9089 may be blank.  In such instances, it is appropriate to request a corroborative statement or other evidence from DOL that clarifies what the correct priority date should be.  USCIS adjudicators will not attempt to determine whether DOL's decision to deny the re-file request and assign a priority date was in error, and assign a priority date that differs from the priority date annotated by DOL.  These determinations are made by DOL.

**(2) Effect of Denial of Petition on Priority Date.**

If a Schedule A petition or a petition which does not require labor certification is denied, no priority date is established. In addition, no priority date is established by an individual labor certification if a petition based upon that certification was never filed and there is a change of employer (except in successor in interest cases).

**(3) Priority Date Based on Earlier Petition.**

If an alien is the beneficiary of two (or more) approved employment-based immigrant visa petitions, the priority of the earlier petition may be applied to all subsequently-filed employment-based petitions.  For example:

Company A files a labor certification request on behalf of an alien ("Joe") as a janitor on January 10, 2003.  The DOL issues the certification on March 20, 2003.  Company A later files, and USCIS approves, a relating I-140 visa petition under the EB-3 category.  On July 15, 2003, Joe files a second I-140 visa petition in his own behalf as a rocket scientist under the EB-1 category, which USCIS approves.  Joe is entitled to use the January 10, 2003, priority date to apply for adjustment under either the EB-1 or the EB-3 classification.

**(4) Conversion of Pre-IMMACT Petitions.**

Memorandum for  Regional Directors, et al.                                                    29
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Petitions filed under the old third and sixth preferences were automatically converted to one of the new classifications when the provisions of IMMACT 90 went into effect.  Priority dates established by the previously approved petitions may be applied to any petition filed under the new provisions.

If the application for labor certification was filed before October 1, 1991, a petition must have been filed by October 1, 1993, in order to preserve the date of the labor certification as the priority date.  If the application for labor certification was filed before October 1, 1991, but not granted until after October 1, 1993, the petition must have been filed within 60 days after the date of certification to maintain the priority date. Otherwise the date the petition is/was filed with USCIS (or prior to March 1, 2003, the Service) will be the priority date.

## (e) [5 USC 552(b)(2) and 5 USC 552(b)(7)(E)]

## (f)  Section 204(c) Fraudulent Marriage Prohibition

Section 204(c) of the Act prohibits the approval of a visa petition filed on behalf of a beneficiary who has been determined to have attempted or conspired to enter into a marriage for the purpose of evading immigration laws.  Please note that the fraudulent marriage prohibition that is articulated in section 204(c) of the Act and 8 CFR 204.2(a)(1)(ii) does not distinguish between Form I-130s, I-360, and Form I-140s, but merely states "*a* petition for immigrant visa classification." (emphasis added).

Although it is not necessary that the beneficiary have been convicted of, or even prosecuted for the attempt or conspiracy, the evidence of the actual act, attempt or conspiracy must be contained in the beneficiary's A-file.  If a review of the beneficiary's A-file indicates that he or she has attempted or conspired to obtain an immigration benefit by virtue of a fraudulent marriage, an intent to deny or intent to revoke notice should be sent to the petitioner that outlines the basis for the 204(c) determination.  The marriage must be shown to have been a sham at its inception in order for 204(c) to apply.

Adjudicators should deny or revoke an I-140 petition filed on behalf of any alien beneficiary for whom there is substantial and probative evidence of such an attempt or a conspiracy, regardless of whether the beneficiary received a benefit through the attempt or conspiracy, if the evidence provided in response to the intent to deny or revoke the petition does not overcome the 204(c) determination.  The petitioner must convincingly demonstrate that the beneficiary entered into the marriage for the purpose of starting a life with his or her spouse and not strictly for the purpose of obtaining an immigration benefit in order to overcome this ground of ineligibility.

Memorandum for  Regional Directors, et al.                                                    30
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).


**(g) Licensure**

**General:** Neither the statute nor the regulations require that the beneficiary of an employment-based petition be able to engage in the occupation immediately.  There are often licensing and other additional requirements that an alien must meet before he or she can actually engage in the occupation.  Unless needed to meet the requirements of a labor certification, such considerations are not a factor in the adjudication of the petition.

Please note:  Licensure requirements for Schedule A registered nurses and physical therapists are discuss in subchapter 22.2(b)(3)(C) of this chapter.


**(h) Portability**. See Chapter 20.2(c) of this field manual.


**(i) Special Considerations Relating to EB-1 Cases**.

Certain alien beneficiaries are exempted from the labor certification application process by virtue of their extraordinary ability, outstanding research, or positions as international managers and executives.  The discussion below highlights issues that you may encounter in adjudicating first preference petitions filed on behalf of such alien beneficiaries.

**(1) E11 Aliens with Extraordinary Ability - Section 203(b)(1)(A) of the INA**.   An immigrant petition filed on behalf of an alien with extraordinary ability must demonstrate that the alien beneficiary possesses a level of expertise indicating that he or she has risen to the top of the field of endeavor.

(A) Evaluating Evidence Submitted in Support of a Petition for an Alien of Extraordinary Ability. 8 CFR 204.5(h)(3) and (4) describe various types of evidence which must be submitted in support of an I-140 petition for an alien of extraordinary ability.  In general, the petition must be accompanied by initial evidence that: (a) the alien has sustained national or international acclaim; and (b) the alien's achievements have been recognized in the field of expertise.  This initial evidence must include either evidence of a one-time achievement (i.e., a major international recognized award, such as the Nobel Prize), or at least three of the types of evidence listed in 204.5(h)(3).  Submission of the types of evidence noted in 8 CFR section 204.5(h)(3), while a minimum requirement does not, in itself, establish that the alien in fact meets the requirements for classification as an alien of extraordinary ability under section 203(b)(1)(A) of the INA.  There may be cases, however, where the petitioner may in fact be able to establish the beneficiary's eligibility by submitting the minimum types of evidence

required.  In such cases, there is no need to request additional evidence.  In short, in adjudicating a petition seeking to have a person classified as an alien of extraordinary ability, the general rule applies:  look at the quality, rather than the mere quantity of the evidence.  In making your determination, bear in mind, again, that 8 CFR 204.5(h)(3) represents the *minimum* evidence that may be submitted, and that meeting this minimum evidentiary requirement will not automatically establish eligibility.  In all cases, the evidence must be evaluated to determine if it in fact establishes that the alien is extraordinary by demonstrating that he or she has garnered sustained national or international acclaim in the field of endeavor.

Certain evidence submitted in support of a petition may overlap with two or more of the ten criteria set forth in 8 CFR 204.5(h)(3).  You must evaluate the quality of the evidence submitted on a case-by-case basis to determine whether the evidence submitted satisfies the minimum required to establish eligibility for E11 classification.

Note that 8 CFR 204.5(h)(4) provides that petitioners may submit "comparable evidence" to establish a beneficiary's eligibility in cases where the standards set forth in 8 CFR 204.5(h)(3) do not apply.  In cases where such comparable evidence is submitted, it is reasonable to require the petitioner to explain why 8 CFR 204.5(h)(3) does not apply.  Examples of such comparable evidence are provided later in this section.

(B)  Self-Petitioners.  An I-140 petition filed on behalf of an alien with extraordinary ability does not need to be supported by a job offer; therefore, the alien may "self-petition" for the classification.  See 8 C.F.R. 204.5(h)(5).  The alien must demonstrate, however, that he or she intends to continue work in the field of his or her extraordinary ability.  Id.  Section 203(b)(1)(A) of the INA, which defines an alien of extraordinary ability, also requires that the alien's work substantially benefit prospectively the United States.  Although the regulations do not specifically define this statutory term, it has been interpreted broadly.  See e.g.  Matter of Price, 20 I&N Dec. 953 (Assoc. Comm. 1994) (golfer of beneficiary's caliber will substantially benefit prospectively the United States given the popularity of the sport)  Whether the petitioner demonstrates that the alien's employment meets this requirement requires a fact-dependent assessment of the case.  There is no standard rule as to what will substantially benefit the United States.  In some cases, a request for additional evidence may be necessary if you are not yet satisfied that the petitioner has satisfied this requirement.  See Memorandum from William R. Yates, Associate Director, Operations, HQOPRD 70/2, "Requests for Evidence (RFE) and Notices of Intent to Deny (NOID)" (February 16, 2005).   In all cases, however, the petitioner must show that the beneficiary intends to continue work in his or her area of expertise.  See 8 CFR 204.5(h)(5).

Memorandum for  Regional Directors, et al.                                    32
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

(C) <u>Additional Adjudication Guidelines</u>.  The following provides further guidelines for adjudicating E11 petitions.  While not presenting hard and fast rules, it may help you evaluate evidence submitted in support of E11 petition.  Whether or not a petition is approvable will depend on the specific facts presented.

The evidence provided in support of the petition need not specifically use the words "extraordinary."  Rather the material should be such that it is readily apparent that the alien's contributions to the field are qualifying.  Also, although some items in the regulatory lists occasionally use plurals, as indicated above, it is entirely possible that the presentation of a single piece of evidence in that category may be sufficient.  On the other hand, the submission of voluminous documentation may not contain sufficient persuasive evidence to establish the alien beneficiary's eligibility.  The evidence provided in support of the petition must establish that the alien beneficiary "is one of that small percentage who have risen to the very top of the field of endeavor."  See 8 CFR 204.5(h)(2).

Remember that an alien may be stronger in one particular evidentiary area than in others; however, the overall impression should be that he or she is extraordinary.  Remember also that you cannot predetermine the kind of evidence you think the alien should be able to submit, and deny the petition if that particular type of evidence (whether one of the types listed in 8 CFR 204.5(h)(3) or "comparable evidence" under 8 CFR 204.5(h)(4)) is not there.  For example, you may think that if an alien is extraordinary, there should be published articles about the alien and his or her work.  However, you cannot deny the petition because no published articles were submitted, if evidence meeting three qualifying criteria has been submitted that demonstrates he or she is in fact extraordinary.  Approval or denial of a petition must be based on the type and quality of evidence that is submitted, not on evidence that you think should be there.

If you need to request additional evidence, you should provide some explanation of the deficiencies in the evidence already submitted and if possible, examples of persuasive evidence that the petitioner might provide to corroborate the statements made in the petition.  If a petitioner has submitted evidence that he or she believes establishes the alien's extraordinary ability, merely restating the evidentiary requirements or saying that the evidence submitted is not sufficient will not give the petitioner any clear guidance in overcoming the deficiencies.

<u>As noted above, under 8 CFR 204.5(h)(5), the beneficiary must intend to continue in the area of his or her expertise.</u>   Note though that there are instances where it is difficult to determine whether the alien's intended employment falls sufficiently within the bounds of his or her area of extraordinary ability.  Some of the most problematic cases are those where

the beneficiary's sustained national or international acclaim is based on his or her abilities as an athlete, but the beneficiary's intent is to come to the United States and be employed as an athletic coach or manager. Competitive athletics and coaching rely on different sets of skills and in general are not in the same area of expertise. However, many extraordinary athletes have gone on to be extraordinary coaches. In general, if a beneficiary has clearly achieved *recent* national or international acclaim as an athlete and has sustained that acclaim in the field of coaching/managing at a national level, adjudicators can consider the totality of the evidence as establishing an overall pattern of sustained acclaim and extraordinary ability such that we can conclude that coaching is within the beneficiary's area of expertise. Where the beneficiary has had an extended period of time to establish his or her reputation as a coach *beyond the years* in which he or she had sustained national or international acclaim as an athlete, depending on the specific facts, adjudicators may place heavier, or exclusive, weight on the evidence of the beneficiary's acclaim as a coach or a manager.

(D)  Letters of endorsement.  Many E11 petitions contain letters of endorsement. Letters of endorsement, while not without weight, should not form the cornerstone of a successful claim for the E11 classification. The statements made by the witnesses should be corroborated by documentary evidence in the record. The letters should explain in specific terms why the witnesses believe the beneficiary to be of E11 caliber. Letters that merely reiterate USCIS' E11 definitions or make general and expansive statements regarding the beneficiary and his or her accomplishments, are generally not persuasive. The relationship or affiliation between the beneficiary and the witness is also a factor to consider when evaluating the significance of the witnesses' statements. It is generally expected that an individual whose accomplishments have garnered sustained national or international acclaim would have received recognition for his or her accomplishments well beyond the circle of his or her personal and professional acquaintances. You may find that certain testimonials written by other individuals working in the alien's field of endeavor may be submitted as evidence. In some cases, such testimonials merely make general assertions about the alien, and at most, indicate that the alien is a competent, respected figure within the field of endeavor, but the authors fail to support such statements with sufficient concrete evidence. These letters should be considered, but do not necessarily show the beneficiary's claimed extraordinary ability.

(E)  Sustained National or International Acclaim.  Under 8 CFR 204.5(h)(3), a petition for an alien of extraordinary ability must be accompanied by evidence that the alien has sustained national or international acclaim and that the alien's achievements have been recognized in the field of expertise. In determining whether the beneficiary has enjoyed "sustained" national or international acclaim bear in mind that such acclaim must be uninterrupted and ongoing. If an alien

Memorandum for  Regional Directors, et al.                                          34
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

was recognized for a particular achievement several years ago, you must
determine whether the alien has maintained a comparable level of acclaim in the
field of expertise since the alien was originally afforded that recognition.  An alien
may have achieved extraordinary ability in the past but then failed to maintain a
comparable level of acclaim thereafter.  On the other hand, depending on the
nature of the acclaim, a one-time major achievement, such as a Nobel Prize,
might satisfy this requirement, provided it is probative of the fact that the alien
has reached the summit of his occupation.  In the absence of such a major,
international recognized award, however, the petitioner may not rely solely on the
alien beneficiary's past achievements to establish the alien's eligibility for
classification as an alien of extraordinary ability under section 203(b)(1)(A) of the
INA.  As noted in paragraph (A) above, the regulations allow the petitioner to
provide evidence that the alien beneficiary has the requisite sustained acclaimed
and recognition by submitting evidence of *at least three* of the following ten
criteria set forth in 8 CFR 204.5(h)(3).

> 1.  Alien's receipt of lesser nationally or internationally recognized prizes
> or awards for excellence in the alien's field (8 CFR 204.5(h)(3)(i)).   In
> evaluating evidence submitted in support of this criterion, the focus should
> be on the alien beneficiary's receipt of the award, as opposed to his or her
> employer's receipt of the award.  In addition, you should determine
> whether the prize or award itself meets the requisite standard of national
> or international recognition for excellence.  In determining the nature of the
> award or prize, relevant considerations would include, but not be limited
> to, the number of awardees or prize recipients as well as any regional
> limitations on competitors (a provincial award limited to competitors in that
> province, for example, might have little national significance.)  Another
> relevant consideration is that awards with national recognition will
> probably be reported in the media.  While such media reports may not
> focus on the alien, they might be relevant to the degree of recognition of
> the award itself.

> Note:  Scholarships, fellowships and competitive postdoctoral
> appointments generally are not the type of "nationally or internationally
> prizes or awards for excellence" that would establish that the alien has
> achieved sustained national or international acclaim and recognition in the
> alien's field of expertise.  Similarly, most academic or junior athletic/music
> awards would not satisfy this criterion

> 2.  Membership in Associations (8 CFR 204.5(h)(3)(ii)).  In order to satisfy
> 8 CFR 204.5(h)(3)(ii), the petitioner must present persuasive evidence to
> establish that the alien's significant achievements in the field were the
> basis for granting the alien's membership in the association.  Membership
> in an organization that is based solely on a level of education or years of

Memorandum for Regional Directors, et al.                                        35
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

experience in a particular field is not sufficient. Paying a fee or subscribing to an association's publications is also not sufficient. Similarly, you should note that membership in certain associations can be a requirement of an occupation, such as union membership or guild affiliation for actors. Compulsory membership in an association is not indicative of the alien's advanced standing in the field. Thus, for example, mere membership in a State bar, in the American Bar Association (ABA), or in the American Immigration Lawyers Association (AILA) should not be considered sufficient, as lawyers are generally required to be members of a State bar, most members of the bar are eligible to become ABA members, and most immigration lawyers may be eligible to join AILA. Rather, to satisfy 8 CFR 204.5(h)(3)(ii), the petitioner must show that the association's membership is exclusive, in the sense that membership is limited solely to those who have been judged by their peers as having attained outstanding achievements in the field for which classification is sought. An alien's election by her professional peers and colleagues to the National Academies of Sciences and Engineering, an honorific society that currently generally bases membership nominations on original research and accomplishment in the field, therefore would likely be sufficient to satisfy 8 CFR 204.5(h)(3)(ii).

3. Published Material About the Alien (8 CFR 204.5(h)(3)(iii)). To satisfy 8 CFR 204.5(h)(3)(iii), the petitioner should submit evidence of published material in professional or major trade publications or in other major media publications about the alien's contributions to the field that clearly identifies the circulation and the intended audience of the publication. Regional publications or publications aimed at a particular ethnic or language group generally will be sufficient only if the publications are considered the top publications in the field, or the publications enjoy national or international circulation and reputation beyond that of the publications' intended audience and the material about the alien beneficiary is published in a section of the publication that is national in scope. Examples of such qualifying regional publications might include The Wall Street Journal, the New York Times, the New England Journal of Medicine, or the Christian Science Monitor. The burden is on the petitioner to establish that a particular publication is covered by this regulatory provision.

In addition, in order to satisfy 8 CFR 204.5(h)(3)(iii), the evidence should establish the significance of the published material submitted as it relates to the alien's contributions and how the alien is one of that small percent who have risen to the very top of his or her field. Articles about the organizations and projects that the alien beneficiary is affiliated with or involved in, but that do not mention the alien or only mention him or her in

passing, generally are not persuasive. The alien and his or her accomplishments should be the focal point of the published material. In addition, marketing materials created for the purpose of selling the alien's products or promoting his or her services are not generally considered to be published material about the beneficiary. Please note that, absent further documentation establishing how the alien is extraordinary in a particular field, mere citations to an alien's work are not sufficient to satisfy 8 CFR 204.5(h)(3)(iii).

4. Judge of the work of others (8 CFR 204.5(h)(3)(iv)). Evidence that the beneficiary has been, or is judging the dissertation work as an external referee, particularly of a Ph.D. in an area of prominent research or study, could also be probative of the alien's outstanding ability as a judge of the work of others for purposes of satisfying 8 CFR 204.5(h)(3)(iv). In addition, evidence that an alien has been asked to review scientific or scholarly articles written by others in the field prior to their acceptance for publication in journals or periodicals that enjoy widespread circulation and readership in the field of endeavor may satisfy this criteria. You should bear in mind; however, when evaluating such evidence, that it is being submitted to establish that the alien has sustained national or international acclaim as well as recognition in the alien's field of expertise. It is therefore reasonable for the petitioner to submit an explanation of the significance of the alien's experience in judging the work of others in the field.

5. Alien's contributions to the field. (8 CFR 204.5(h)(3)(v). To satisfy 8 CFR 204.5(h)(3)(v), the petitioner must submit evidence of the beneficiary's original contributions of major significance to the alien's field of endeavor. Although funded and published work may be "original," this alone is insufficient; you must evaluate whether the work constitutes a major, significant contribution to the field. Note that, in evaluating such evidence, a footnoted reference to the alien's work without evaluation, an unevaluated listing in a subject matter index, or a negative or neutral review of the alien's work would be of little or no value. On the other hand, peer-reviewed presentations at academic symposia or peer-reviewed articles in scholarly journals that have provoked widespread commentary and/or received acclaim from others working in the field, unsolicited requests for copies of the alien's scientific abstracts or published research papers, entries (particularly a goodly number) in a citation index which cite the alien's work as authoritative in the field, or participation by the alien as a reviewer for a peer-reviewed scholarly journal would very likely be probative of the beneficiary's ability.

Scientific Citations: In the scientific community, citations are generally

Memorandum for Regional Directors, et al.                                         37
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

required when a researcher uses the research findings of another scientist as part of their own research.  Such citations are, therefore, not considered to be particularly probative as to whether the alien has extraordinary ability in the field of endeavor, unless shown otherwise.  When evaluating citations to an alien beneficiary's work, you must determine the significance of the alien beneficiary's original contribution to the field that resulted in the citation.  In some cases, inclusion of a lengthy list of referenced articles that often accompany published articles might be probative of the alien's ability because the alien's contributions served as a significant, original "find" that spurred the subsequent references and citations.  Similarly, frequent citation by independent researchers may demonstrate widespread interest in, and reliance on, the beneficiary's work and may serve as persuasive evidence that the beneficiary is authoritative in the field.  For example, published research by others in the field that is based on, and consistently references and cites, an advanced technology for monitoring environmental ecosystems developed by the alien beneficiary would likely be relevant to a finding of extraordinary ability.  On the other hand, published research by others in the field that cites to the alien beneficiary's similar research techniques (i.e., cites confirming that the alien beneficiary's previous research was also conducted using a 4 ml vial), without accrediting any significant research findings to the alien, may not be probative.

Bear in mind that scientific researchers live constantly under the cloak of potential plagiarism and so must always give credit to other investigators involved in the same small area of investigation.  Such credit may or may not say anything to the merits of the other scientists' work.  Some of the listings that you may see are simply aids to finding literature available in the field and not an evaluation of the work.  It is for you to evaluate the evidence submitted to determine whether such citations are an indication that the alien has the requisite ability.

6.  Scholarly Articles.  To satisfy 8 CFR 204.5(h)(3)(vi), the petitioner must present evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media.  The evidence should establish the significance or value of the published material and how it has set the alien apart as one of the small percent who has risen to the very top of his or her field.  The most persuasive evidence in this regard is unsolicited contemporaneous documentation that shows that independent experts or organizations in the field consider the published material to be significant or that the beneficiary's findings or methodologies have been widely cited or adopted by the industry or professional community at large.  For example, peer-reviewed

presentations at academic symposia or peer-reviewed articles in scholarly journals that have provoked widespread commentary and /or received acclaim from others working in the field of endeavor, might satisfy this criterion.  On the other hand, a book by the alien that was published by a "vanity" press, or a poster or abstract presentation at an academic symposium that garnered little or no commentary from others involved in the field would be of little or no value.  Likewise, the alien's internal work product that was created for his or her employer or its clients as part of the scope of the alien's employment is not generally considered to be significant for purposes of satisfying 8 CFR 204.5(h)(3)(vi) (which requires publication of material in professional or trade publications or major media), unless shown otherwise through corroborative, independent documentary evidence.

Note:  It is significant to note that the March 31, 1998 Report and Recommendations of the Association of American Universities' Committee on Postdoctoral education, set forth (on page 5 of its report) recommended definition of a postdoctoral appointment.  Among the factors in this definition were the acknowledgement that the "appointment is viewed as preparatory for a full-time academic and/or research career" and that "the appointee has the freedom, *and is expected*, to publish the results of his or her research or scholarship during the period of the appointment." (emphasis added) Thus, this national organization considers publication of a researcher's work to be "expected," rather than a mark of distinction, among postdoctoral researchers.  Note:  When scientific citations are presented as evidence of the alien's publications, please refer to the discussion in the section on 8 CFR 204.5(h)(3)(v), above.

Note also:  Articles that were published in foreign language periodicals should be accompanied by an English translation sufficient to demonstrate that the alien beneficiary authored the piece.  See 8 CFR 103.2(b)(3).  Obtaining full English translations of published material can be burdensome, thus you should not request complete translations unless absolutely necessary to evaluate to quality of the material.   In many cases, such an evaluation of the material can be sufficiently conducted without a complete translation.  The evidence should also show the date that the article was published and the circulation and readership of the periodical.

Note also:  In some cases, such as those involving scientists, this criterion might be satisfied by a showing of conference presentations, provided such evidence is indicative of the requisite sustained national or international acclaim.

7. Display of the alien's work in the field at artistic exhibitions or showcases.  (8 CFR 204.5(h)(3)(vii)).  In evaluating evidence submitted to meet this criterion, the mere fact that the alien has had his or her work exhibited does not necessarily establish the alien's extraordinary ability within the field.  The petitioner must demonstrate the exhibition or showcase is itself of distinction and that the alien beneficiary's exhibited work at such an exhibition or showcase was itself of such significance as to be probative of the fact that the alien has sustained national or international acclaim in his or her field of expertise.  On the other hand, where the evidence submitted shows merely that an artist or performer had a "bit part" role in a significant artistic performance or that the alien's overall contribution to an exhibit displayed at a distinguished venue was very minor, such evidence may not be very persuasive in terms of establishing that this criterion has been met.

8. Performance in a critical or leading role for organizations or establishments having a distinguished reputation.  (8 CFR 204.5(h)(3)(viii)).  Pursuant to 8 CFR 204.5(h)(3)(viii), evidence must show that the alien has performed in a "leading or critical role" within a distinguished organization or establishment.  The evidence must establish that the alien has played more than just a supporting role and that the organization or establishment has a distinguished reputation or has hosted other distinguished productions in the recent past.  In evaluating such evidence, you must examine the position that the alien was hired or appointed to fill on behalf of the organization or establishment and determine whether the alien's position therein is (or was), a "leading" or "critical" one.  You must also determine whether the organization or establishment itself is in fact distinguished.

Note:  In evaluating the alien's position, the key question is whether the alien's role was leading or critical to the entire organization, as opposed to a mere department within the organization.

Note also:  Documentation about the organization or establishment that does not specifically refer to the beneficiary and his or her contributions is not persuasive evidence of the significance of the role played by the beneficiary on behalf of the organization; it merely goes to the reputation of the organization or establishment itself.

9. High salary or remuneration (8 CFR 204.5(h)(3)(ix)).   To satisfy this criterion, the petitioner must show that the alien beneficiary has commanded a significantly high salary or remuneration for services, in relation to others in the field.   In this regard, evidence that the alien has commanded a salary or other remuneration significantly higher than others at the alien's workplace would not be sufficient to establish the alien's

outstanding role within his or her field without further, objective additional evidence.  Additionally, the submission of official U.S. Department of Labor prevailing wage rate information for the alien's field of endeavor, without other corroborative evidence, generally would not meet this criterion, as it might not establish whether the salary or other remuneration is "significantly" higher than that of others in the field.  Such prevailing wage rate information should normally be accompanied by other documentation satisfactorily explaining why the petitioner believes the alien beneficiary's salary or remuneration is significantly higher than that of others in the alien's specific field.

10. <u>Commercial success in the performing arts (8 CFR 204.5(h)(3)(x))</u>. This criterion focuses on volume of sales and box office receipts. Therefore, the mere fact that an alien has recorded and released musical compilations or performed in theatrical, motion picture or television productions would be insufficient, in and of itself, to establish eligibility under this provision.

(F) <u>Comparable evidence (8 CFR 204.5(h)(4)</u>.  This regulatory provision, as noted above, provides petitioners the opportunity to submit comparable evidence to establish the alien beneficiary's eligibility, if the standards described in 8 CFR 204.5(h)(3) do not readily apply to the alien's occupation.  When evaluating such "comparable" evidence, consider whether the criteria are readily applicable to the alien's occupation and, if not, whether the evidence provided is really comparable to the objective criteria listed in the regulations.  General assertions that the ten objective criteria described in 8 CFR 204.5(h)(3) do not readily apply to the alien's occupation are not probative and should be discounted.  Similarly, claims that USCIS should accept witness letters as comparable evidence are not persuasive.  The petitioner should explain clearly why it has not submitted evidence that would satisfy at least three of the criteria set forth in 8 CFR 204.5(h)(3) as well as why the evidence it has submitted is "comparable" to that required under 8 CFR 204.5(h)(3).  On the other hand, the following are examples of where 8 CFR 204.5(h)(4) might apply.

1) An alien beneficiary who is an Olympic coach whose athlete wins an Olympic medal while under the principal tutelage of the alien might provide support to a petitioner's argument that the success of this athlete is evidence comparable to that in 8 CFR 204.5(h)(3)(i), since that section might not readily apply to certain types of athletic coaches, if coaches in their field do not typically receive nationally recognized coaching awards.

2) A bestselling author might be able to demonstrate evidence comparable to the specific evidence required for commercial success in 8 CFR 204.5(h)(3)(x) even though he or she is not a performing artist.

3) Election to a national all-star team might serve as comparable evidence for evidence of memberships in 8 CFR 204.5(h)(3)(ii).

Note:  There is no comparable evidence for the one-time achievement of a major, international recognized award.

Note also:  As discussed above, in certain cases, one type of evidence may be sufficient to satisfy more than one of the criteria set forth in 8 CFR 204.5(h)(3). Similarly, in some cases, one type of "comparable" evidence submitted in connection with 8 CFR 204.5(h)(4) might satisfy more than one of the criteria set forth in 8 CFR 204.5(h)(3).

(G) Evaluating E11 petitions filed on behalf of O-1 nonimmigrants:  In some cases an E11 petition may be filed on behalf of an alien who was previously granted the O-1, alien of extraordinary ability nonimmigrant classification. Though the prior approval of an O-1 petition on behalf of the alien may be a relevant consideration in adjudicating the E11 petition, you are not bound by the fact that the alien was previously accorded the O-1 classification if the facts do not support approval of the E11 petition; eligibility as an O-1 nonimmigrant does not automatically establish eligibility under the E11 criteria for extraordinary ability.  Each petition is separate and independent, and must be adjudicated on its own merits, under the corresponding statutory and regulatory provisions. Moreover, the O-1 nonimmigrant classification includes different standards and criteria for aliens in the arts, athletics, and the motion picture industry.  In such cases, there would be nothing inconsistent about finding that an alien in the arts has "distinction" according to the nonimmigrant criteria, but not "national or international acclaim" according to the immigrant criteria.

You should be aware that, some courts, notwithstanding the fact that each petition must be adjudicated on its own merits, have asked USCIS to provide an explanation as to why, if the alien had previously been classified in a roughly analogous nonimmigrant category, USCIS has determined that the alien is not eligible for classification in the employment-based immigrant visa classification in question.   For this reason, where possible, it would be appropriate to provide a brief discussion, *geared to the specific material facts of the underlying I-140 petition*, as to why, notwithstanding the previous nonimmigrant visa petition approvals, the petitioner has failed to meet its burden to establish eligibility for approval of the I-140 petition.

## (2) E12 Outstanding Professors and Researchers - Section 203(b)(1)(C) of the INA.

(A) Evaluating Evidence Submitted in Support of a Petition for an Outstanding Professor or Researcher.  8 CFR 204.5(i) describes the evidence which must be

submitted in support of an I-140 petition for an outstanding professor or
researcher.  The same general guidelines discussed in the preceding section
relating to the adjudication of a petition for an alien of extraordinary ability apply to
the adjudication of a petition for an outstanding professor or researcher.  However,
unlike the requirement for the E11, alien of extraordinary ability petition, that the
alien must have garnered sustained *national or international* acclaim in the field of
endeavor, the evidence that must be provided in support of E12, outstanding
professor or researcher petitions must demonstrate that the alien is recognized
*internationally* as outstanding in the academic field specified in the petition.  See
8 CFR 204.5(i)(3)(i).  In addition the petition must be accompanied by an offer of
permanent, tenured, or tenure-track employment (in the case of research
positions, the offer must be for a "permanent" research position) from a qualifying
prospective employer and evidence that the alien has had at least three years of
experience in teaching or research in the "academic field" in which the alien will
be engaged.  8 CFR 204.5(i)(3)(ii) and (iii).  The definitions for "permanent" and
"academic field" can be found in 8 CFR 204.5(i)(2).

(B) Employment Offer.  Although a labor certification is not required for the E12
classification, 8 CFR 204.5(j)(3)(iii) requires that the petitioner provide an offer of
employment as initial evidence in support of a first preference petition filed on
behalf of an outstanding professor or researcher. The offer of employment may
be in the form of a letter from the petitioning employer (i.e., U.S. university or
institution of higher learning or a department, division, or institute of a private
employer) stating that the employment is a tenured or tenure-track teaching
position or a "permanent" research position in the alien's academic field. See 8
C.F.R. § 204.5(i)(3)(iii)(A)-(C).

The word "Permanent", in reference to a research position, is defined as:

> "either tenured, tenure-track, or for an indefinite or unlimited
> duration, and in which the employee will ordinarily have an
> expectation of continued employment unless there is good
> cause for termination."
> 8 C.F.R. § 204.5(i)(2).

Note:  Many research positions may be permanent, but not be tenure-track.  As
noted below, such a position may still qualify for E12 classification.

(C) "Permanent" for Research Positions.  Adjudicators should not deny a petition
where the employer is seeking an outstanding researcher solely because the
actual employment contract or offer of employment does not contain a "good
cause for termination" clause.  The petitioning employer, however, must still
establish that the offer of employment is intended to be of an indefinite or
unlimited duration and that the nature of the position is such that the employee

Memorandum for  Regional Directors, et al.                                    43
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

will ordinarily have an expectation of continued employment.  For example, many research positions are funded by grant money received on a yearly basis. Researchers, therefore, are employed pursuant to employment contracts that are valid in one year increments.  If the petitioning employer demonstrates, however, the intent to continue to seek funding and a reasonable expectation that funding will continue (such as demonstrated prior renewals for extended long-term research projects) such employment can be considered "permanent" within the meaning of 8 CFR 204.5(i)(2).  Adjudicators should also consider the circumstances surrounding the job offer as well as the benefits attached to the position.  A position that appears to be limited to a specific term, such as in the example above, can meet the regulatory test if the position normally continues beyond the term (i.e., if the funding grants are normally renewed).

(D) Tenure or Tenure-Track Positions.  The determination as to whether a position qualifies as a tenured or a tenure-track position is not linked to the regulatory requirement that the position be "permanent" as defined in 8 C.F.R. 204.5(i)(2). 8 C.F.R. 204.5(i)(2) applies only to "research positions." Adjudicators do not need to evaluate whether the employment contract for a tenured or tenure-track position has a "good cause for termination" clause, and should not deny a petition seeking an outstanding professor for a tenured or tenure-track position on that basis alone. Adjudicators, however, should continue to evaluate whether the overall nature of the position is tenured or tenure-track. Note, USCIS will not equate tenured or tenured-track positions with those that are temporary, adjunct, limited duration fellowships or similar positions, where the employee has no reasonable expectation of long-term employment with the university.

**(3) E13 Multinational Executives and Managers – Section 203(b)(1)(C) of the INA.**

(A) Explanation of Terms.  Except as otherwise noted, terms pertaining to the certain multinational executives and managers have the same meanings as discussed in Chapter 32.2 of this field manual.

As described in 8 CFR 204.5(j)(3), the petitioner must demonstrate that the:

- U.S. organization and the organization abroad maintain a qualifying relationship;
- U.S. organization and the organization abroad are both actively engaged in doing business; and
- U.S. organization has been actively engaged in doing business for at least one year.

In addition, under 8 CFR 204.5(g)(2), the petitioner must demonstrate that the U.S. organization has the ability to pay the beneficiary's salary.

Memorandum for  Regional Directors, et al.                                      44
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

(B) Qualifying relationship between the U.S. employer and the organization
abroad.  When an employer wishes to transfer an alien employee working abroad
to a U.S. company location as an E13 immigrant, a qualifying relationship must
exist between the foreign employer and the U.S. employer.  A qualifying
relationship exists when the U.S. employer is an affiliate, parent or a subsidiary
of the foreign firm, corporation, or other legal entity, as specified in 8 CFR
204.5(j)(2).  To establish a "qualifying relationship" under the Act and the
regulations, the petitioner must show that the beneficiary's foreign employer and
the proposed U.S. employer are the same employer (i.e., a U.S. entity with a
foreign office) or related as a "parent and subsidiary" or as "affiliates."  See
generally § 203(b)(1)(C) of the Act, 8 U.S.C. § 1153(b)(1)(C); see also 8 CFR
204.5(j)(2) (providing definitions of the terms "affiliate" and "subsidiary").  In this
regard, "ownership" and "control" are the factors that must be examined in
determining whether a qualifying relationship exists between the United States
and foreign entities for purposes of this visa classification.  See 8 CFR
204.5(j)(2)(definitions of "affiliate" and "subsidiary").  The foreign entity must own
and control the U.S. entity.  See Matter of Church Scientology International, 19
I&N Dec. 593 (BIA 1988); see also Matter of Siemens Medical Systems, Inc., 19
I&N Dec. 362 (BIA 1986); Matter of Hughes, 18 I&N Dec. 289 (Comm. 1982).  In
the context of this visa petition, ownership refers to the direct or indirect legal
right of possession of the assets of an entity with full power and authority to
control; control means the direct or indirect legal right and authority to direct the
establishment, management, and operations of an entity.  Matter of Church
Scientology International, 19 I&N Dec. at 595.

(1) Subsidiary and Parent:  Under 8 CFR 204.5(j)(2), the term "subsidiary" means
   a firm, corporation, or other legal entity of which a parent: (a) owns, directly or
   indirectly, more than half of the entity and controls the entity; (b) owns,
   directly or indirectly, half of the entity and controls the entity; (c) owns, directly
   or indirectly, 50 percent of a 50-50 joint venture and has equal control and
   veto power over the entity; or (d) owns, directly or indirectly, less than half of
   the entity, but in fact controls the entity.  While the term "parent" is not directly
   defined by the regulations, it is the owner of a subsidiary.

(2) Affiliate: 8 CFR 204.5(j)(2)(A)–(C) sets forth three types of qualifying affiliate
   relationships: (1) One of two subsidiaries, both of which are owned and
   controlled by the same parent or individual; (2) One of two legal entities
   owned and controlled by the same group of individuals, each owning and
   controlling approximately the same share or proportion of each entity; or (3) A
   partnership (or similar organization) that is organized outside the United
   States to provide accounting services to the U.S. partnership.  Such a
   partnership shall be considered affiliated with a partnership organized within

the United States if the foreign partnership markets its services under the same internationally recognized name acquired through an agreement with a worldwide coordinating organization that is owned and controlled by the member accounting firms, a partnership (or other similar organization) as the U.S. partnership.

(3) Branch Offices: While the L-1 nonimmigrant visa regulations allow for a "branch office" to petition for a manager or executive, the E13 immigrant visa regulations do not provide for a foreign branch office as a petitioner.  The nonimmigrant regulations define the term "branch" as "an operating division or office of the same organization housed in a different location." 8 CFR 214.2(l)(1)(ii)(J).

Neither an unincorporated branch office of a foreign employer nor a nonimmigrant alien is competent to offer permanent employment to a beneficiary for the purpose of obtaining an immigrant visa for the beneficiary under section 203(b)(1)(C) of the Act.  See Matter of Thornhill, 18 I&N Dec. 34 (Comm. 1981).  The petitioner must be a U.S. citizen, corporation, partnership, or other legal entity to file this immigrant visa petition.  Thus, a U.S. corporation with an overseas branch may file an E13 petition, but a foreign corporation with a branch office in the United States may not.

> NOTE: Adjudicators should keep in mind the difference between a "self-incorporated" petitioner and a "sole proprietorship."  Although a self-incorporated individual may only have one owner or employee, a corporation is a separate and distinct legal entity from its owners or stockholders and may petition for that owner or employee.  See Matter of M, 8 I&N Dec. 24, 50 (BIA 1958, AG 1958); Matter of Aphrodite Investments Limited, 17 I&N Dec. 530 (Comm. 1980); and Matter of Tessel, 17 I&N Dec. 631 (Act. Assoc. Comm. 1980).

A "sole-proprietorship," on the other hand, is a business in which one person operates the business in his or her personal capacity.  Black's Law Dictionary 1398 (7th Ed. 1999).  Unlike a corporation, a sole proprietorship does not exist as an entity apart from the individual owner.  See Matter of United Investment Group, 19 I&N Dec. 248, 250 (Comm. 1984).  A sole-proprietorship may not file an E13 petition on behalf of the alien owner, as such would be considered an impermissible self-petition.

(4) Limited Liability Corporations (LLCs):  An LLC is deemed to be a separate entity from its members, and may therefore file an immigrant visa petition on behalf of a manager or executive.  An LLC is a relatively new business structure allowed by state statute.  LLCs are popular because, similar to a

corporation, owners have limited personal liability for the debts and actions of the LLC.  Other features of LLCs are more like a partnership, providing management flexibility and the benefit of pass-through taxation.  LLCs may have one or more members.  Generally, when an LLC has only one member, the IRS will disregard or ignore the fact that it is an LLC for the purpose of filing a federal tax return.  Note though that this is only a mechanism for tax purposes, and does not change the fact that the LLC is legally a separate entity from the member.  Similarly, even though most multiple member LLCs file a Form 1065 partnership tax return, the LLC is still, legally, a separate entity.

(C) <u>Doing Business.</u> "Doing business" means the regular, systematic, and continuous provision of goods and/or services by a qualifying organization.  Doing business <u>does not include</u> the mere presence of an agent or office of the qualifying organization in the United States and abroad.  [See 8 CFR 204.5(j)(2)]

(1) <u>Foreign employer must continue to do business.</u>  Both the U.S. employer and at least one qualifying organization abroad must be doing business up until the time of visa issuance or adjustment of status.  The mere presence of an office or an agent either in the United States or abroad is not considered to be doing business for E13 purposes.

    Note:  If the beneficiary's overseas employer's foreign operations cease entirely (e.g., the company, together with all other otherwise qualifying related organizations, goes out of business or if the company, together with all otherwise qualifying related organizations relocates completely to the United States) prior to the time of visa issuance or adjustment of status, the beneficiary will no longer be eligible for E13 immigrant visa classification.

(2) <u>U.S. employer must have been doing business for at least one year</u>:  The U.S. petitioner must be actively engaged in doing business for at least one year at the time of filing of the petition.  (See 8 CFR 204.5(j)(3)(i)(D))  There is no "new office" provision for persons seeking to immigrate under the E13 category as there is for certain aliens who seek admission as L-1 nonimmigrants in order to open or be employed in a new office in the United States.  See 8 CFR 214.2(l)(3)(v).  Note that because of the "doing business" requirement, a U.S. organization may have a legal existence in the United States for more than one year, but if it has not engaged in the continuous provision of goods and services for at least one year, then the organization is ineligible to file E13 petitions.

(D) <u>Multinational Executive or Manager</u>.  Since 1990, this group, which was

Memorandum for Regional Directors, et al.                                                    47
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

formerly designated under the U.S. Department of Labor's regulations as
"Schedule A Group IV," is now a separate visa classification under section
203(b)(1)(C) of the INA.  An I-140 filed on behalf of such an executive or manager
must be accompanied by a permanent job offer in a primarily managerial or
executive position with a qualifying U.S. employer.  A labor certification is not
required for this classification.  See section 212(a)(5)(D) of the INA; 8 CFR
204.5(j)(5).  Under 8 CFR 204.5(j)(3)(i)(A), the petition must demonstrate that the
beneficiary was employed abroad by a qualifying organization for one year out of
the previous three years.  Note that, unlike the L-1 nonimmigrant classification, the
year of qualifying employment does not have to be "continuous."  Compare section
101(a)(15)(L) (requiring that the alien have been employed "continuously" abroad
for the one year period) with section 203(b)(1)(C) of the Act (requiring that the alien
be employed overseas for "at least one year."

As noted, the regulations at 8 CFR 204.5(j)(3)(i)(D) require that the petitioning U.S.
employer have been doing business in the United States for at least one year
before filing an I-140 petition for its managers and executives (a similar provision
was in Schedule A Group IV).  Also, as noted above, unlike the L-1A nonimmigrant
classification, aliens seeking to enter the United States to open a new office are
not eligible for the E13 immigrant classification.  The regulations at 8 CFR
204.5(j)(3)(D) specifically require that the individual be coming to an existing
business in the United States.  This requirement was based in part on the pre-
existing Schedule A, Group IV requirement.  It was also based on the fact that,
unlike the case of an L-1 new office petition, which, under 8 CFR 214.2(l)(14)(ii),
may only be extended upon a showing that the U.S. entity has been doing
business for the previous year, E13 immigrant visa classification is permanent in
nature; there is no  "conditional resident" status until a showing is made that the
new business has in fact grown into an ongoing viable concern.

(E) Managerial Capacity:  The statutory definition of "managerial capacity" allows
for both "personnel managers" and "function managers."  See section
101(a)(44)(A)(i) and (ii) of the Act.

As it relates to "personnel managers," managerial capacity means an assignment
within an organization in which the beneficiary ***primarily***:

- Manages the organization, department, subdivision, function, or component of
  the organization;
- Supervises and controls the work of other supervisory, professional, or
  managerial employees;
- Possesses authority to hire and fire or recommend those and other personnel
  actions (such as promotion and leave authorization) for employees directly
  supervised; and

Memorandum for  Regional Directors, et al.                                          48
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- Exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

Contrary to the common understanding of the word "manager" as any person who supervises others, the statute has a much more limited definition of the term "manager."  Under section 101(a)(44)(A) of the Act, a first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.  See also 8 CFR 204.5(j)(4)(i)).  Further, if staffing levels are used as a factor in determining whether the alien is functioning in a managerial or executive capacity, you should not merely rely on the number of employees the beneficiary is supervising, but should look at the beneficiary's role and function within the organization.  (8 CFR 204.5(j)(4)(ii)).

(1) <u>Function Managers</u>: The term "functional" or "function manager" applies generally when a beneficiary does not supervise or control the work of a subordinate staff but instead is primarily responsible for managing an "essential function" within the organization.  See section 101(a)(44)(A)(ii) of the Act, 8 U.S.C. § 1101(a)(44)(A)(ii).

The definition of the term "manager" includes functional managers.  Section 101(a)(44)(A).  A manager may qualify for E13 classification as a functional manager if the petitioner can show, among other things, that the beneficiary will be primarily managing or directing the management of a function of an organization, even if the beneficiary does not directly supervise any employees.

As it relates to "function managers," managerial capacity means an assignment within an organization in which the beneficiary ***primarily***:

- Manages the organization, or a department, subdivision, function, or component of the organization;
- Manages an essential function within the organization, or a department or subdivision of the organization;
- Functions at a senior level within the organizational hierarchy or with respect to the function managed; and
- Exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

See 8 CFR 204.5(j)(2).

It must be clearly demonstrated, however, that the "essential function" being managed is not also being directly performed by the alien beneficiary.  For

example, an alien who claims to primarily direct the laboratory research on chemical compounds for a specialty chemical company cannot also be primarily performing the day-to-day laboratory research.  An employee who primarily performs the tasks necessary to produce a product or to provide services is not considered to be employed in a managerial or executive capacity.  Boyang, Ltd. v. I.N.S., 67 F.3d 305 (Table), 1995 WL 576839 (9th Cir, 1995)(citing Matter of Church Scientology International, 19 I&N Dec. 593, 604 (Comm. 1988)).

In applying the statute and applicable regulations to determine whether the beneficiary meets the definition of a "manager" of a function, it is useful to turn to Barron's Dictionary of Business Terms, which defines functional authority as "staff ability to initiate as well as to veto action in a given area of expertise.  Functional authority allows decisions to be implemented directly by the staff in question.  Areas where functional authority is found are accounting, labor relations, and employment testing."  A business textbook, Management for Productivity, by John R. Schermerhorn, Jr., defines functional authority as "[t]he authority to act within a specified area of expertise and in relation to the activities of other persons or units lying outside the formal chain of command."  A functional manager is defined as a "manager who has responsibility for one area of activity such as finance, marketing, production, personnel, accounting, or sales."

An important, although not necessarily determinative, factor in determining whether an individual qualifies as a functional manager is the alien's authority to commit the company to a course of action or expenditure of funds.  Functional managers perform at a senior level in the organization and may or may not have direct supervision of other employees.

(2) Executive Capacity:  The statutory definition of the term "executive capacity," found at section 101(a)(44)(B) of the Act, 8 U.S.C. § 1101(a)(44)(B, focuses on a person's position within an organization.  To adjudicate an E13 petition properly, therefore, you should have a basic understanding not only of the position the beneficiary intends to fill, but also of the nature and structure of the organization itself.

Under section 101(a)(44)(B), the term "executive capacity" means an assignment within an organization in which the employee ***primarily***:

- Directs the management of the organization or a major component or function of the organization;
- Establishes the goals and policies of the organization, component, or function;

Memorandum for  Regional Directors, et al.                                    50
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- Exercises wide latitude in discretionary decision-making; and
- Receives only general supervision or direction from higher-level executives, the board of directors, or stockholders of the organization.

An individual will not be deemed an executive under the statute simply because they have an executive title or because some portion of their time is spent "directing" the enterprise as the owner or sole managerial employee; the focus is on the primary duties of the individual.  In this regard, there must be sufficient staff (e.g., contract employees or others) to perform the day-to-day operations of the petitioning organization in order to enable the beneficiary to be primarily employed in the executive function.  As discussed in detail below, the petitioner must also establish that the U.S. entity itself is in fact conducting business at a level that would require the services of an individual primarily engaged in executive (or managerial) functions.  In making this determination, you should consider, as appropriate, the nature of the business, including its size, its organizational structure, and the product or service it provides.

(G) <u>Evaluating Managerial or Executive Status</u>:  When examining the executive or managerial capacity of the beneficiary, an adjudicator should look first to the petitioner's description of the job duties.  See 8 CFR 204.5(j)(5).  Specifics are an important indication of whether a beneficiary's duties are primarily executive or managerial in nature.  Merely repeating or paraphrasing the language of the statute or regulations does not satisfy the petitioner's burden of proof.

If the beneficiary performs non-managerial administrative or operational duties, the description of the beneficiary's job duties must demonstrate what proportion of the beneficiary's duties is managerial in nature, and what proportion is non-managerial.  A beneficiary that primarily performs non-managerial or non-executive duties will not qualify as a manager or executive under the statutory definitions.

Beyond the petitioner's description of the beneficiary's proposed job duties, adjudicators should review the totality of the evidence, including descriptions of a beneficiary's duties and his or her subordinate employees, the nature of the petitioner's business, the employment and remuneration of other employees, and any other facts contributing to a complete understanding of a beneficiary's actual role in a business.  The evidence must substantiate that the duties of the beneficiary and his or her subordinates correspond to their placement in an organization's structural hierarchy; in this regard, artificial tiers of subordinate employees and inflated job titles are not probative.  For smaller organizations, it may be helpful to request a description of the overall management and executive personnel structure supported by position descriptions for the managerial and executive staff-members of the organization.  For organizations that are substantial

Memorandum for  Regional Directors, et al.                                        51
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

in size, it may be helpful to request comparable descriptions for the organizational unit where the alien beneficiary is to be employed.  If you believe that the facts stated in the petition are not true, and can articulate why in your denial, then that assertion may be rejected.  Section 204(b) of the Act.

> **Note:** If staffing levels are used to determine whether a beneficiary's job capacity is primarily "executive" or "managerial" in nature, the reasonable needs of the business enterprise in light of its overall purpose and stage of development shall be considered.  See section 101(a)(44)(C) of the Act; 8 CFR 204.5(j)(4)(ii).  However, in evaluating reasonable needs, an adjudicator should not hold a petitioner to his or her undefined and unsupported view of "common business practice" or "standard business logic."  It is the petitioner's burden to demonstrate the company's reasonable needs with respect to staff or the organization's structure.  See section 101(a)(44)(C) of the Act.

> **Note also**:  As indicated above, a single-person office is not precluded from being classified as an multinational manager or executive for E13 purposes, provided the requisite corporate affiliation exists and all other requirements are met.  You should note, nevertheless, that it may be very difficult for a petitioner to establish that the sole employee will be engaged *primarily* in a managerial (or executive) function.  While a sole employee or "self-employed" person will have some managerial (or executive) duties, simply to keep the business running, he or she will normally be spending the majority of his/her work time doing the day-to-day work of the business, that is, performing the type of duties that persons who would normally be employed in the business in question would perform, were the alien not self-employed.

(H) Evaluating E13 petitions filed on behalf of L-1A nonimmigrants:  In some cases, you may be required to adjudicate an E13 petition that was filed on behalf of a manager or executive who was previously granted L-1A nonimmigrant classification as a nonimmigrant manager or executive.  Though the prior approval of an L-1A petition on behalf of the alien may be a relevant consideration in adjudicating the E13 petition, you are not bound by the fact that the alien was previously accorded the L-1A classification if the facts do not support approval of the E13 petition.  Eligibility as an L-1A nonimmigrant does not automatically establish eligibility under the E13 criteria for extraordinary ability; each petition is separate and independent, and must be adjudicated on its own merits, under the corresponding statutory and regulatory provisions.

You should be aware that some courts, notwithstanding the fact that each petition must be adjudicated on its own merits, have asked USCIS to provide an

explanation as to why, if the alien had previously been classified in a roughly analogous nonimmigrant category, USCIS has determined that the alien is not eligible for classification in the employment-based immigrant visa classification in question.   For this reason, where possible, it would be appropriate to provide a brief discussion, *geared to the specific material facts of the underlying I-140 petition*, as to why, notwithstanding the previous nonimmigrant visa petition approvals, the petitioner has failed to meet its burden to establish eligibility for approval of its I-140 petition.

> **Note also**:  Unlike in the case of the L-1B nonimmigrant classification, there is no provision of law that allows an individual who was/is employed in a purely specialized knowledge capacity abroad to be classified as a "specialized knowledge" E13 immigrant. However, it should be noted that some E13 beneficiaries who are classified as L-1B nonimmigrants might qualify for the E13 classification because their specialized knowledge employment abroad also would have qualified as managerial or executive employment and because the petitioners intend to employ them in managerial or executive positions on a permanent basis.

**(j) Special Considerations Relating to EB-2 Cases**.

**(1) Advanced Degree Professionals**.

(A) Eligibility.  To qualify for this immigrant classification, two requirements must be satisfied:  the alien must be a member of the professions holding an advanced degree or foreign equivalent; and the underlying position must require, at a minimum, a professional holding an advanced degree or the equivalent.

(B) Foreign Equivalent.  Pursuant to section 203(b)(2)(A) of the INA certain "qualified immigrants who are members of the professions holding advanced degrees or their equivalent..." are eligible for E21 immigrant classification.  The Joint Explanatory Statement of the Committee of Conference, made at the time Congress adopted the Immigration Act of 1990, stated that the equivalent of an advanced degree is "a bachelor's degree plus at least five years progressive experience in the professions." See H.R. Rep. No. 101-955, 101st Cong., 2d Sess. 121 (1990).  USCIS has incorporated this standard with respect to establishing equivalency to a *master's* degree in its regulations at 8 CFR 204.5(k)(3)(B).  If a doctorate is customarily required for the profession, however, the regulations reflect that the alien must have the doctorate or a foreign equivalent degree.  8 CFR 204.5(k)(2).

Memorandum for Regional Directors, et al.                                    53
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

An alien can satisfy the advanced degree requirement by holding any of the
following:  (1) a U.S. master's degree or higher, or a foreign degree evaluated to
be the equivalent of a U.S. master's degree or higher; or (2) a U.S. bachelor's
degree, or a foreign degree evaluated to be the equivalent of a U.S. bachelor's
degree, plus five years of progressive, post-degree work experience.  An alien who
does not possess at least a bachelor's degree or a foreign equivalent degree will
be ineligible for this classification.

(C) Credentials Evaluation:  In cases involving foreign degrees, you may favorably
consider a credentials evaluation performed by a certified independent credentials
evaluator who has provided a credible, logical and well-documented case for such
an equivalency determination that is based solely on the foreign degree(s).  In
addition, you may accept an evaluation performed by a school official that has the
authority to make such determinations and is acting in his or her official capacity
with the educational institution.  Nevertheless, it is important to understand that
any educational equivalency evaluation performed by a credentials evaluator or
school official is solely advisory in nature and that final determination continues to
rest with the adjudicator.

(D) Advanced degree position.  Mere possession of an advanced degree is not
sufficient for establishing eligibility for E21 classification.  Pursuant to 8 CFR
204.5(k)(4)(i), the petitioner must also demonstrate that the position certified in the
underlying labor certification application or set forth on the Schedule A application
requires a professional holding an advanced degree or the equivalent.  The
petitioner must demonstrate that it, and the industry as a whole, normally requires
that the position be filled by an individual holding an advanced degree.  In this
regard, the key factor is not whether a combination of more than one of the foreign
degrees or credentials is comparable to a single U.S. bachelor's degree, but rather
that a combination of foreign degrees or credentials meets the educational
requirements that have been specified by the employer on individual labor
certification approved by the Department of Labor.

The requirement that the position require, at a minimum, a person holding an
advanced degree has resulted in a particular problem involving E21 petitions filed
on behalf of registered nurses.  Although many such nurses possess advanced
degrees, they are filling nursing positions in the United States that generally do not
require advanced degrees.  Specifically, the DOL's Occupational Outlook
Handbook indicates that, in the nursing profession, only managerial jobs (director
of nursing or assistant director of nursing) or advanced level jobs (clinical nurse
specialist, nurse practitioner, etc.) generally require advanced degrees. A
registered nurse job, by contrast, usually does not require an advanced degree
holder.  Because of the long waiting periods currently required for issuance of

third-preference employment-based immigrant visas, a "gap" between the available supply of visa eligible nurses and the high demand for nursing services has developed.

## (2)  Aliens of Exceptional Ability.

Alternatively, an alien may qualify for E21 visa preference classification if: (a) he or she has exceptional ability in the sciences, arts, or business, (b) will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and (c) if the alien's services in one of those fields are sought by an employer in the United States.  Note that the term "exceptional ability" is defined in 8 CFR 204.5(k)(i)(2) as "a degree of expertise significantly above that ordinarily encountered in the sciences, arts, or business." This standard is of course lower than that for E11 aliens of extraordinary ability.

(A) Evidence - 8 CFR 204.5(k)(3)(ii) provides that, in order to show the requisite exceptional ability, the petition must be accompanied by at least three of six criteria (set forth in 8 CFR 204.5(k)(3)(ii)).  This evidence must be indicative of or consistent with a degree of expertise significantly above that ordinarily encountered.  Therefore, evidence submitted to establish exceptional ability must somehow place the alien above others in the field in order to fulfill the criteria; qualifications possessed by every member of a given field cannot demonstrate a degree of expertise "significantly above that ordinarily encountered."  Note that section 203(b)(2)(C) of the Act provides that mere possession of a degree, diploma, certificate or similar award from a college, university school or other institution of learning shall not by itself be considered sufficient evidence of exceptional ability.  To meet the criterion set forth in 8 CFR 204.5(k)(3)(ii)(F), formal recognition in the form of certificates may have more weight than letters prepared for the petition "recognizing" the alien's achievements.

(B) Comparable Evidence - 8 CFR 204.5(k)(3)(iii) allows for the submission of evidence "comparable" to that set forth in 8 CFR 204.5(k)(3)(ii) if the criteria set forth in 8 CFR 204.5(k)(3)(ii) do not readily apply to a petition filed on behalf of an "alien of exceptional ability."

(C) Schedule A, Group II Labor Certification - Adjudicators should be careful not confuse Schedule A, Group II labor certification under 20 CFR 656.15(d) for aliens of "exceptional ability in the sciences or arts" with classification under section 203(b)(2) of the Act as an alien of "exceptional ability in the sciences, arts, professions, or business."  Under the Department of Labor's regulations at 20 CFR 656.15(d), an employer seeking labor certification on behalf of an alien of "exceptional ability in the sciences or arts" may apply directly to USCIS for Schedule A, Group II labor certification in lieu of applying to the Department of

Labor for issuance of a labor certification.  The application for Schedule A, Group II is made in conjunction with the filing of the Form I-140 petition for E21 classification.  In order to obtain Schedule A, Group II certification, an employer must file documentary evidence showing "widespread acclaim and international recognition accorded the alien by recognized experts in the alien's field" as well as evidence that the alien's work in that field during the past year and in the future will require "exceptional ability."  In addition, the employer must present documentation from at least two of the seven groups listed in 20 CFR 656.15(d)((1)(i) - (vii), or, in the case of an alien of exceptional ability in the performing arts, from the list in 20 CFR 656.15(d)(2)(i) - (vi).  Though both the regulations governing Schedule A, Group II certification and the E21 provisions of the Act refer to aliens of "exceptional ability", the term "exceptional ability" is defined differently by each.  The requirement for Schedule A, Group II labor certification to submit evidence showing "widespread acclaim and international recognition" is clearly a higher standard than the E21 requirement to demonstrate "a degree of expertise significantly above that ordinarily encountered in the sciences, arts, or business."

The standard for Schedule A, Group II labor certification is actually closer to, though not exactly the same as, that for E11 classification.  Schedule A, Group II requires "widespread acclaim and international recognition," while the E11 classification requires "sustained national or international acclaim."  Despite this similarity, the E11 standard is stricter than the Schedule A, Group II standard, as the E11 classification also requires that the alien establish that he or she "is one of that small percentage who have risen to the very top of the field of endeavor."

Note also that the granting of Schedule A, Group II labor certification is separate from the adjudication of the E21 petition.  Eligibility for Schedule A, Group II labor certification therefore does not guarantee approval of the E21 petition itself, which must be adjudicated in accordance with the standards set forth in 8 CFR 204.5(k)(2) and/or (3).

Finally, note that an alien may not self-petition for Schedule A, Group II labor certification.  Schedule A designation requires a job offer, and a petition that includes a request for such designation must be filed by a United States employer, rather than by a self-petitioning alien. See 8 CFR 204.5(k)(1) and (4)(i).

### (3) E21 Professional Athletes.

Some E21 petitions are filed on behalf of professional athletes and are supported by a certified Form ETA-750 requesting that the athlete be classified as an alien of exceptional ability in the arts.  (Labor certification applications for professional

Memorandum for Regional Directors, et al.                                    56
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

athletes, unlike most other types of labor certification applications, are still filed
with DOL using the Form ETA-750 and are processed at DOL-ETA's national
office in Washington, DC.)  The precedent decision of Matter of Masters, 20 I&N
Dec. 953 (Assoc. Comm. 1994), held that a professional golfer could, if he was
otherwise qualified, qualify as an alien of exceptional ability in the arts under
section 203(b)(2) of the INA.  This holding has been interpreted to apply to E21
petitions filed on behalf of any athlete.  However, as noted below, in determining
such eligibility, the fact that the beneficiary has signed a contract to play for a
major league team, may not be sufficient to establish exceptional ability as a
professional athlete.

The following are some general guidelines regarding the adjudication of E21
petitions filed on behalf of professional athletes, and are based on the standards
governing the validity of labor certifications found in section 212(a)(5)(A) of the
INA:

(A) In General. A petition for classification of a professional athlete under section
203(b)(2)(A) of the INA, as well as the underlying labor certification filed on the
alien's behalf, remains valid even if the athlete changes employers, as long as the
new employer is a team in the same sport as the team which was the
employer who filed the petition.  See 212(a)(5)(A)(iv) of the INA.

(B) Definition. - For purposes of paragraph (A), the term "professional athlete"
means an individual who is employed as an athlete by -

> (1) a team that is a member of an association of 6 or more professional
> sports teams whose total combined revenues exceed $10,000,000 per
> year, if the association governs the conduct of its members and regulates
> the contests and exhibitions in which its member teams regularly engage;
> or

> (2) any minor league team that is affiliated with such an association.  See
> section 212(a)(5)(A)(iii).

The petitioner must provide, as initial evidence, certain documentation, described
in 8 CFR 204.5(k)(3)(ii) or (iii) demonstrating that the alien qualifies as an alien of
exceptional ability.  This regulation sets forth the minimum evidence that must be
presented in support of the petition.  Submission of such evidence may not
necessarily establish that the alien is qualified for the classification.  An
adjudicator must assess the quality of such evidence, in addition to the quantity
of the evidence presented, in determining whether the petitioner has met its
burden.

Note:  An approved labor certification filed on behalf of a professional athlete does not necessarily mean that the alien qualifies as an athlete of exceptional ability as defined in section 203(b)(2) of the INA and adjudicators should look for evidence of exceptional ability beyond the mere existence of a contract with a major league team or an approved labor certification.  Many athletes, for example, enjoy substantial signing bonuses, but may not, thereafter, prove to be of "major league," let alone "exceptional" caliber.  Similarly, the fact that an alien played for a portion of a season for a major league team does not automatically establish that the alien will continue to play at a major league level.  It would be incongruous to grant an immigrant visa petition on behalf of a major league player on the basis of section 203(b)(2) of the Act if the alien is unlikely to continue to perform the duties specified in the underlying petition for a reasonable period following a grant of lawful permanent resident status.

Further, an approved labor certification filed on behalf of the alien does not bind USCIS to a determination that the alien is of exceptional ability.  Notwithstanding the grant of a labor certification, the alien may, for any number of reasons, be unable to fulfill the underlying purpose of the I-140 petition.  For example, the alien could be cut from the major league roster prior to adjudication of the petition, thereby removing the job offer that formed the basis of the I-140 and resulting in a denial of the petition.  Similarly, a player may suffer a career-threatening injury while in the middle of a multi-year contract, thereby precluding him from playing in the sport for the foreseeable future.  Even if the player remains under contract and on a major league roster as of the date of the I-140 filing, he or she may have a marginal record at best (such as a lower than average batting record or substantially higher percentage of incomplete passes) with no other compensating skills or achievements to offset the deficiency.  As a result, he or she would not likely meet the standard for an exceptional alien.

**(4) National Interest Waiver of Job Offer.**

Since 1990 the Act has provided that an alien of exceptional ability may obtain a "waiver of job offer" if such waiver is deemed by the agency to be in the "national interest."  A subsequent technical amendment extended the job offer waiver to certain professionals.  Since this waiver provision is included in section 203(b)(2) of the Act, it applies only to professionals holding advanced degrees and exceptional ability aliens.  In fact, the regulations, at 8 CFR 204.5(k)(4)(ii) provide that a waiver of a job offer also includes a waiver of the labor certification requirement.  The petitioner may file Form ETA-750, Part B, or Form ETA-9089, in duplicate, in support of the petition.  Either form is acceptable.

Memorandum for Regional Directors, et al.                                    58
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Legacy INS initially proposed limiting the national interest waiver to occupations where self-employment is common or traditional or to an occupation in the DOL's pilot program. However, commenters to the proposed rule questioned whether the waiver of job offer really meant waiver of labor certification. Therefore, the final regulation deleted the requirement of self-employment or listing in the pilot program and states only that it must be shown that the waiver would be in the national interest.

Section 203(b)(2) of the Act requires that all aliens seeking to qualify as having exceptional ability show that their presence in the United States would substantially benefit prospectively the national economy, cultural or educational interests or welfare of the United States and adds the additional test of "national interest" to those who wish the job offer waiver. Neither Congress nor legacy INS defined the term "national interest" in either the Act or the regulations in order to leave the application of this test as flexible as possible. However, an alien seeking to meet the national interest standard must show significantly more than "prospective national benefit" required of all aliens seeking to qualify as having exceptional ability. The burden rests with the petitioner to establish that exemption from, or waiver of, the job offer requirement will be in the national interest. Each case is to be judged on its own merit.

In 1998, the Administrative Appeals Office (AAO) issued a precedent decision, *Matter of In Re: New York State Department of Transportation*, 22 I&N Dec. 215 (Comm. 1998) ("NYSDOT"), which created a three-prong test for petitioners seeking a national interest waiver. You should remember that the purpose of these prongs is to set minimum requirements for activities that are in the national - not local - interest. These minimum requirements follow:

- Under the first prong of the NYSDOT test, the alien must seek employment in an area that has substantial intrinsic merit. In NYSDOT, the alien was a structural engineer working on highway bridges. This activity was found to have substantial intrinsic merit. It is obvious that the protection of motorists and the maintenance of a highway system are activities of substantial intrinsic merit. By contrast, a person who is a juggler and asserts that he or she wishes to perform at children's birthday parties, might not meet this requirement. While the alien's proposed activity is not deleterious, it would be difficult to claim that such an activity has "substantial" intrinsic merit for purposes of establishing the "national" interest.

- The second prong of the NYSDOT test requires that the waiver applicant demonstrate that the proposed benefit to be provided will be national in scope. There are many activities which have positive effects, such as job creation for a local community, but may in fact have a limited, or even

Memorandum for Regional Directors, et al.                                                    59
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

negative, national impact. For example, an alien may be sought as a loan officer for a regional bank. The alien's clients may come from various parts of the country, but the primary purpose of the alien's employment is to benefit the regional bank, not to benefit the nation as a whole. The principal aim of the alien's activities is to benefit the bank, not the nation. As another example, an alien may be sought to manage a waste disposal facility for a municipal government. That facility, however, may be contributing to pollution of a nearby river. While the alien's activities might result in the preservation of local jobs, his or her activities might in fact have a detrimental effect on other communities lying along the path of the stream or river, even those located in other states. Therefore, any interest in hiring this person would be local at best, and could not be deemed to be national in scope or in the "national" interest.

On a related note, the basis for the waiver may not be the existence of a local labor shortage. The mere fact that the alien might fill a locally needed position - irrespective of the positive effect of such activity - does not qualify the activity as being in the national interest. While there exists a generalized national interest in providing jobs to all work authorized persons, the national interest waiver is a waiver of the labor certification requirement - it is not a substitute for this requirement. Congress specifically created the labor certification process in order to test the domestic local labor market. A shortage of qualified workers in a given field does not constitute grounds for a national interest waiver. Given that the labor certification process was designed to address the issue of worker shortages, a shortage of qualified workers is an argument for obtaining rather than waiving a labor certification. (As noted below, however, following issuance of the NYSDOT precedent, Congress created an exception for certain physicians who are working in medically underserved or needed areas).

- Finally, under the third prong of the NYSDOT test, it must be demonstrated that the national interest would be adversely affected if the employer is required to proceed with the labor certification process. In order to satisfy the third component of the test, therefore, it must be shown "that it would be contrary to the national interest to potentially deprive the prospective employer of the services of the alien by making the position sought available to U.S. workers." In addition, NYSDOT further requires, as a condition of meeting the third prong, "that the alien will serve the national interest to a substantially greater degree than would an available U.S. worker having the same minimum qualifications." This test recognizes that there can be two competing "national interests" - the national interest, as set forth by Congress in section 212(a)(5) of the INA, of requiring a test of the labor market versus the "national interest" in fulfilling a permanent need for the alien's services.

Memorandum for Regional Directors, et al.                                             60
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Given the variety of occupations potentially covered by the waiver, a single set of standards applicable to all cases is impractical.  Therefore each determination must be made on a case-by-case basis and will depend on an assessment of the specific facts presented.

To meet the third prong, the petitioner might be able to demonstrate that the need for the alien's services is so great that the national interest would not be properly served were the petitioner required to postpone employment of the alien until the labor certification process is completed.  An example would be the need for an alien epidemiologist to work on prevention of an epidemic following a natural disaster.  Obviously, time would be of the utmost essence in such a case.

It should be remembered that while the <u>NYSDOT</u> decision sets forth these three minimum criteria which must be met in order to establish eligibility for a national interest waiver, the presence of these factors, alone do not necessarily mean that you must grant the waiver.  For example, an alien with a criminal background might meet the above criteria, yet still might not merit a discretionary grant of the waiver.  You should consider all the facts presented in making your determination.

In addition to the above, you should also bear in mind the following general considerations with respect to adjudicating requests for national interest waivers:

- An alien seeking immigrant classification as an alien of exceptional ability or as a member of the professions holding an advanced degree cannot meet the threshold for a national interest waiver of the job offer requirement simply by establishing a certain level of training or education which could be articulated on an application for a labor certification.

- General arguments regarding the importance of a given field of endeavor, or the urgency of an issue facing the U.S., cannot by themselves establish that an individual alien benefits the national interest by virtue of engaging in the field or seeking an as yet undiscovered solution to the problematic issue.

In all cases, while the national interest waiver hinges on *prospective* national benefit, it clearly must be established that the alien's past record justifies projections of future benefit to the national interest.  The petitioner's subjective assurance that the alien will, in the future, serve the national interest cannot suffice to establish prospective national benefit if the alien has few or no demonstrable achievements.

When a petition is denied because eligibility for the national interest waiver has not

been established, you must give the petitioner the right to appeal that decision.

**(5) Petition for a Physician Which Is Supported by Individual Labor Certification.**

Section 212(a)(5)(B) excludes alien physicians who are coming to the United States principally to perform services as a member of the medical profession unless they have passed parts I and II of the National Board of Medical Examiners Examination (NBME exam) or an equivalent exam as determined by the Secretary of Health and Human Services and they are competent in written and oral English. However, this exclusion ground only applies to alien physicians seeking admission as an alien classified under section 203(b)(2) or section 203(b)(3) of the Act.  In addition, the definition of "graduates of a medical school" in section 101(a)(41) excepts aliens who are of national or international renown in the field of medicine. Therefore, if a physician qualifies under section 203(b)(1) as an alien of extraordinary ability or an outstanding professor or researcher, passage of the NBME exam is not necessary.

Physicians who are immigrating under sections 203(b)(2) or 203(b)(3) are required to pass the NBME exam.  However, the DOL regulations require passage of the exam to obtain a labor certification. Therefore, if the alien has an individual labor certification, he has already demonstrated compliance with this requirement to the DOL and does not have to submit evidence of it with the I-140.

That leaves the physician immigrating under section 203(b)(2) who is requesting a waiver of the job offer requirement in the national interest.  Such an alien does not have an individual labor certification and, therefore, must submit evidence of passage of the examination with the I-140.  Remember, this only applies if the physician will be involved in patient care.  Researchers, teachers, etc. are not subject to this requirement. In addition, the exclusion ground does not apply if the alien was fully and permanently licensed to practice medicine in a State of the U.S. on January 9, 1978, and was practicing medicine in a State of the U.S. on that date.

**(6) Petition for a Physician Based on a National Interest Waiver for Physicians Serving in Medically Underserved Areas or at Department of Veterans Affairs Health Care Facilities.  Reserved.**

**(7) Scientists from the Former Soviet Union and Baltic States.  Reserved.**

**(k) Special Considerations Relating to EB-3 Cases.**

**(1) Determining Whether a Beneficiary is a Skilled Worker or Professional.**

Memorandum for  Regional Directors, et al.                                          62
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

A total of 40,000 visas are available each fiscal year for third preference workers, of which not more than 10,000 may be issued to "other" (unskilled) workers.  The visas for skilled workers (requiring at least two years training or experience) and professionals (persons holding a bachelor's degree or its equivalent in the specific field in which they are to be engaged) are deducted from the same 30,000 number allotment.  In all cases, the alien must have the minimum education and work experience requirements that are specified on the individual labor certification. Therefore, if the labor certification specifies that a bachelor's degree in a given field is the minimum requirement for entry in to the position, the alien must possess a minimum of a U.S. bachelor's degree or its foreign equivalent degree in the field. On the other hand, if the labor certification states a requirement of "two years college and two years experience," mere possession of a bachelor's degree, without such experience, would not qualify.

(A) Sheepherders. A Department of Labor approved Application for Alien Employment Certification is not required for an alien sheepherder who has been legally employed as a nonimmigrant sheepherder in the United States for at least 33 of the preceding 36 months. Instead, the Application for Alien Employment Certification is filed directly with the USCIS District Office or the Department of State.  This procedure relates only to the labor certification process and has no bearing on the amount of training or experience needed to perform the job.  A sheepherder is an unskilled worker.

(B) Armed Forces. The Department of Defense has requested that, before a decision is made on any visa petition filed by a field commander of a military post or installation in behalf of an alien member of the Armed Forces, the views of the appropriate branch of service be obtained, as follows:

- Army - When the petition is on behalf of a (prospective) member of the U.S. Army, the petition shall be returned to the petitioner with the advice that the assistant Secretary of the Army (Manpower and Reserve Affairs) informed the Service on November 1, 1973, that the initiation of petitions in behalf of aliens who are seeking status as lawful permanent residents is not authorized and that, therefore, the petition cannot be accepted unless the Secretary of the Army specifically authorizes the Bureau, in writing, to do so.

- Coast Guard - When the petition is on behalf of a (prospective) member of the U.S. Coast Guard, the inquiry as to whether there is any objection to the filing of the petition shall be addressed to the Commandant (PE), U.S. Coast Guard, Washington, DC 20591.

- Navy (including Marine Corps) or Air Force - When the petition is on behalf of a (prospective) member of the U.S. Navy or the U.S. Air Force, the views of the

Memorandum for  Regional Directors, et al.                                    63
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

> Secretary of the Navy or the Secretary of the Air Force, as appropriate, shall be solicited as to whether there exists any objection to filing of the petition.

- Branch of Service Unknown - Where the military department involved (Army, Navy, or Air Force) is not readily apparent, the inquiry shall be made to the Assistant Secretary of Defense (Manpower), Department of Defense, Washington, DC 20301.

**(I) Closing Actions.**

**(1) Approval.**

(A) Processing Steps. Complete the following steps upon approval of an I-140 petition:

- Affix the approval stamp on the petition and sign it.
- Check the block for the classification for which the petition is approved.
- Enter the priority date in the appropriate block.
- Determine where to send the petition.  If the petition will be sent to the NVC, write the appropriate consulate on the petition.  If the beneficiary will apply for adjustment, write "245 Adj." in the consulate block. (See paragraph (B)).  If the adjustment application was filed concurrently with the visa petition, refer the case to the appropriate office or unit for adjudication of that adjustment application.
- Call the case up in the CLAIMS system and make sure the information entered is correct.  Update the CLAIMS system with the approval, using the appropriate approval phrase.  **In most cases you will have to change the priority date in the system.**
- Place a clerical hold on the approval notice only if there are original documents to be returned.  **This is very important.**
- If the beneficiary will apply for adjustment, notify Records to create a file and house on main file shelf.  The petition will be held at the Service Center until requested by another office.

(B) Determining Eligibility to Apply for Adjustment of Status.  After a petition has been approved, you must determine its disposition. A beneficiary may go to an American Consulate abroad to obtain an immigrant visa or, in some cases, he or she may apply to adjust status in the United States.  If the petitioner does not specifically indicate that the beneficiary will apply for adjustment, forward the petition to the Department of State's National Visa Center (NVC).  If the petitioner indicates that the beneficiary will apply for adjustment of status, you must determine whether the alien is prima facie eligible to apply for adjustment.  If the adjustment application has already been filed under the concurrent filing

procedure, refer the case to the appropriate office or unit for adjudication of the adjustment application.

Section 245 of the Act governs adjustment of status.  An alien must have been inspected and admitted or paroled into the United States in order to be eligible for adjustment of status.  Crewmen, aliens who have engaged in unauthorized employment or who have failed to maintain lawful nonimmigrant status continuously, and those who were admitted in transit without a visa (TWOV) are not eligible to adjust status.  Therefore, if the beneficiary of a petition entered without inspection or falls into one of the precluded classes, you must send the petition to the NVC.

If the alien is not barred from adjustment for one of the reasons mentioned above, but his or her priority date is not current (or within 60 days of being current), you should determine if there is a reasonable chance that he or she will be able to maintain lawful status until the priority date becomes current.  For example, if an alien is in H or L status, and has several years to go before reaching the limit in that status, the petition can be held for adjustment.  If, however, the alien is an otherwise qualified B-2 visitor and the State Department Visa Bulletin shows it will be months or years before the priority date becomes current, it is unlikely that he or she would be able to maintain status long enough to adjust.  In that case, the petition would be sent to the NVC.

There are many reasons why an alien may not actually be able to adjust status; however, you are determining only whether the alien is prima facie eligible to <u>apply</u> for adjustment of status.  You do not, at this stage, have to look beyond the information given on the petition about his or her nonimmigrant status nor do you have to verify that information is correct.  You also do not have to determine whether the alien is inadmissible for any of the grounds in section 212 of the Act, requires a waiver of the two-year foreign residence requirement, has engaged in unauthorized employment, or is otherwise is ineligible for adjustment.

**(2) <u>Denial of Petitions</u>.**

The denial should be written in clear and comprehensive language and all grounds for denial should be covered.  Refer in your denial to the controlling statute and/or regulations and to any relevant precedent decisions.  The denied petition should then be placed in "call-up" to await appeal.  The denial decision may be appealed to the Administrative Appeals Office (AAO), unless the denial is based upon lack of labor certification.  Remember that cases which are denied because the alien does not qualify for the Schedule A designation or for the waiver of the job offer in the national interest, or because you determine that a successor in interest does not exist, may be appealed.

Memorandum for  Regional Directors, et al.                                      65
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

A copy of the denial must be forwarded to the Employment and Training Administration in Washington, DC, in the case of a petition denied because a petitioner does not desire or intend to employ the alien in the position for which certification was issued.

If an appeal is filed, that appeal must be reviewed to see if the grounds of denial have been overcome.  If so, the appeal should be treated as a motion and the case approved.  If the grounds of denial have not been overcome, an A-file is created to house the record of proceeding and the case must be forwarded to the AAO in accordance with 8 CFR 103.3.

### (3) Revocation.

An employment-based visa petition may be revoked, in the agency's discretion, "for good and sufficient cause" under section 205 of the Act.  A petition may also be withdrawn upon a written request for withdrawal of the petition filed by the petitioner (who in some cases may also be the beneficiary).  The regulations governing revocation of immigrant visa petitions are found at 8 CFR 205.1 and 8 CFR 205.2.

**Note:** Under section 203(g) of the Act, the Department of State may also terminate the registration of an alien with an approved I-140 petition if such alien fails to apply for an immigrant visa within one year of notification of availability of a visa number.  The same statutory provision provides for reinstatement of registration in certain cases.

### (m) Precedent Decisions.

Listed below are some precedent decisions that relate to employment-based immigrants. These cases were decided under previous law and regulations and the principles involved may or may not be applicable to the current situation.  They are offered as a guide to previous ways of thinking about the issues involved in employment-based petitions and may be helpful in your consideration of those same issues under current regulations.  For example, before 1965 a professional did not need a job offer but had to establish that he or she intended to engage in his or her profession in the United States.  Decisions related to that issue may have a bearing on the current provision that an alien of extraordinary ability must establish that he or she intends to continue work in the area of expertise in the United States. This list is not all inclusive; in your research you may find other cases that are just as helpful.

- *Matter of Semerjian*, 11 I. & N. Dec. 751 (R.C. 1966).  Qualified engineer must have bona fide intent to engage in profession in the United States.

- *Matter of Imondi and Constantini*, 12 I. & N. Dec. 261 (R.C. 1967).  Petition to accord beneficiaries sixth preference classification as sample stitchers denied because evidence did not establish that the beneficiaries, although experienced as tailors, possessed the requisite experience in the particular duties described on the labor certification.

- *Matter of Vittore*, 12 I. & N. Dec. 402 (R.C. 1967).  Petition for a house painter is approved where labor certification attested to a shortage of like labor in the United States notwithstanding the only requirement was that the beneficiary have experience painting houses.

- *Matter of Din*, 12 I. & N. Dec. 413 (Acting R.C. 1967).  Notwithstanding beneficiary has a bachelors and masters degree as well as experience as a forester, he is not eligible for third preference because he intends to be in the United States only during vacation periods and does not intend to be employed in the United States.

- *Matter of Bozdogan*, 12 I. & N. Dec. 492 (R.C. 1967).  Sixth preference petition approved to work as hairdresser since state requirements that a license or permit be obtained to practice or work in a trade or occupation does not affect eligibility for preference classification.

- *Matter of Sonegawa*, 12 I. & N. Dec. 612 (RC. 1967).  Petition approval not precluded by the fact that the petitioner's net profit for the previous year is not commensurate with the proffered salary where the petitioner's business has increased, expectations of continued increase in business and profits are reasonable, and it has been established that she has the ability to meet the wage given on the labor certification.

- *Matter of Maher*, 12 I. & N. Dec. 680 (R.C. 1968).  Alien graduate of a foreign dental school with full and unrestricted license to practice in his country is eligible for third preference notwithstanding he will not be immediately eligible to practice dentistry in the United States.

- *Matter of Romano*, 12 I. & N. Dec. 731 (R.C. 1968).  Petition for a live-in maid denied where the evidence does not establish that the beneficiary (petitioner's mother) is physically able to do the work, that the petitioner is able to pay the wage offered or that he intends to actually employ her to perform all the duties set forth in the job offer.

- *Matter of Smith*, 12 I. & N. Dec. 772 (D.D. 1968).  A temporary help agency can offer permanent employment if it acts as the actual employer and the employment offer is not of a temporary or seasonal nature.

Memorandum for  Regional Directors, et al.                                    67
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- *Matter of Sun*, 12 I. & N. Dec. 800 (R.C. 1968).  The petitioner, an alien against whom an order of deportation is outstanding, cannot offer "permanent" employment since his status is not settled or stabilized.

- *Matter of Klein*, 12 I. & N. Dec. 819 (BIA 1968).  Beneficiary granted admission with immigrant visa even though at the time of his arrival there was not a job available as specified in the job offer.  Change in the petitioner's circumstances unknown to the beneficiary when he departed abroad and the fact that the beneficiary has found similar employment in the same position in the same geographic area, coupled with an absence of fraud on part of beneficiary judged not an impediment to his immigration. (**Note:** Today a waiver under section 212(k) of the Act would be available.)

- *Matter of Kim*, 13 I. & N. Dec. 16 (R.C. 1968).  Alien is denied third preference classification despite his qualification as a pharmacist because he does not intend engage in the profession of pharmacist.

- *Matter of Ling*, 13 I. & N. Dec. 35 (R.C. 1968).  An alien with a degree in business administration is denied third preference because he failed to establish in what area, if any, in the field of business administration he intends to engage or is qualified.

- *Matter of Yau*, 13 I. & N. Dec. 75 (R.C. 1968).  Alien denied third preference as an engineer where his B.S. degree is electronic engineering was obtained from a non-accredited school and the combination of his degree and practical training do not constitute the equivalent of a baccalaureate degree (under present regulations, equivalence is not allowed).

- *Matter of Chu*, 13 I. & N. Dec. 122 (R.C. 1969).  For purposes of the former third preference immigrant visa classification (superseded by the Immigration Act of 1990, or "IMMACT90"), an alien physician who graduated from a medical school in the United States is a qualified member of the professions notwithstanding he has not completed his internship.  Further, there is no requirement that the alien must be able to engage in the qualifying profession immediately if admitted to the United States; it is sufficient or if the alien can show a bona fide purpose or intent to work here in the qualifying endeavor.

- *Matter of Zang*, 13 I. & N. Dec. 290 (Acting D.D. 1969).  With respect to petition filed for classification under the former sixth preference immigrant visa category (superseded by IMMACT 90), such petition was denied for licensed contractor where no labor certification has been issued despite the fact that the beneficiary, as an immigrant investor, would have been exempt from the labor certification

Memorandum for Regional Directors, et al.                                      68
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

requirement were he to have instead applied for immigrant status as an investor.

- *Matter of Katigbak*, 14 I. & N. Dec. 45 (R.C. 1971).  Alien beneficiary must be fully qualified for preference status at the time of filing the immigrant visa petition.  Education or experience acquired subsequent to the filing date of the visa petition (if required for visa classification) may not be considered in support of such petition, since doing so would unfairly provided the alien with a priority date at a time when he or she was not qualified for the preference status sought.

- *Matter of Tamayo*, 15 I. & N. Dec. 426 (BIA 1975).  Subject denied admission as immigrant with sixth preference petition where he knew at the time he obtained his immigrant visa and departing his country for the United States that the job offer had been withdrawn even though he had obtained other employment in the same occupation.  A labor certification is valid only for the particular job for which it is issued. (Compare with *Matter of Klein* above.)

- *Matter of Great Wall*, 16 I. & N. Dec. 142 (R.C. 1977).  Petition denied where the record revealed that at the time the petition was filed the petitioner did not and could not pay the proffered wage and the petitioner did not establish that he would be able to pay the salary offered in the future.

- *Matter of Wing's Tea House*, 16 I. & N. Dec. 158 (Acting R.C. 1977). The beneficiary must possess all of the qualifications on the labor certification as of the date it was accepted for processing by any office of the DOL; experience acquired after the filing date cannot be considered because to do so would accord the beneficiary a priority date as of a date when he was not qualified for the benefit sought.

- *Matter of Danquah*, 16 I. & N. Dec. 191 (BIA 1975).  Beneficiary denied adjustment of status where premised upon an approved visa petition on the ground that the labor certification (and therefore the visa petition) was no longer valid since she was unable to assume the position specified in the certification prior to obtaining adjustment of status.  An applicant for adjustment of status is assimilated into the position of an applicant for an immigrant visa.  Since an application for an immigrant visa must be denied if the job offer has been withdrawn at the time the alien applies for the visa, the beneficiary's application for adjustment must also be denied, irrespective of the alien's good faith or her intention to accept such employment were it to be made available again.

- *Matter of Medical University of South Carolina*, 17 I. & N. Dec. 266 (R.C. 1978).  To qualify under the U.S. Department of Labor's Schedule A, Group II (exemption from normal labor certification requirements, currently set forth at 20 CFR 656.5(b)), the alien must be of exceptional ability in the sciences or arts (except

Memorandum for  Regional Directors, et al.                                                    69
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

performing arts) and be so far above the average member of his field that he will
clearly be an asset to the United States.

- *Matter of Sunoco Energy Development Co.*, 17 I. & N. Dec. 283 (R.C. 1979).
  Petition denied because labor certification issued for a specific geographic area
  other than the one where the beneficiary was to be employed.  Immigrant visa
  petition must be supported by a labor certification for the particular job opportunity
  and be premised upon a shortage of workers in the area where employment
  actually will take place.

- *Matter of Allan Gee, Inc.*, 17 I. & N. Dec. 296 (R.C. 1979).  A corporation is a
  separate legal entity existing independently of its stockholders; therefore, the sole
  stockholder may be the beneficiary of a petition filed by a viable corporation
  sponsoring the alien as an executive/manager of the U.S. entity. (No labor
  certification was involved in this case.)

- *Matter of United Investment Group*, 19 I. & N. Dec. 248 (Commr 1984).  For a visa
  petition, the actual partnership which existed when the job offer was made and
  certified must continue and intend to employ the beneficiary as certified.  A
  separately entered partnership or newly constituted partnership may not be a
  successor in interest to the original partnership.

- *Matter of A. Dow Steam Specialties, Ltd.*, 19 I. & N. Dec. 389 (Commr 1986). A
  foreign company, that is, one having no location or status in the United States
  cannot offer to permanently employ an alien in the United States.  Only a U.S.
  based branch, affiliate, or subsidiary of the foreign organization may file such a
  petition.

- *Matter of Silver Dragon Chinese Restaurant*, 19 I. & N. Dec. 401 (Commr 1986).
  An occupational preference petition may be filed on behalf of a prospective
  employee who is a shareholder in the corporation. The prospective employee's
  interest in the company, however, is a material fact to be considered in
  determining whether the job being offered was really open to all qualified
  applicants.

- *Matter of Harry Bailen Builders, Inc.*, 19 I. & N. Dec. 412 (Commr 1986).  An alien
  who abandons residence after being admitted for permanent residence to take up
  a certified job offer cannot subsequently be the beneficiary of an employment-
  based immigrant visa petition without the petitioner first seeking a new labor
  certification.  Once the job offer was filled initially, it ceased to exist, and the
  petitioner and alien cannot use the same labor certification again, even if the job to
  be filled is the same as that previously held by the alien.

Memorandum for  Regional Directors, et al.                                                 70
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- *Matter of Dial Auto Repair Shop, Inc.*, 19 I. & N. Dec. 481 (Commr 1986).  Where successorship-of-interest is recognized, the petitioner bears the burden of proof to establish eligibility in all respects as of the date the application for labor certification was originally accepted for processing by the DOL, including ability to pay the proffered wage.  The predecessor's ability to pay the proffered wage at that time, and not the successor's subsequent ability to pay the proffered wage, is relevant. (At the time of this decision, DOL had to determine successorship.)

## 22.3 Special Immigrants.

References:  Section 101(a)(27)(C) and section 203(b)(4) of the Act; 8 CFR 204.5(m).

### (a) General.

Special Immigrant classifications are defined in section 101(a)(27) of the Act.  Other than section 101(a)(27)(A) (LPR returning from a temporary visit abroad) and section 101(a)(27)(B) (former U.S. citizen), each of these classifications requires an immigrant visa petition.  Special immigrant classifications are subject to the numerical limitations on admissions set forth in section 203(b)(4) of the Act:

- An overall limitation of 7.1 percent of the annual worldwide level for employment-based immigrants (but special immigrants under sections 101(a)(27)(A) and (B) and not included);
- An annual limit of 5,000 on the number of religious workers described under section 101(a)(27)(C)(ii)(I) and (II) (which does not include ministers of religion); and
- An annual limit of 100 on the number of broadcasters who may be admitted as principal immigrants under section 101(a)(27)(M) (i.e., the spouses and children of such broadcasters are not included in the limitation).

### (b) Ministers of Religion & Other Religious Worker Cases.

#### (1) General.

An alien, or any person in behalf of the alien, may file an I-360 visa petition for classification under section 203(b)(4) of the Act. Such a petition may be filed by or for an alien, who (either abroad or in the United States) for at least the two years **immediately** preceding the filing of the petition has been a member of a religious denomination which has a bona fide nonprofit religious organization in the United States. The alien must have also been performing the vocation, professional work, or other work continuously (either abroad or in the United States) for the two-year period **immediately** preceding the filing of the petition.

Memorandum for Regional Directors, et al.                                  71
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

The alien must be coming to the United States for the purpose of:

- Working solely as a minister for a religious denomination;

- Working in a professional capacity in a religious vocation or occupation for the organization; or

- Working in a religious vocation or occupation for the organization or a bona fide organization which is affiliated with the religious denomination.

(A) Minister of Religion. A minister of religion is defined as an individual authorized by a recognized religious denomination to conduct religious worship and to perform other duties usually performed by authorized clergy of that religion. There must be a reasonable connection between the activities performed and the religious calling of the minister.  This term does not include lay ministers not authorized to perform such duties.  Evidence that would establish a person qualifies as a minister of religion would be a certificate of ordination, license, or formal letter of conferral.  In addition to those generally thought of as ministers (ministers, priests, rabbis), the following individuals have also been found to be ministers of religion:

- Commissioned officers of the Salvation Army;

- A deacon of any recognized religious denomination if ordination or similar authorization has taken place which confers the power to:
  – Lead a congregation and preach;
  – Administer the sacraments (baptism, communion, etc.) or their equivalents; and
  – Give benedictions.

- Practitioners and nurses (not readers and lecturers) of the Christian Science Church (Church of Christ, Scientist); and

- Buddhist monks, if coming for the sole purpose of acting as a minister of the Buddhist religion, to conduct religious worship and to provide other traditional religious services.

(B) Worker in a Professional Capacity. The definition of professional capacity is an activity in a religious vocation or occupation for which the minimum requirement is the possession by the beneficiary of a U.S. baccalaureate degree or a foreign equivalent degree in the field of endeavor or a closely related field.

(C) Worker in a Religious Vocation or Occupation.

Memorandum for Regional Directors, et al.                                    72
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- <u>Religious vocation</u> is defined as a calling to religious life as evidenced by the demonstration of commitment practiced in the religious denomination, such as the taking of vows.  Examples of persons with religious vocations include, but are not limited to, nuns, monks, and religious brothers and sisters.

- <u>Religious occupation</u> is defined as an activity which relates to a traditional religious function.  As such, it should be distinguished from someone who will be employed by a religious organization to perform purely non-religious functions.

  For example, even though churches (like all other buildings) occasionally need the services of a plumber, a plumber does not perform a religious function, even while he or she is fixing leaky pipe at a church.  Examples of persons in religious occupations include, but are not limited to, liturgical workers, religious instructors, religious counselors, cantors, catechists, workers in religious hospitals or religious health care facilities, missionaries, religious translators, or religious broadcasters.  Examples of positions that do not qualify as religious occupations include janitors, maintenance workers, clerks, fund raisers, or persons involved solely in the solicitation of donations.

## (2) **Religious Organizations**.

In order to sponsor or employ a religious worker, an organization must be a bona fide nonprofit religious organization in the United States, or if the proposed position is in a religious vocation or occupation, a bona fide organization which is affiliated with the religious denomination.  The denomination must be one that the beneficiary has been a member of for at least the two years immediately preceding the time of application for classification as a religious worker.

- <u>Religious denomination</u> is defined as a religious group or community of believers having some form of ecclesiastical government, a creed, or a statement of faith.  Some form of worship, a code of doctrine and discipline, and religious services and ceremonies are required.  There must be established places of worship and religious congregations or comparable indications of the existence of a bona fide religious denomination by the religious denomination.  An interdenominational religious organization which is exempt from taxation pursuant to section 501(c)(3) of the Internal Revenue Code of 1986 will be defined as a religious denomination as well.

- <u>A bona fide nonprofit religious organization</u> in the U.S. is defined as an organization exempt from taxation pursuant to section 501(c)(3) of the Internal

Memorandum for  Regional Directors, et al.                                         73
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Revenue Code of 1986, or an organization which has never sought such exemption but establishes to the satisfaction of USCIS that, if it had applied, would be eligible for tax exempt status.

- A bona fide *organization which is affiliated with the religious denomination* is defined as an organization which is both closely associated with the religious denomination and exempt from taxation pursuant to section 501(c)(3).

**(3) Evidence Requirements.**

The burden is upon the alien seeking classification as a special immigrant religious worker to provide the required documentation to establish eligibility.

(A)  The applicant must establish through documentation that the organization for which the alien intends to work qualifies as a non-profit organization. This evidence must be in the form of either:

- Documentation showing that the organization is exempt from taxation in accordance with section 501(c)(3) of the Internal Revenue Code of 1986 as it relates to religious organizations; or

- Documentation which is required by the Internal Revenue Service to establish eligibility for exemption under section 501(c)(3).

  **Note 1:** The religious organization does not necessarily have to be already exempt from taxation; it merely has to establish that it is eligible for such exemption.

  **Note 2:** According to the IRS, all organizations listed in the Official Catholic Directory are tax exempt.  Therefore, a copy of the directory page which lists the organization would be considered acceptable evidence.

- If the alien is to work in a non-ministerial and nonprofessional capacity for a bona fide organization which is affiliated with a religious denomination, a letter from the authorized official must explain how the affiliation exists.  A tax-exempt certificate indicating that the affiliated organization is exempt from taxation in accordance with section 501(c)(3) of the Internal Revenue Code of 1986 is also required in this instance.  In addition, an affiliated organization may submit its articles of incorporation, brochures, flyers and other documentation to establish its close association with the religious denomination.  An affiliated organization need not establish that it was classified as a "church" by the

Memorandum for Regional Directors, et al.                                    74
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Internal Revenue Service under section 101(b)(1)(A)(i) of the Internal
Revenue Code.

(B) A letter from an authorized official of the religious organization in the United
States which establishes:

- If the alien's religious membership was maintained, in whole or in part,
  outside the United States, and that the foreign and domestic religious
  organizations belong to the same religious denomination;

- That the alien has the required two years of membership in the denomination
  and the required two years of experience in the religious vocation, professional
  religious work, or other religious work; and

- As appropriate:

  (i) If the alien is a minister, he or she is authorized to conduct religious
  worship for that denomination and to perform other duties usually performed
  by authorized members of the clergy of that denomination, including a
  detailed description of those duties; or

  (ii) If the alien is a religious professional, he or she has at least a U.S.
  baccalaureate degree or its foreign equivalent and that such a degree is the
  least required for entry into the religious profession; or

  (iii) If the alien is to work in a religious vocation or occupation, that he or she
  is qualified in the religious vocation or occupation.  Evidence of such
  qualifications may include, but are not limited to, evidence that the alien is a
  monk, nun, or religious brother or sister, or that the type of work to be done
  relates directly to a traditional religious function;

- The arrangements made, if any, for remuneration for services to be rendered
  by the alien. This must include the amount and source of any salary, a
  description of any other types of remuneration to be received (including
  housing, food, clothing, and any other benefits to which monetary value may
  be affixed), and a statement whether such remuneration shall be in exchange
  for services rendered;

(C)  Any appropriate additional evidence which the examining officer may request
relating to the religious organization, the alien, or the affiliated organization. Such
additional documentation may include, but is not limited to, diplomas, degrees,

financial statements, or certificates of ordination.  No prior petition, labor certification, or prior approval notices shall be required.

**(4) Qualifying Employment and Permanent Employment.**

The two years of prior qualifying employment dates back from the date the petition is filed and must be continuous.  The employment to be undertaken permanently must be full-time.  The prior employment also had to be with the same religious denomination, as defined in 8 CFR 204.5(m)(2).  Two years of part-time prior employment will not qualify an alien for this classification.  Continued study by a minister of religion during the two-year period will not be considered disqualifying provided that the petitioner can demonstrate that such study is consistent with the alien's ministerial vocation and provided that the alien continues to perform the duties of a minister of religion.  Continued study by an alien in a religious vocation will not be considered disqualifying if it can be demonstrated that the study is consistent with the alien's vocation.  Any breaks in carrying on the religious vocation or occupation for the two-year period will be evaluated on a case-by-case basis.  Usually such breaks are only excusable if they are for reasons beyond the alien's control.

**(5) Job Offer.**

The offer of employment in the United States need not be for paid services.  In the religious context, individuals often do not receive pay, but rather remuneration in the form of board, room, and incidental expenses.  Regardless of the type, remuneration should be for full-time services.  The alien should not be dependent upon supplemental employment and solicitation of funds for support.

**(6) Closing Action.**

(A) Approval. The examiner places his/her approval stamp in the Action Block on the petition and signs his/her name. The examiner then annotates the proper classification and consulate.  The **SR1** classification is for an alien working in a professional capacity, a religious vocation or occupation, while the **SD1** classification is for an alien working as a minister of religion.  The petition will be forwarded to the Department of State's Processing Center.  If the petition indicates that the alien will apply for adjustment to permanent residence in the United States, the approved petition will be retained for consideration with the application for permanent residence (Form I-485).

(B) Denial.  If the petition is denied, the petitioner shall be informed of the reasons for denial and of his/her right to appeal.  The denial may be appealed to the Administrative Appeals Office.

Memorandum for Regional Directors, et al.                                    76
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

**(7) Validity of Approved Petitions.**   A petition is valid indefinitely, unless revoked under Section 203(e) or 205 of the Act.

**(8) Precedent Decisions.**

The following list of precedent decisions involving Special Immigrants employed in religious occupations can provide some guidance:

- ***Matter of Varughese***, 17 I&N Dec. 399 (BIA 1980).  In determining whether or not one has been ordained as a minister and has carried on the vocation of a minister of a recognized religious denomination, acceptable evidence includes a letter or other appropriate statement signed by the Superior or Principal of the religious denomination.  An alien has not carried on the vocation of minister of the church as defined by section 101(a)(27)(C) of the Immigration and Nationality Act, 8 U.S.C. 1101(a)(27)(C), when only 9 hours per week are devoted to church activities, and the position is of a voluntary nature (delegated by the minister).

- ***Matter of Rhee***, 16 I&N Dec. 607 (BIA 1978).  Ordination by a recognized religious organization is not conclusive as to who qualifies as a minister for purposes of the Act.  The alien's training, experience and duties were in the field of music, not theology.

- ***Matter of Faith Assembly Church***, 19 I&N Dec. 391 (Commissioner 1986).  Any minister, who for the previous 2 years has been or will be engaged in part-time ministerial employment is precluded from the special immigrant classification, which requires the minister to have been and intend to be engaged solely as a minister of the religious denomination.

- ***Matter of N***, 5 I&N Dec. 173 (Central Office 1953).  The Salvation Army is a religious denomination having a bona fide organization in the United States within the meaning of section 101(a)(27)(F) of the Act.  Its commissioned officers are ministers of a religious denomination within the meaning of that section.  The following are guidelines which should be considered in arriving at a determination as to whether the a petitioner is a bona fide religious denomination within the contemplation of section 101(a)(27)(F)(i):
    (1)   Is the petitioner a worldwide religious organization having a distinct legal existence; a recognized creed and form of worship?
    (2)   Does the petitioner have a definite and distinct ecclesiastical government?
    (3)   Does the petitioner have a formal code of doctrine and discipline?

Memorandum for  Regional Directors, et al.                                    77
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

    (4)   Does the petitioner have a distinct religious history?

    (5)   Does the petitioner have a membership, not associated with any other church or denomination?

    (6)   Does the petitioner have officers ministering to its congregation, ordained by a system of its own?

    (7)   Does the petitioner have established places of religious worship?

    (8)   Does the petitioner have religious congregations and religious services?

    (9)   Does the petitioner operate a Sunday school for the religious instruction of the young? and

    (10)  Does the petitioner operate schools for the preparation of its ministers, who in addition to conducting religious services, perform marriage ceremonies, bury the dead, christen children, and advise and instruct the members of their congregations?

- ***Matter of Sinha***, 10 I&N Dec. 758 (Regional Commissioner 1964).  A petitioner has failed to establish that it is a religious denomination within the meaning of section 101(a)(27)(F)(i) of the Act if: (1) its members may be associated with other religious denominations; (2) there are no prescribed standards for the selection, training and ordination of its ministers; and (3) the society does not have a distinct form of worship.  The petitioning organization is financially unable to pay the beneficiary a salary for his services as minister and therefore failed to establish that the beneficiary will be engaged solely in carrying on the vocation of minister of a religious denomination as required by the statute.

- ***Matter of Church of Scientology International***, 19 I&N Dec. 593 (Commissioner 1988).  A detailed comparison between the Roman Catholic Church and the Church of Scientology with regards to a qualifying relationship between the foreign and U.S. organization for nonimmigrant intra-company transferees.  Personnel of religious organizations who meet labor certification and L-1 visa requirements may be granted these benefits.

- ***Matter of Bennett***, 19 I&N Dec. 21 (BIA 1984).  An alien who is admitted to the U.S. as a nonimmigrant visitor, who without permission of USCIS engages in purely religious activities on behalf of a church, and who is compensated for those activities, is deportable for failure to maintain status.  That he now qualifies as a special immigrant minister and intends to work for the same church which has been employing him, does not affect his status.

- ***Matter of Hall***, 18 I&N Dec. 203 (BIA 1982).  The respondent, who engages in fund-raising activities as part of his missionary work for the Unification

Memorandum for Regional Directors, et al.                                                         78
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

Church, is employed within the contemplation of section 245(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1255(c)(2). Therefore, his employment without the permission of USCIS bars him from adjusting his status in the United States to that of a lawful permanent resident. In considering the applicability of section 245(c)(2) of the Act, the Government does not improperly dictate to the Unification Church the permissible scope of its missionaries' duties by isolating the respondent's fund-raising activities from his purely ministerial duties. Determining the status or duties of an individual within a religious organization is a distinct question from determining whether that individual qualifies for status or benefits under our immigration laws, and authority over the latter determination lies not with any ecclesiastical body but with the secular authorities of the United States.

- ***Matter of Dupka***, 18 I&N Dec. 282 (District Director 1981). Where an alien, prior to applying for the benefits of section 245 of the Act, and without USCIS authorization, performs duties and receives remuneration identical to the alien's anticipated duties and remuneration as a special immigrant minister under section 101(a)(27)(C)(i) of the Act, 8 U.S.C. § 1101(a)(27)(C)(i), the alien is employed within the meaning of section 245(c) of the Act, 8 U.S.C. 1255(c) , and is barred from the benefits of this section. But see *Matter of Bennett*, 19 I. & N. Dec. 21 (BIA 1984).

## (m) Employees of U.S. Government Abroad.

Section 101(a)(27)(D) of the Act allows for special immigrant status for an alien and his or her spouse and children who is an employee or is an honorably retired employee of the U.S. Government outside the United States. Fifteen (15) years of employment is required. The principal officer of a Foreign Service establishment must first recommend the grant of such status. Such recommendations are to occur only in exceptional circumstances. The Secretary of State must ratify the recommendation and must find it in the national interest to grant such status, upon which the alien may petition to the Department of State for special immigrant status. The USCIS plays no role on the adjudication of this petition.

An approved petition is valid for six months but may be extended for up to an additional year by the Department of State.

## (n) Panama Canal Zone Employees.

Under Section 101(a)(27)(E) of the Act, certain former employees of the Panama Canal Zone and their spouses and children may receive special immigrant status. Such employees include those employed for at least one year by the Zone or Zone government and who were employees on the date the treaty transferring the Canal to Panama took effect, June 16, 1978. Retired former employees who were employed for fifteen years

Memorandum for  Regional Directors, et al.                                          79
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

are also eligible, or five years in the case of an employee whose personal safety is
endangered because of such employment.

**(o) Foreign Medical Doctors.   Reserved**

**(p) International Organization Employees.  Reserved**

**(q) Juvenile Court Dependents.**

    **(1) General.**

        Adjustment of status based on designation as a Special Immigrant Juvenile (SIJ)
is a humanitarian form of relief available to foreign-born minors who enter the US
child welfare system due to abuse, neglect, or abandonment. It provides eligible
juveniles with a means of legalizing their immigration status in the United States.

    **(2) Background.**

        The Immigration Act of 1990 (IMMACT 90) created section 101(a)(27)(J) of the
Immigration and Nationality Act (the Act), establishing a special immigrant
classification for juvenile aliens (juveniles) who were declared dependent upon a
juvenile court in the United States where the court found them eligible for long-
term foster care, and where the court or an administrative agency found it would
not be in the juvenile's best interest to be returned to his/her (or his/her parents')
country of nationality or last habitual residence.  Classification as a Special
Immigrant Juvenile allowed this individual to apply for adjustment of status to that
of lawful permanent resident.

        Later amendments (the Miscellaneous and Technical Immigration and Nationality
Amendments of 1991) exempted special immigrant juveniles from inadmissibility
provisions restricting the admission of aliens who are likely to become public
charges, aliens without labor certification, and aliens who entered the United
States without proper documents.

        The amendments provided waivers of most other grounds of exclusion. The
amendments also provided that all special immigrant juveniles shall be deemed,
for the purposes of section 245(a) of the Act, to have been paroled into the
United States and exempted them from compliance with any of the requirements
of section 245(c) of the Act.

        Additionally, the amendments provided that neither section 101(a)(27)(J) of the
Act nor section 245(h) of the Act could be construed as authorizing an alien to
apply for admission or be admitted to the United States in order to obtain special
immigrant status under section 101(a)(27)(J) of the Act.

Memorandum for Regional Directors, et al.                                    80
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

The 1998 Appropriations Act took effect on November 26, 1997. Section 113 of that act amended the special immigrant juvenile provision of section 101(a)(27)(J) of the Act in three ways.

- First, Congress amended this provision to limit eligibility for this status to juveniles declared dependent on juvenile courts *on account of abuse, neglect, or abandonment* (emphasis added).

- Second, Congress provided that juveniles are eligible for the status only if the Secretary (formerly the Attorney General) expressly consents to the dependency order serving as a precondition to the grant of status.

- Third, Congress amended the provision to prohibit juvenile courts from determining the custody status or placement of a juvenile who is in the actual or constructive custody of the federal government unless the Secretary specifically consents to the court's jurisdiction to make the determination. Policy guidance has governed implementation of the 1997 legislation. *See* Memorandum from William R. Yates, Memorandum #3- Field Guidance on Special Immigrant Juvenile Petitions (May 27, 2004).

**(3) <u>Filing Requirements</u>.**

Although current regulations allow for separate filing of the Form I-360 (Petition for Amerasian, Widow(er), or Special Immigrant) and the Form I-485 (Application To Register Permanent Residence or Adjust Status), USCIS strongly encourages concurrent filing of both forms.

(A) <u>Form I-360</u>. The Form I-360 must be supported by:

    (i)   Court order declaring dependency on the juvenile court or placing the juvenile under (or legally committing the juvenile to) the custody of an agency or department of a State;

    (ii)   Determination from an administrative or judicial proceeding that it is in the juvenile's best interest not to be returned to his/her country of nationality or last habitual residence (or the juvenile's parents' country of nationality or last habitual residence) (the "home country"); and

    (iii)   Proof of the juvenile's age in the form of documents such as birth certificate, passport, official foreign identity document issued by a foreign government, such as a cedula or cartilla.

(B) <u>Form I-485</u>. The Form I-485 must also be supported by documentation:

    (i)   Birth certificate or other proof of identity in compliance with 8 CFR 103.2;

    (ii)   A sealed medical examination (Form I-639);

    (iii)   Two full-frontal passport-style color photographs, taken within 30 days;

Memorandum for  Regional Directors, et al.                                              81
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

   (iv)   Evidence of inspection, admission or parole (if available; but, remember,
          SIJ applicants are, by law, deemed to be paroled);

   (v)    If the applicant is over 14, s/he must also submit a Form G-325A
          (Biographic Information);

   (vi)   If the juvenile has an arrest record, s/he must also submit certified
          copies of the records of disposition; and

   (vii)  If the juvenile is seeking a waiver of a ground of inadmissibility that is not
          otherwise automatically waived under section 245(h)(2)(A) of the Act,
          s/he must submit a Form I-601 (Application for Waiver of Ground of
          Excludability) and supporting documents establishing that waiver is
          warranted for humanitarian purposes, family unity, or in the public
          interest (supporting documents could include affidavits, letters, press
          clippings, etc.).

(C) Form I-765. Applicants may also submit a Form I-765 (Application for
Employment Authorization) based on the pending Form I-485, if needed.

(D) Applicants may also submit a request for a fee waiver, pursuant to 8 CFR
103.7(c).  SIJ applicants may be eligible for fee waivers for Forms I-360, I-485
and I-765. Requests for fee waivers should be adjudicated expeditiously, and
consistent with prevailing policy guidance. *See* Memorandum from William R.
Yates Memorandum #3-Field Guidance on Special Immigrant Juvenile Petitions
(May 27, 2004).  In considering the applicant's inability to pay the fee,
adjudicators should pay particularly close attention to fee waiver guidance
relating to consideration of humanitarian or compassionate reasons in support of
a request. *Id.* at 4.  Recommendations on fee waiver requests must be forwarded
to the appropriate supervisor for decision.

**(4) Adjudication of Form I-360**.

   (A) Threshold Eligibility Criteria.

   (i)   The threshold eligibility criteria are as follows.  On the date the application
         is adjudicated, the applicant must be:

   •  under 21 years of age

   •  unmarried; and

   •  the subject of a dependency order, or have been adopted or placed in
      guardianship after being subject to a dependency order.  Note that a
      child adopted or placed in guardianship after receiving a dependency
      order continues to be considered eligible for long-term foster care
      under 8 CFR 204.11(a), and, necessarily, remains considered a
      juvenile court dependent based on the prior dependency order.

Memorandum for Regional Directors, et al.                                          82
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

> (ii) The applicant must also be eligible to adjust status to lawful permanent resident, subject to ==section 245(h)== of the Act.

(B) <u>Substantive Eligibility Requirements</u>.

> (i) <u>The dependency order</u>:

> > • Must be issued by a juvenile court, which could include any court whose jurisdiction includes determinations as to juvenile dependency. Examples (depending on the state jurisdiction): Juvenile Court; Family Court; Probate Court

> > • Must deem the juvenile eligible for long term foster care

> > • Must be based on a finding that the child suffered abuse, neglect or abandonment, as defined in the specific jurisdiction.

> > > – The order must reflect a determination of "abuse, neglect, or abandonment," but the language of the order may vary based on individual state law, *e.g.*, a juvenile who becomes eligible for long term foster care due to the death of his/her parents might be considered by a court to have suffered abandonment.  Specific legal definitions of these terms for the purposes of juvenile dependency proceedings vary from state to state.  As such, the determination of whether a child is eligible for long term foster care due to abuse, neglect, or abandonment is a matter for determination by the juvenile court, applying relevant state law.

> > > – While the court order must include a finding of abuse, abandonment or neglect, it does not need to include the basis for that finding.  Ordinarily, the order and findings of fact will be contained in the same document.  If not, the adjudicator may need to look at alternative evidence (discussed below) to determine whether the court order is sufficient.

> > > – If the order does not include reference to specific facts in support of the determination, it may be supplemented by specific findings of fact.

> > • Includes or is supplemented by a finding that it is in the best interest of the juvenile not to be returned to the juvenile's actual or ancestral home country.

> (ii) <u>Alternative evidence in support of application</u>. If an order alone does not establish that it is based on a finding of abuse, neglect, or abandonment, the adjudicator must consider other evidence.  The task of the adjudicator is not to determine whether the order was properly issued.  Rather, the adjudicator must review additional evidence to determine whether the

Memorandum for  Regional Directors, et al.                                              83
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

order was based on a finding of abuse, neglect, or abandonment.
Alternative evidence of abuse, neglect, or abandonment would include the
following:

- A separate Findings of Fact will normally be sufficient to establish a
  foundation of abuse, neglect, or abandonment if the Order lacks such
  findings;

- If the Order lacks sufficient findings, and there are no separate findings of
  fact in support of the order, the adjudicator should request that the
  applicant submit actual records from the judicial proceeding, or a summary
  of the evidence presented as it related to a finding of eligibility for long
  term foster care based on abuse, neglect, or abandonment.

  Adjudicators must be mindful of confidentiality rules that may restrict
  disclosure of records from juvenile-related proceedings.  In most cases,
  when the order alone does not suffice, an affidavit from the Court, or the
  state agency or department in whose custody the child has been placed
  summarizing the evidence presented to the court, will be sufficient.

(iii) <u>Consent to the dependency order</u>.

- The addition of requiring USCIS "express" consent to the dependency
  order serving as a precondition to a grant of special immigrant juvenile
  status is required by the 1997 amendment to <mark>section 101(a)(27)(J)</mark> of the
  Act.  USCIS consent to a dependency order may be based on the order
  itself, findings accompanying the order, or other evidence that establishes
  that the order was based on a determination that the juvenile was abused,
  neglected or abandoned.  The extent to which a court order can also
  establish eligibility for consent depends on the content of the order.
  Orders that include or are supplemented by specific findings of fact as to
  its foundation on abuse, neglect, or abandonment are sufficient to
  establish eligibility for consent, and the adjudicator need not review any
  additional material.  Orders lacking specific factual findings are not
  sufficient to establish eligibility for consent, and adjudicators should review
  supplemental materials to determine whether consent is appropriate.

- <u>USCIS Action to Consent to an Order</u>.

  - The District Director shall consent to dependency orders that establish
    that the juvenile was deemed eligible for long term foster care due to
    abuse, neglect, or abandonment, as described above, when that order
    is the basis for an approved adjustment of status based on a SIJ
    determination.  Such consent is positive, direct, and unequivocal.
    Consent to an order is reflected in the approval of the application.
    Lack of sufficient evidence establishing the consent elements, either

Memorandum for  Regional Directors, et al.                                          84
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

through the order itself or through supporting documents, shall result in withholding of consent and denial of the SIJ petition.

– Consent may only be granted to orders that are the basis for an approved self-petition.  Self-Petitions may be denied for failure to meet the definition of a special immigrant juvenile or for ineligibility to adjust status to lawful permanent resident.

(iv) Limitation on Additional Evidence. Generally, no other documentary evidence, other than what is noted above, is required for SIJ applications. In particular, adjudicators should not seek documents such as school or employment records, confirmation of compliance with the Vienna Convention on Consular Relations, or other information not directly related to SIJ status or required for adjustment of status (as described above).

(C)  Adjudication of the Form I-485. *See* AFM Ch. 23. Remember, pursuant to section 245(h) of the Act, SIJ beneficiaries are deemed to have been paroled for the purpose of adjustment.  Also note that SIJ petitioners who are age 14 and over must also comply with fingerprinting and other agency background check requirements. *See* Memorandum for Regional Directors, Fingerprint Waiver Policy for All Applicants for Benefits under the Immigration and Naturalization Act and Procedures for Applicants Whose Fingerprint Responses Expire after the Age Range During Which Fingerprints Are Required (July 20, 2001).

(D)  Interview Requirements.  Current regulations regarding interview requirements for SIJ applicants are based on the general interview requirements for section 245 of the Act. *See* 8 CFR 245.6. Pursuant to those general requirements, adjudicators may waive the interview of SIJ petitioners who are under age 14.

(E)  Age-Out Prevention.

(i) Current regulations require that an applicant for SIJ adjustment must be under 21 years of age, not only at the time of application, but also at the time of adjustment.  Failure to adjust prior to age 21 results in denial of the application, regardless of the merits of the underlying dependency order; this is known as "aging out."  Applicants are strongly encouraged to submit petitions and applications in a timely fashion and to notify the agency when the risk of aging out is strong.  In addition, District Offices should assess new applications to avoid the risk of SIJ age outs, and take the following precautions to prevent it:

• Schedule SIJ adjustment interviews well in advance of the petitioner's 21st birthday, or in jurisdictions where court dependency terminates before age 21, *e.g.*, age 18, well in advance of that birth date.

Memorandum for Regional Directors, et al.                                    85
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

- Ensure proper completion of background checks, including biometric information clearances and name-checks.

- Provide for expedited processing of cases at risk of aging out, *e.g.*, in-person filing for applicants who age out within a year; priority interviews and capturing of biometric information; other appropriate administrative relief.

- Officers are also reminded that, in many circumstances, ==Section 424 of the USAPATRIOT Act== provides SIJ beneficiaries limited age-out protection by extending benefits eligibility for 45 days beyond the 21st birthday.  Pursuant to Section 424(2), an alien who is the beneficiary of a petition or application filed on or before September 11, 2001, whose 21st birthday occurs after September 2001 is considered to be a child for 45 days after the alien's 21st birthday for purposes of adjudicating such petition or application.  This necessarily extends age out protection on all grounds for 45 days.

(ii)  Adjudicators should also be sensitive to the effect aging out has on appeals, and should seek to ensure sufficient time for appeals processing.

**(r) U.S. Armed Forces Members.**

**(1) General.**

The purpose of the *Armed Forces Immigration Adjustment Act of 1991* is to provide special immigrant status to a limited number of foreign nationals who have served honorably on active duty status in the Armed Forces of the United States.

**(2) Filing Procedure.**

An alien Armed Forces enlistee or veteran may file the petition for Armed Forces special immigrant status in his/her own behalf.  The petitioner must file Form I-360, with fee, with the Service office having jurisdiction over the place of the alien's current or intended place of residence in the United States, or with the overseas Service office having jurisdiction over the alien's residence abroad.

**(3) Eligibility Requirements.**

In order to be eligible for classification under section 101(a)(27)(K), the petition must establish that:

Memorandum for  Regional Directors, et al.                                            86
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

(A) He or she served honorably on active duty after October 15, 1978;

(B) His or her original lawful enlistment was outside the United States;

(C) The service period or periods of active duty amount to an aggregate of a minimum of 12 years **or**, in the case of an applicant currently on active duty, a minimum of 6 years with proof of re-enlistment for the required number of years to incur a total active duty service obligation of 12 years;

(D) If now separated from service, he or she was honorably discharged;

(E) He or she is a national of an independent state which maintains a treaty or agreement allowing nationals of that state to enlist in the U.S. Armed Forces (currently, this only applies to nationals of the Philippines, the Federated States of Micronesia, and the Republic of the Marshall Islands); and

(F) The appropriate military department has recommended the granting of special immigrant status.

**(2) <u>Supporting Documentation</u>.**

The petitioner must submit the following documentation with the petition for classification in order to establish eligibility for the benefit sought:

(A) His or her birth certificate which establishes that he or she is a national of an independent state which maintains a treaty or agreement allowing nationals of that state to enlist in the U.S. Armed Forces;

(B) Either:

> (i) Certified proof of his or her re-enlistment (after 6 years of active duty service); or

> (ii) Both:

> • Certification of his or her past honorable active duty status of 12 years from the appropriate military official, who is at the local command level or higher (**Note:** see paragraph (5) for a discussion on revocation); and

> • The recommendation from the appropriate military official (local command level or higher) that he or she (the applicant) be granted special immigrant status. (**Note:** USCIS will accept a letter issued by the command under

Memorandum for Regional Directors, et al.                                          87
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

which the alien is serving or has served.  Such a letter shall include all
required information: dates of service and place of enlistment, type of
discharge (if applicable), and the recommendation of special immigrant
status by the authorizing official.)

**(3) Closing Action.**

(A) Approval. If the alien meets the eligibility requirements set forth above, endorse
the petition by placing your approval stamp in the Action Block and signing your
name, annotating the petition (classification **SM1**), and preparing an approval
notice to advise the petitioner of the director's decision.

(B) Denial. If the petitioner has failed to establish eligibility for the benefit sought,
deny the petition, and prepare a formal decision to inform the petitioner of the
reasons for denial and of his/her right to appeal. The denial is appealable to the
Administrative Appeals Office.

**(4) Derivative Beneficiaries.**

A spouse or child accompanying or following to join a principal immigrant who has
requested benefits under this section may be accorded the same special
immigrant classification as the principal alien.

**(5) Revocation.**

If an applicant ceases to be a qualified enlistee by failing to complete the required
active duty service obligation for reasons other than an honorable discharge prior
to entering or adjusting, the petition can be automatically revoked under Section
205 of the Act. In order to do so, USCIS must, however, obtain a current Form DD-
214 (Certificate of Release or Discharge from Active Duty) from the appropriate
military office to verify that the applicant is no longer eligible for special immigrant
status.

**(s) NATO Civilian Employees or Family Members.  Reserved**

**22.4  Employment Creation Entrepreneur Cases.**

**(a) General.**

In 1990, Congress created the Employment Creation Immigrant Visa Category (EB-5).
Section 121(a) of Public Law 101-649 (Nov. 29, 1990).  Section 203(b)(5) of the
Immigration and Nationality Act, as amended, allows for admission to permanent
residence on a two-year conditional basis to qualified aliens who will contribute to the

economic growth of the United States by investing in U.S. businesses and creating
needed employment opportunities.  In 2002, Congress amended the EB-5 statute.  Those
amendments are discussed in paragraph (h), below.

**(1) Basic (Non-Pilot Program) Provisions.**

Section 203(b)(5) of the Act authorizes up to 10,000 visas each fiscal year to alien
entrepreneurs (along with their spouses and unmarried minor children) who have
invested or are actively in the process of investing in a new commercial enterprise.

The new commercial enterprise may take any lawful business form, including a
limited partnership, and must both benefit the U.S. economy and directly create
full-time employment for not fewer than 10 "qualifying employees," defined as U.S.
citizens, lawful permanent residents, or certain other immigrants lawfully
authorized to be employed.  Noncommercial activities, including home ownership,
do not qualify.  In general, the Act established a threshold investment amount of
one million U.S. dollars ($1,000,000.00).  In order to encourage the investment in
new enterprises located in areas that would most benefit from employment
creation, section 203(b)(5)(B) of the Act sets aside on an annual basis 3,000 of the
available 10,000 EB-5 visas for qualified aliens who have made investments in
"targeted employment areas."  Such targeted employment areas are defined in the
Act to include rural areas and areas which have experienced high unemployment.
The investment amount for investing in a targeted employment area is currently
set at five hundred thousand dollars ($500,000.00).

**(2) Regional Center Pilot Program.**

Under a Pilot Program first instituted in 1992, up to 3,000 visas (of the 10,000 total
available EB-5 visas) are set aside for aliens who invest in a "regional center" (as
designated by DHS) in the United States set up "for the promotion of economic
growth, including improved regional productivity, job creation, and increased
domestic capital investment.  Section 610 of Pub. L. No. 102-395, as amended by
section 116(a)(l) of Public Law 105-119 and section 402(a) of Pub. L. No. 106-396.
In addition, a regional center may, but need not, be set up for the purpose of
increasing export sales.

Under the Pilot Program, aliens investing in new commercial enterprises located in
regional centers are not required to demonstrate that the new commercial
enterprise itself employs ten U.S. workers; a showing of indirect job creation and
improved regional productivity will suffice. Implementing regulations for the Pilot
Program are found at 8 CFR 204.6(m).

**Note:** Other than the ability to demonstrate indirect creation of ten full-time

jobs, all other requirements applicable to other EB-5 investors must be met.

**(b) Governing Factors.**

8 CFR 204.6(a) cites several governing factors which you must consider. They are:

• A visa petition must be filed;

• A fee for filing the petition is required;

• Before the petition is considered properly filed, the petition must be signed by the petitioner and the initial supporting documentation required by this section must be attached;

• The petition must be filed with the Service Center having jurisdiction over the area in which the new commercial enterprise is or will be principally doing business. For EB-5 petition filing purposes, the Texas Service Center has jurisdiction over its own territory and the territory of the Vermont Service Center; the California Service Center has jurisdiction over its own territory and the territory of the Nebraska Service Center;

• The appeal of a denial of this petition is to the Administrative Appeals Office; and

• The approval of the petition is valid indefinitely, provided that the investment remains qualifying.

**(c) Preliminary Action.** (after petition has been accepted and fee paid).

   **(1) When to Create a File.** If the alien petitioner is in the United States, search for an existing "A" file. If none exists, create one. If the beneficiary is not in the United States, no file should be created, unless the petition is to be denied.

   **(2) Priority Date.** The priority date of a petition for classification as an alien entrepreneur is the date the petition is properly filed with USCIS.

   **(3) General Review.** Review the petition for completeness and signature of the petitioner.

   • Verify that the name given in Part 1 (Information about you) is identical to the signature in Part 7 (Signature block).

   • Remember that the petition can only be signed by the petitioner and not by his or her authorized representative.

Memorandum for  Regional Directors, et al.                                                90
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

**(4) Review of Supporting Documents.**  When reviewing the documentation
submitted in support of the petition you should keep in mind the following factors:

(A) Investment in a New Commercial Enterprise.

- Whether the alien creates an original business, purchases an existing
  business, expands an existing business, or joins with a pool of investors
  who have already invested in an existing business, his or her action must
  be taken after November 29, 1990.  The statute requires it, and the
  definition of the word "new" means created after November 29, 1990.

  **Note: [5 USC 552(b)(2) and 5 USC 552(b)(7)(E)]**

  If the petitioner submits evidence that the new commercial enterprise was a
  result of simultaneous or subsequent restructuring or reorganization of an
  existing business, the commercial enterprise that is the result of this action
  must be a new legal entity.  Thus, there are three ways to invest in a new
  commercial enterprise: creation of brand new business, purchase of an existing
  business, or expansion of an existing business.  You must keep in mind that in
  order for the business to qualify as a new commercial enterprise, any of the
  above actions must have taken place after November 29, 1990.

- You must look at the evidence presented to demonstrate the date of
  creation of the business to determine whether it is a "new" commercial
  enterprise. In general, the business must have been created AFTER
  November 29, 1990.  If the business was created BEFORE November 29,
  1990, it cannot qualify, unless the petitioner can demonstrate expansion of
  the business after November 29, 1990.  If the business was created prior to
  November 29, 1990, issue a RFE explaining this requirement, and
  requesting evidence relating to post-November 29, 1990, expansion.

- To qualify for creation based on expansion, the petitioner must invest the
  required capital in the existing business, and demonstrate that the
  investment has increased, by 40 percent, either the number of employees
  or the net worth of the business. The petitioner will still be required to
  employ ten additional employees before the conditional basis of his or her
  EB-5 permanent resident status may be removed.

(B) Investing the Required Amount of Capital. You should always be aware that
the statutory requirements of investing the prescribed amount of capital and the
creation of new jobs apply no matter how the alien seeks to demonstrate
investment in a new commercial enterprise.  These requirements apply even if the
alien is investing in a new commercial enterprise that purchases an existing

business.  The alien is still obligated to show that he or she has invested the prescribed amount of capital (some of which would probably be the purchase price of the old company) and that 10 new jobs would be created in addition to the employees of the purchased company.  A mere intent to invest does not suffice for EB-5 purposes.  The petitioner must actually have committed the capital to the new commercial enterprise.

> **Note:** "Capital" is defined to include cash, equipment, inventory, other tangible property, cash equivalents and indebtedness secured by assets owned by the alien provided that he or she is personally and primarily liable and the assets of the new commercial enterprise are not used to secure any of the indebtedness. If the alien uses a secured note, the alien must be able to show that this note has a real cash value, and that the total value of all capital invested, including the note, has a cash value equal to or greater than the statutory minimum.

> **Note also:**  As discussed below, all of the requisite capital must go directly into the new commercial enterprise; amounts paid for "administrative fees, attorneys' fees," "finders' fees" and other types of expenses not directly paid into the new commercial enterprise will not count towards the minimum investment amount.

> **Note further:**  The term "invest" is defined as a contribution of capital.  In determining whether the full amount of capital has been invested, adjudicators should be aware that proceeds that are left (i.e., "reinvested") in the business do not count toward meeting the minimum investment requirement.  Further, adjudicators should be aware that an EB-5 petitioner must make an equity investment in the commercial enterprise; a mere loan from the alien shareholder or partner to the business does not qualify as an investment of capital for purposes of the EB-5 statute.  Thus, contributions of funds to the commercial enterprise, in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement, cannot be counted toward meeting the minimum capital requirement.  Balance sheets, including those incorporated into tax returns, generally, but not necessarily, should reflect the amount of equity versus debt contributed to the commercial enterprise.  The determination as to what constitutes debt or equity is, in the final analysis, a question of fact, and not simply a matter of what is reflected on a balance sheet.

(C) Investment of Capital Obtained Through Lawful Means. The regulation at 8 CFR 204.6(j)(3) indicates that the petitioner is to submit documentation "as applicable" that investment capital has been obtained through lawful means. Since it is often difficult to determine the source of the capital used for the investment, there is no clear-cut answer as to how far back the petitioner should

Memorandum for Regional Directors, et al.                                    92
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

go to establish that he or she has met this requirement. In making your
determination, you should exercise sound judgment.  Obviously, if you have
reason to believe that more documentation is necessary, it should be requested.

An individual who is operating as a sole proprietor cannot count his or her personal
bank account as committed funds.  The regulation refers specifically to funds in
business bank accounts, not personal bank accounts.  This applies to all cases,
including sole proprietorships.  Funds in a personal bank account are not
necessarily committed to the new commercial enterprise.

(D) <u>Job Creation</u>.  The petition must be supported with evidence the new
commercial enterprise will create no fewer than 10 full-time positions (or the
equivalent).

If the petitioner has invested in an existing enterprise, he or she must demonstrate
how the investment will cause the creation of at least 10 additional full-time
positions.  Merely purchasing a share of a business from an existing shareholder,
without more, will not qualify, since the payment goes to the former shareholder
rather than towards the development of the enterprise.

If the employees have already been hired, the petitioner must submit copies of tax
records, Forms I-9, or similar documents relating to the ten qualifying employees.
If the employees have not been hired, the petitioner must submit a comprehensive
business plan demonstrating the need for ten new employees.  If the petitioner
purchases a troubled business, it must be demonstrated that the number of jobs at
the pre-investment level will be maintained for at least two years.  To qualify as a
troubled business, it must have been in existence for at least two years and have
incurred a net loss for accounting purposes of at least twenty percent of the
troubled business's net worth prior to such loss.  The loss must have been incurred
during the twelve or twenty-four month period prior to the priority date on the I-526.

If the investment is in a regional center under the Pilot Program, the petition must
show, through the use of reasonable methodologies, the likelihood that the
business will create ten jobs indirectly. See 8 CFR 204.6(m)(7)(ii).  Such
methodologies may include multiplier tables, feasibility studies, and other
economically or statistically valid forecasting devices indicating the likelihood that
the business will result in increased employment.

**Note:** You must also keep in mind that full-time employment as defined in 8 CFR
204.6(e) means year-round employment and not seasonal full-time employment.
Full-time employment consists of 35 hours a week. Regulations permit the
combining of certain part-time positions to equal one full-time equivalent position
for purposes of meeting the job creation requirement.  Seasonal positions do not

qualify for purposes of the full-time employment requirement.

(E) <u>Alien Petitioner Engaged in the Management of the New Enterprise</u>. The alien petitioner must be involved in the new enterprise by either exercising managerial control of the day-to-day operations or through policy formulation. The alien petitioner cannot just invest in the new enterprise; he or she must be involved in the new enterprise.  An alien must be "actively involved in the business;" a purely passive investor may not qualify for the EB-5 classification. See 8 CFR 204.6(j)(5). While an alien may seek EB-5 qualification on the basis of an investment in a limited partnership, under current regulations, even he or she, as a limited partner, must have a certain level of involvement in the running of the business.  Under 8 CFR 204.6(j)(5)(iii), if the alien is a limited partner, he or she must have been granted *all* (i.e., not simply some) of the rights, powers, and duties granted to the other limited partners in the partnership in order to be considered sufficiently engaged in the business.

(F) <u>New Commercial Enterprise in a Targeted Employment Area</u>.  As noted, a targeted area is <u>either</u> a rural area or an area experiencing a high unemployment rate at the time the qualifying EB-5 investment is made. If the petitioner shows that the area where he or she is investing is a rural area, the petitioner need not also establish that the area has high employment.  Conversely, if the area is a high unemployment area, the petitioner need not also show that it is a rural area.

•A <u>rural area</u> means any area outside of a metropolitan statistical area (MSA) or an area outside of a city or town having a population of 20,000 or more. See section 203(b)(5)(B)(iii) of the Act.  MSAs are designated by the Office of Management and Budget and can be found on the Internet at www.census.gov.

•  A <u>high unemployment area</u> may include an MSA, a county, city, or town, or, other political or geographical subdivision designated by a State authority (appointed by the State's governor) as having an unemployment rate of at least 150% of the national unemployment rate.  For a political or geographical area other than an MSA, county, city, or town, the State authority must also certify, in writing, that such area is in fact a "high unemployment area" meeting the requisite 150% unemployment rate standard.  If the State governor has not designated an official for this purpose, an alien petitioner must demonstrate that, at the time when the petition is filed, there has been an unemployment rate of at least 150% of the national unemployment rate within the MSA or other non-rural area in which the ten newly created positions is located (or in the case of a troubled business, the location of the ten saved positions). This should be based on the most recent information available from Federal or State governmental

sources as of the time the petition is submitted.  An adjudicator, of course, must be satisfied of the veracity of any documentation as well as the substance of the information submitted by the petitioner.  If the adjudicator has reason to believe that the information submitted by the petitioner fails to meet either of these criteria, he or she of course is not obligated to approve the petition.

**(d) Approval of the Petition.**

(1) Affix the approval stamp on the Form I-526 and sign.

(2) An approved visa petition should be sent to the specified embassy or consul or if petitioner is requesting adjustment, then the petition should be routed (with file) to the main file shelf waiting request by field office.

(3) Keep a record of statistics (approvals, denials, returned, etc.)

(4) Update CLAIMS with appropriate information. Do not place on clerical hold unless there is documentation to be sent back to the petitioner.

**(e) Action to be Taken if the Petition is Denied.**

Denial decisions will be prepared on Form I-292, usually with the reference "SEE ATTACHMENTS."  The attached pages will cover the specific grounds for denial as determined from the evidence.  Form M-188 (on appeals and motions) and Form I-290B will be attached to all visa petition denials.  It is essential that any denial you prepare be premised solely on the evidence submitted.  Refer in your denial to controlling statutes and regulations.  Where the decision is motivated by or governed by any published decisions, reference to those decisions must be made in the approved format. Your decision should be written in direct and comprehensible language. All reasons for denial should be included.  In all denial cases, an "A" file must be used to house the petition and supporting documents.  Copies of the decision must be sent to the petitioner and any attorney of record.  Once your supervisor has signed off your denial, CLAIMS should be updated to reflect that the case has been denied.

**(f) Revocation of Petitions.** Visa petitions approved under section 204 of the Act may be revoked under the provisions of section 203(e) or section 205 of the Act.

**(g) Precedent Decisions.** The following precedent decisions relate to employment creation petitions:

• *In re Soffici*, ID #3359 (Commr, 1998). (1) A petitioner under section 203(b)(5) of the Act cannot establish the requisite investment of capital if he lends the money to his

Memorandum for Regional Directors, et al.                                                                              95
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

new commercial enterprise. (2) Loans obtained by a corporation, secured by assets of the corporation, do not constitute capital invested by a petitioner.  Not only is such a loan prohibited by 8 CFR 204.6(e), but the petitioner and the corporation are not the same legal entity. (3) A petitioner's personal guarantee on a business's debt does not transform the business's debt into the petitioner's personal debt. (4) A petitioner must present clear documentary evidence of the source of the funds that he invests. He must show that the funds are his own and that they were obtained through lawful means. (5) A petitioner who acquires a pre-existing business must show that the investment has created, or at least has a reasonable prospect of creating, 10 full-time positions, in addition to those existing before acquisition.  The petitioner must, therefore, present evidence concerning the pre-acquisition level of employment. Simply maintaining the pre-acquisition level of employment is not sufficient, unless the petitioner shows that the pre-existing business qualifies as a "troubled business."

• *In re Izumii*, ID #3360 (Assoc. Commr, 1998). (1) Regardless of its location, a new commercial enterprise that is engaged directly or indirectly in lending money to job creating businesses may only lend money to businesses located within targeted areas in order for a petitioner to be eligible for the reduced minimum capital requirement. (2) Under the Immigrant Investor Pilot Program, if a new commercial enterprise is engaged directly or indirectly in lending money to job-creating businesses, such job-creating businesses must all be located within the geographic limits of the regional center. The location of the new commercial enterprise is not controlling. (3) A petitioner may not make material changes to his petition in an effort to make a deficient petition conform to USCIS requirements. (4) If the new commercial enterprise is a holding company, the full requisite amount of capital must be made available to the business(es) most closely responsible for creating the employment on which the petition is based. (5) An alien may not receive guaranteed payments from a new commercial enterprise while he owes money to the new commercial enterprise. (6) An alien may not enter into a redemption agreement with the new commercial enterprise at any time prior to completing all of his cash payments under a promissory note. In no event may the alien enter into a redemption agreement prior to the end of the two-year period of conditional residence. (7) A redemption agreement between an alien investor and the new commercial enterprise constitutes a debt arrangement and is prohibited under 8 CFR 204.6(e). (8) Reserve funds that are not made available for purposes of job creation cannot be considered capital placed at risk for the purpose of generating a return on the capital being placed at risk. (9) USCIS does not pre-adjudicate immigrant investor petitions; each petition must be adjudicated on its own merits. (10) Under 8 CFR 204.6(e), all capital must be valued at fair market value in United States dollars, including promissory notes used as capital. In determining the fair market value of a promissory note, it is necessary to consider, among other things, present value. (11) Under certain circumstances, a promissory note that does not itself constitute capital may constitute evidence that the alien is "in the process of investing" other capital, such as cash. In such a case, the petitioner must substantially complete

Memorandum for  Regional Directors, et al.                                                    96
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

payments on the promissory note prior to the end of the two-year conditional period.
(12) Whether the promissory note constitutes capital or is simply evidence that the
alien is in the process of investing other capital, nearly all of the money due under the
promissory note must be payable within two years, without provisions for extensions.

**Note:** In 2002, Congress eliminated the requirement set forth in *Izumii* that, in order
for a petitioner to be considered to have "created" an original business, he or she must
have had a hand in its actual creation. Under the new law, an alien may invest in an
existing business at any time following its creation, provided he or she meets all other
requirements of the regulations.

- *In re Hsiung*, ID #3361 (Assoc. Commr, 1998). (1) A promissory note secured by
  assets owned by a petitioner can constitute capital under 8 CFR 204.6(e) if: the assets
  are specifically identified as securing the note; the security interests in the note are
  perfected in the jurisdiction in which the assets are located; and the assets are fully
  amenable to seizure by a U.S. note holder. (2) When determining the fair market value
  of a promissory note being used as capital under 8 CFR 204.6(e), factors such as the
  fair market value of the assets securing the note, the extent to which the assets are
  amenable to seizure, and the present value of the note should be considered. (3)
  Whether a petitioner uses a promissory note as capital under 8 CFR 204.6(e) or as
  evidence of a commitment to invest cash, he must show that he has placed his assets
  at risk. In establishing that a sufficient amount of his assets are at risk, a petitioner
  must demonstrate, among other things, that the assets securing the note are his, that
  the security interests are perfected, that the assets are amenable to seizure, and that
  the assets have an adequate fair market value. (4) A petitioner engaging in the
  reorganization or restructuring of a preexisting business may not cause a net loss of
  employment.

- *In re Ho*, ID #3362 (Assoc. Commr, 1998). (1) Merely creating and capitalizing a new
  commercial enterprise and signing a commercial lease are not sufficient to show that
  an immigrant investor petitioner has placed his capital at risk. The petitioner must
  present, instead, evidence that he has actually undertaken meaningful concrete
  business activity. (2) The petitioner must establish that he has placed his own capital
  at risk; that is to say, he must show that he was the legal owner of the invested capital.
  Bank statements and other financial documents do not meet this requirement if the
  documents show someone else as the legal owner of the capital. (3) The petitioner
  must also establish that he acquired the legal ownership of the invested capital
  through lawful means. Mere assertions about the petitioner's financial situation or work
  history, without supporting documentary evidence, are not sufficient to meet this
  requirement. (4) To establish that qualifying employment positions have been created,
  Forms I-9 presented by a petitioner must be accompanied by other evidence to show
  that these employees have commenced work activities and have been hired in
  permanent, full-time positions. (5) In order to demonstrate that the new commercial

enterprise will create not fewer than 10 full-time positions, the petitioner must either provide evidence that the new commercial enterprise has created such positions or furnish a comprehensive, detailed, and credible business plan demonstrating the need for the positions and the schedule for hiring the employees.

**Note:** There are also a number of precedent decisions that pertain to old (pre-1978) immigrant investor provisions under the former non-preference immigrant visa category. While some of these decisions may be interesting from a historical perspective, they have little or no relevance to the "employment creation" investor category created by IMMACT 90 and should not be relied upon when adjudicating post IMMACT 90 cases.

**(h) November 2, 2002 Amendments to EB-5.**

On November 2, 2002, the President signed into law certain amendments to the EB-5 program. Title I, subtitle B of Division C of the Twenty-First Century Department of Justice Appropriations Authorization Act (the "2002 DOJ Appropriations Act)," sections 11031-37 of Public Law 107-273.

On June 10, 2003, USCIS issued interim policy guidance regarding changes effected by the new law. Memorandum from William R. Yates, HQ40/6.1.3, entitled "Amendments Affecting Adjudication for Alien Entrepreneur (EB-5)" (the "Yates Memorandum"). The Yates Memorandum provides that:

- As before, the commercial enterprise must be "new," that is, have been created after November 29, 1990. See 8 CFR 204.6(e). Section 11036 of the law does, however, eliminate the previous requirement that an alien personally have "established," that is, have had a personal hand in, the creation of the new commercial enterprise. Under the 2002 DOJ Appropriations Act, the alien need only "sustain" his or her investment in a pre-existing commercial enterprise. This effectively allows multiple investments in the same commercial enterprise at any time, *provided* that the alien still creates ten new positions for qualifying U.S. workers jobs and meets all other EB-5 requirements are complied with. The law applies to both pending I-526 and I-829 petitions filed on that date or thereafter. This provision modifies 8 CFR 204.6(h)(1), regarding the creation of an original business.

  **Note:** The 2002 DOJ Appropriations Act does not change the requirement that the commercial enterprise create 10 new jobs. In order to determine whether the commercial enterprise actually has created ten new positions, adjudicators must first determine whether the petitioner personally created the commercial enterprise and, if the petitioner did not create the business, the number of jobs there were in the existing business at the time the petitioner acquired the business.

  **Note Also:** The 2002 DOJ Appropriations Act supercedes, in part, 8 CFR 204.6(h)(3),

which describes "the establishment of a new commercial enterprise," due to the removal of the requirement that the alien entrepreneur establish the new commercial enterprise. Section 204.6(h)(3) of the Act continues, however, to be relevant in that it describes the circumstances under which a commercial enterprise in existence prior to November 29, 1990 will be considered "new" for purposes of the law.  Enterprises that have been expanded or substantially reorganized, as described above, will continue to meet the definition of "new" regardless of when the commercial enterprise was actually created.

• As was the case by regulation before November 2, 2002, a new commercial enterprise may include a limited partnership.

• Full-time employment is defined as employment that requires at least 35 hours of service per week "at any time," regardless of who fills the position.  This provision does not change the requirement that, in order to be "full-time," the job created may not be seasonal. If the enterprise employs individual workers on a temporary basis, it can meet the "full-time" requirement only if the job itself is permanent in nature and will be staffed year-round by qualified U.S. workers for the requisite 35 hours per week. For example, an enterprise which is staffed by qualifying workers on one-year contracts would qualify only if, upon expiration of a particular contract, the enterprise, without break, continues to employ the same or another U.S. worker in that same position.

• With the limited exception of certain persons eligible for a "second opportunity" to make a qualifying investment (discussed below) under the 2002 DOJ Appropriations Act, as before, a petitioner may invest capital, for purposes of EB-5, in only one commercial enterprise.  A petitioner who filed a Form I-526 petition after August 31, 1998 therefore may not qualify for removal of conditions if he or she has invested in multiple commercial enterprises.

• The 2002 DOJ Appropriations Act does not change the definition of "qualifying employee."

The 2002 DOJ Appropriations Act also provides a second opportunity for certain aliens whom USCIS believes failed to make a qualifying investment, now to satisfy USCIS that they have done so, provided certain conditions are met.  Persons specifically covered by this provision of the 2002 law may invest in the same or a new commercial enterprise, or even a combination of the two. This second opportunity is limited, however, to cases where the alien's EB-5 petition does not contain any material misrepresentation. Persons eligible for this "second chance" to comply with the statute and regulations are those whose Form I-526 petitions were approved between January 1, 1995 and August 31, 1998.  The 2002 DOJ Appropriations Act also contains provisions with respect to certain aliens who applied for immigrant visas or adjustment of status prior to November 2, 2002,

Memorandum for Regional Directors, et al.                                    99
Subject: *AFM* Update: Chapter 22: Employment-based Petitions (AD03_01).

but did not obtain or were not granted conditional resident status.

**Note:** The 2002 Appropriations Act is NOT an amnesty program; the statute merely provides certain aliens with a second chance to establish that they have made a qualifying investment.  Conditions may not be removed with respect to any of these persons unless they can establish, at the end of their two-year period of conditional residence, that they meet all applicable requirements for removal of conditions.

Regulatory guidance will be forthcoming as to how cases covered by the 2002 Appropriations Act are to be handled.

☞   3.  The *AFM* **Transmittal Memoranda** button is revised by adding, in numerical order, a new entry to read:

AD 03-01              Chapter 22                    Adds guidance on the adjudication of
[INSERT                                             petitions for classification under the
SIGNATURE                                           employment-based immigrant visa
DATE]                                               categories.

cc: USCIS Headquarters Directors
     Bureau of Immigration and Customs Enforcement
     Bureau of Customs and Border Protection

# EXHIBIT C

# POLITICO

# POLITICO

POLITICO

## Morning Shift

*Your daily speed read on employment and immigration policy*

✉ ...e Morning Shift Newsletter

| Your email... |

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

## Travel ban at SCOTUS

By **TED HESSON** | 04/25/2018 10:00 AM EDT

*With help from Ian Kullgren, Andrew Hanna, Josh Gerstein and Akela Lacy*

**TRAVEL BAN AT SCOTUS:** The Supreme Court will hear oral arguments at 10 a.m. today in a case over the legality of President Donald Trump's travel ban. In October the administration rolled out the third iteration of the policy, placing a variety of restrictions on travelers from Chad, Iran, Libya, Somalia, Syria and Yemen, as well as North Korea and Venezuela. Chad was dropped from the list earlier this month after administration officials said it had met security benchmarks.

**The justices will likely probe** whether the president had the authority to institute the ban, whether it aids national security, and whether it targets Muslims in violation the establishment clause of the Constitution. Even after two redrafts, critics argue the ban is tainted by Trump's campaign statement in December 2015 calling for a "total and complete shutdown of Muslims entering the United States" until U.S. officials "can figure out what is going on." Trump's done little since entering office to dispel the impression that he wants

to keep Muslims out. In November, for instance, he retweeted a series of anti-Muslim and misleading videos from a far-right figure in Britain.

**Some court watchers** nonetheless expect the justices to side with the administration. A federal statute passed in 1952 gives the president authority to suspend the entry of any class of foreigner deemed detrimental to U.S. interests "for such period as he shall deem necessary." In addition, the Constitution grants the president broad powers to regulate immigration. "I think this is a silly policy," said Josh Blackman, associate law professor with South Texas College of Law, told POLITICO. "But it's not my job to make these sorts of decisions, and traditionally courts have deferred to the executive when dealing with matters of national security." Read more from POLITICO's Josh Gerstein and Ted Hesson here.

**From the archive:** The 1952 statute cited in support of the travel ban was designed for "restricting foreigners from entering the country based on general anxieties about religion, ideology and national origin," H. Richard Friman wrote in the Washington Post last year. Take a look here.

**GOOD MORNING!** It's Wednesday, April 25, and this is Morning Shift, POLITICO's daily tipsheet on employment and immigration policy. Send tips, exclusives and suggestions to thesson@politico.com, ikullgren@politico.com, ahanna@politico.com, and tnoah@politico.com. Follow us on Twitter at @tedhesson, @IanKullgren, @AndrewBHanna and @TimothyNoah1.

**POLITICO's Ben White is bringing Morning Money** to the Milken Institute Global Conference to provide coverage of the day's events and evening happenings. The newsletter will run April 29 — May 2, 2018. Sign up to keep up with your daily conference coverage.

**COLUMBIA GRAD STRIKE:** Graduate teaching and research assistants at Columbia went on strike Tuesday after administrators refused to negotiate with their union. It was the school year's last week of classes and 50 years and one day after the Columbia student strikes of 1968, which ended in violent confrontations between student protesters and New York City police. MSNBC host Chris Hayes canceled a promotional book event to avoid crossing the picket line, and Cynthia Nixon, the actor and left-flank primary challenger to New York Gov. Andrew Cuomo, tweeted a message of solidarity. But the university appeared unlikely to budge, with a spokesperson castigating the union for employing "pressure tactics and disruption" instead of waiting for a "definitive, non-partisan resolution of that legal question in the federal courts."

**6TH CIRCUIT TO HEAR IRAQI CASE:** The 6th Circuit will hear oral arguments today in a case challenging the Trump administration's attempted deportations of Iraqi nationals. As part of a reported deal in 2017 to drop Iraq from the list of travel ban countries, Iraq agreed to accept deportees. The Trump administration then arrested hundreds of Iraqis with final orders of removal, many of whom were Chaldean Christians in the Detroit area. A federal court blocked the deportations and ordered the administration to grant bond hearings to roughly 300 people in detention. The Justice Department appealed the case to the 6th Circuit, where the ACLU will represent the plaintiffs.

**EPA UNION RALLIES AGAINST PRUITT:** A union that represents federal workers will rally today in opposition to embattled EPA Administrator Scott Pruitt, whom organizers say "has worked to dismantle the agency, silence workers, and enrich himself and private corporations." The union will be joined by Democratic lawmakers, including Reps. Salud Carbajal (Calif.), Don Beyer (Va.) and Debbie Wasserman Schultz (Fla.). The event takes place at noon outside the agency's headquarters at 302 12th St. NW.

**AMAZON, TESLA LABELED 'DIRTY DOZEN:'** A federation of state and local occupational safety groups placed Amazon and Tesla on its annual list of employers putting workers at risk, which it dubs "The Dirty Dozen." The National Council for Occupational Safety and Health singled out Amazon for "preventable" warehouse worker deaths and Tesla for a reported higher than average injury rate. According to the Bureau of Labor Statistics, 5,190 people died from workplace injuries in 2016. Read the report summary here.

**DOL TAKES STOCK AFTER HACK:** A Labor Department spokesperson said officials found "no indication of data loss" in the immediate aftermath of a successful hack and hijacking of an MSHA webpage. A logo for the hacktivist collective Anonymous appeared on the page around 5:30 p.m. Monday and vanished a few minutes later. After that, the page would not load (an issue that continued into Tuesday evening). The DOL spokesperson said said the department "initiated immediate protocols to contain and mitigate the incident" and that "teams are diligently working on securely bringing the website back online."

**GLASSON ON LABOR ISSUES:** Cathy Glasson, a local SEIU president competing in the crowded Democratic primary for Iowa governor, said Tuesday she's skeptical of the Trump administration's approach on apprenticeships — and vehemently opposes Republican proposals to add work requirements to food stamps and let people borrow from Social Security for paid leave. Glasson, a registered nurse, has received boatloads of cash

from SEIU donors, propelling her competitive poll numbers despite having no government experience.

**Glasson told Morning Shift** in an interview Tuesday that she thinks Republicans' work-for-welfare proposal is "ridiculous," and that Iowa should instead raise the minimum wage and provide health care for all. Iowa, she said, must "create jobs that are green jobs, green energy jobs and union jobs. We have to talk about rebuilding the labor movement if people are ever going to get a leg up in our economy." On paid leave, Glasson said that the government shouldn't "be stealing from a retirement fund to have time off. We should actually have family friendly policies that have paid family leave, we need child care in this country so that folks can thrive in an economy and not worry how they're going to pay the bills."

**THIRD JUDGE RULES AGAINST DACA TERMINATION:** "A third federal judge has rejected the Trump administration's justification for winding down the program protecting immigrants who came to the U.S. illegally as children," POLITICO's Josh Gerstein reports. In his opinion, U.S. District Court Judge John Bates of the District of Columbia wrote: "Neither the meager legal reasoning nor the assessment of litigation risk provided by DHS to support its rescission decision is sufficient to sustain termination of the DACA program." Bates, who was placed on the bench by President George W. Bush, is the first Republican appointee to rule against Trump on ending DACA.

**Unlike two previous court rulings** blocking DACA's shutdown, this one may go beyond compelling DHS to process DACA renewals and compel the agency to process new DACA applications as well. "Bates said in his decision on Tuesday that if DHS didn't come up with a new, better explanation for the rescission within 90 days, the entire program would be restored," Gerstein writes. The 9th Circuit is scheduled to hear oral arguments in a separate case in California on May 15. Read more on the latest decision here and the opinion here.

**USCIS EXPLAINS JUVENILE VISA DENIALS:** U.S. Citizenship and Immigration Services has denied roughly 260 applicants who sought special immigrant juvenile status based on guidance issued in February, spokesman Jonathan Withington told Morning Shift. The special visas are available to children who were abused, neglected or abandoned by one or both parents. In recent years, they've increasingly served as an avenue to legal status for unaccompanied minors arriving at the southwest border.

**The denials followed a clarification** by the USCIS chief counsel's office, which called in February for the agency to reject pending applications in cases where applicants could

not be returned to the custody of a parent, according to USCIS. The logic is that if a state court can't legally place a young person in the custody of a parent or guardian (for instance, in cases where the young person is over 18), the applicant shouldn't be eligible for an SIJ visa. The guidance effectively means young people over age 18 can be denied visas, even though the program remains open to people under age 21.

**The new guidance** — never announced publicly by the agency — prompted an internal review of 5,500 cases that had been put on hold. In addition to the 260 denials, approximately 130 applicants were told to expect a denial. The New York Times reported last week that dozens in New York City saw their applications turned down because of the internal change and that more than 1,000 could be affected. USCIS declined to provide a copy of the guidance. Read the full statement from USCIS here.

**TRUMP TO END NEPAL TPS:** The Trump administration plans to phase out temporary protected status for thousands of Nepal nationals, the Washington Post's Nick Miroff reports. DHS Secretary Kirstjen Nielsen intends to terminate the country's designation with a one-year delay, so that it will end by June 24, 2019, according to the Post. USCIS estimates nearly 13,000 Nepalis are covered under the program. More here.

**CARAVAN AT THE BORDER:** "The caravan of weary migrants that the Trump administration has called a threat to the sovereignty and security of the United States began to arrive on the northern border of Mexico on Tuesday, a month after the group started its journey at the country's southern border with Guatemala," Kirk Semple reports in the New York Times.

**"Two buses carrying about 130 migrants**, most of them women and children, arrived at a migrant shelter in Mexicali, a border city, and were welcomed by volunteers and government officials who provided them with sandwiches, water, medical care and worn mattresses to rest on," he writes. "After an hour-and-a-half stop, the participants, nearly all from Central America and fleeing poverty and violence in their homeland, pushed on toward Tijuana, the group's final destination in Mexico, where many intended to apply for asylum in the United States." More here.

**ARIZONA TEACHERS STRIKE LOOMS:** Arizona State Rep. Kelly Townsend (R) blasted the imminent possibility of a public school teacher strike in her state, Ryan Randazzo reports in the Arizona Republic. The lawmaker tweeted Tuesday that she's exploring a class-action lawsuit for people affected by a potentially longer school year. And a work stoppage looks more likely by the hour: Gov. Doug Ducey (R) "met with lawmakers of both parties on Tuesday in an attempt to rally support for his plan to raise teacher pay

20 percent by the years 2020," writes Randazzo. "No bill has yet been introduced with teachers scheduled to walk off the job on Thursday." More here.

**STUDY: TRUMP VOTERS FEARED DISPLACEMENT:** A study published Monday suggests Trump voters were driven by fear of cultural displacement instead of economic anxiety, Niraj Chokshi reports in the New York Times. The research, published in the Proceedings of the National Academy of Sciences, found "voters weren't driven by anger over the past, but rather fear of what may come," according to the Times. "White, Christian and male voters, the study suggests, turned to Mr. Trump because they felt their status was at risk." More here.

**7TH CIRCUIT REJECTS DOJ 'SANCTUARY' PLEA:** The 7th Circuit on Tuesday rejected a Trump administration request to stay part of a nationwide injunction against an anti-sanctuary policy. The administration had sought to limit the injunction to the city of Chicago, the plaintiff in the case. If the DOJ requests that the appeals court rehear the case en banc, it can ask for a stay at that stage, according to the order issued Tuesday. Read it here.

**JURY ACQUITS BORDER PATROL AGENT:** "U.S. Border Patrol Agent Lonnie Swartz was found not guilty of second-degree murder in the slaying of an unarmed Mexican teenager, who Swartz shot through the border fence in a 2012 incident," Rafael Carranza and Rob O'Dell report in the Arizona Republic. "The Tucson federal court jury was unable to reach a verdict Monday on lesser charges of voluntary and involuntary manslaughter in the shooting death of 16-year-old Jose Antonio Elena Rodriguez, leaving open the possibility for a retrial." The Wall Street Journal's Alicia Caldwell reports that federal prosecutors haven't decided whether to take the case back to trial. Read more from the Arizona Republic here and the Journal here.

**EPI'S ROTHSTEIN WINS HILLMAN PRIZE:** Richard Rothstein, a distinguished fellow at the Economic Policy Institute, was awarded a Hillman Prize for "The Color of Law," about how government policies exacerbated segregation in America. Brett Murphy won the Hillman newspaper prize for a four-part report on working conditions for truck drivers at Los Angeles ports, and Slate's Dahlia Lithwick won for her legal commentaries. Named for Sidney HIllman, founder and president of the Amalgamated Clothing Workers of America, the prize honors "journalists who pursue investigative reporting and deep storytelling in service of the common good." More here.

**COFFEE BREAK:**

—"The top jobs where women are outnumbered by men named John," from the New York Times

—"A study finds nearly half of jobs are vulnerable to automation," from the Economist

—"Sanctuary cities don't 'breed crime.' They encourage people to report crime," from the Washington Post

—"Trump administration to crack down on H-1B fraud," from Axios

—"Finland has second thoughts about giving free money to jobless people," from the New York Times

—"The next Hy-Brand: 3 cases that could undo Browning-Ferris," from Law360

—"Flagstaff businesses found violating minimum wage laws," from KJZZ

**THAT'S ALL FOR MORNING SHIFT.**

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

RSS

Site Map


Terms of Service

Privacy Policy

───────────

© 2018 POLITICO LLC

April 24, 2018
Statement from USCIS spokesperson Jonathan Withington to POLITICO:

"In November 2016, USCIS decided to centralize adjudication of all Special Immigrant Juvenile (SIJ) cases to the National Benefits Center (NBC) in Missouri to more consistently and efficiently process these cases. By late summer 2017, the USCIS NBC asked for legal guidance that affected pending cases filed by individuals over 18 at the time the New York state court order was issued while the NBC sought legal clarification from the USCIS Office of Chief Counsel. The agency began holding Texas cases for the same reason in fall 2017. In February 2018, OCC provided legal guidance on the statutory requirements for "reunification with one or both parents" for the purposes of establishing eligibility for the SIJ classification.

In February, in light of OCC's legal guidance, the NBC began to review the approximately 5,500 pending cases, resulting in the issuance of Notices of Intent to Deny for approximately 130 cases in that population.  Pending cases that had previously been issued Requests for Evidence or Notices of Intent to Deny were issued final decisions.  A total of approximately 260 have been denied.

For purposes of establishing eligibility for SIJ, the statute requires that a state court have the authority to return a child to the custody of their parent in order for that court to find that reunification is not viable.  Since most courts cannot place a child back in the custody of their parent once the child reaches the age of majority (as determined by state and in most instances that is age 18), those state courts do not have power and authority to make the reunification finding for purposes of SIJ eligibility."

# EXHIBIT D

# A Rule Is Changed for Young Immigrants, and Green Card Hopes Fade

**By Liz Robbins**

April 18, 2018

As a child, Y. says she was beaten by her father with ropes and cables in Honduras.

J. says he was forced into labor in Burkina Faso.

R., who was born in the Dominican Republic, says she was neglected by her mother and abandoned by her father.

All three applied for something known in immigration law as Special Immigrant Juvenile status, which lets children under the age of 21 who have been abused, abandoned or neglected by one or both parents obtain a green card. But in the last several weeks, all three, living in New York, were denied because of an unannounced policy reversal by the Trump administration.

Under the new interpretation, the United States Citizenship and Immigration Services said that applicants in New York who were over 18, but not yet 21, when they began the application process no longer qualify.

For the last 10 years, cases like theirs have routinely been approved. But as the Trump administration focuses on limiting all forms of immigration and tries to stop the flow of unaccompanied minors at the Mexico-United States border, it appears to be targeting the special immigrant status; President Trump often invokes fear that these immigrants could belong to MS-13, the transnational gang, and that they are committing fraud in their applications.

"They are looking for what he calls 'loopholes,' and what we call protections, and trying to close them," said Wendy Young, the executive director of Kids In Need of Defense, a nonprofit organization that represents young immigrants who come to the country unaccompanied. "Under this administration, everybody is presenting a fraudulent claim, rather than, 'Why is this child here and do they need protection?'"

**You have 4 free articles remaining.**
**Subscribe to The Times**

So far, at least 81 applicants from the New York City area have been denied or were told they would soon be denied by the immigration agency, according to The Legal Aid Society of New York. In total, more than 1,000 young people across the state, not all of them from Central America, could be affected.

Although there are other states that follow a process similar to New York's, including California, Massachusetts, Maryland and Washington, lawyers believe that New York has seen the most denials.

Case 5:18-cv-04914-NC   Document 7-6   Filed 08/14/18   Page 142 of 199



Rebecca McBride, director of legal services at Atlas: DIY, which works with young immigrants in Brooklyn, said the reason the federal agency gives for its rejections is "a bad faith argument."
Mark Abramson for The New York Times

In the last week, the Legal Aid Society said, the immigration agency has also sent a handful of notices to New York-area clients saying they were going to revoke applications that had previously been approved.

"When do immigrants get to rely on decisions from U.S.C.I.S.?" asked Eve Stotland, the legal director for The Door, an organization that works with disadvantaged youth in New York. "What if the client is naturalized? You spin into a place of arbitrariness and absurdity, and a failure to follow the rule of law."

Jonathan Withington, a spokesman for the agency, said: "U.S.C.I.S. has not issued any new guidance or policy directives regarding the adjudication of S.I.J. petitions. We remain committed to adjudicating each petition individually based on the merits of the case and safeguarding the integrity of our lawful immigration system."

The federal law establishing Special Immigrant Juvenile status was first enacted as part of the Immigration Act of 1990 and then expanded in 2008. To obtain it, applicants must first have a ruling from their state's juvenile court, finding that they have been abused, abandoned or neglected. A judge must also declare the young person dependent on the court, or appoint a caretaker. In the second part of the process, the applicant submits the judge's order to the immigration agency.

The Trump administration seems to be narrowly reinterpreting the law, saying that in cases where applicants are over 18, they no longer qualify, because the state court's authority ends at that age. According to its reasoning in one denial letter provided to The Times, "once a person attains the age of 18, the family courts lack jurisdiction over the person's custody."

Those over 18 can be appointed guardians, however, which the immigration agency now does not consider the same as custody. Lawyers say that's semantics, since in state law, guardianship and custody have equal rights and responsibilities.

"Nothing in the federal statutes has changed; only the interpretation has changed," Beth Krause, the supervising attorney for the Immigrant Youth Project at The Legal Aid Society of New York, said. "And now, U.S.C.I.S. is interpreting this in a way to cut out a very large portion of kids who, until the past couple of weeks, had gotten these grants under the same facts."

"It's a bad faith argument," said Rebecca McBride, a lawyer at Atlas: DIY, a nonprofit organization helping immigrant youth in Brooklyn, who represents several people with special immigrant status.

The immigration agency declined to explain the change, saying in an email response, "A petitioner must submit a court order issued by a juvenile court that contains specific determinations made under relevant state law." It referred to a policy manual rewritten in October 2016. The agency pointed to the dramatic increase in SIJ applications in recent years, with 11,335 approved applications in 2017 compared with 1,590 in 2010, with the greatest increase coming after the surge of Central American minors coming to the U.S. in 2014.

Consider the case of J., a shy young man, now 22, from Burkina Faso. He went to family court in New York in late 2016 when he was 20, and the court granted him an order that enabled him to apply to the immigration agency. He received two requests for more information before being denied because of his age several weeks ago."At the moment of application, if they had this issue about 18 years old, why would they allow me to continue this if that's what they thought?" J. said, in French, with his lawyer at The Door. "Why would they let this whole family court thing happen? Why would they allow this to advance to this point and now decide?"He and other young immigrants interviewed asked to be identified only by their first initial or first name because of fear of repercussions from the government.

J.'s lawyer at The Door is appealing the denial.

Y., another client of The Door, came to the United States in August 2016, and at the end of that year, when she was 20, obtained a special findings order from the New York family court. She said she had also been threatened with rape by a gang in Honduras because she was a lesbian. That would seem, her lawyer said, to make it "in the best interests of the child" not to send her back — another part of the law.

Y. was denied, but her younger brother, A., who had come to the United States in 2015 and also applied when he was over 18, was approved in February 2016.

"The government wants to pick and choose who is and isn't a child, but in fact it's a matter of law," Ms. Stotland said.

Legal organizations say they first started seeing signs that the government was holding up the special immigrant applications in the later years of the Obama administration, but the trend became more pronounced in the spring of 2017, when the agency started asking for more information about applications.

Romain, 23, was 4 years old when his parents were murdered in Congo, in the house where he was sleeping. His uncle took him to Burkina Faso, and 14 years later sent him to the United States to study. Then the uncle cut all ties with him, Romain says, leaving him in New York, alone, broke and homeless.

Romain came on a student visa, but without money to pay for college, it lapsed. He landed in a homeless shelter for boys.

In 2015, when Romain was 20, he applied for special immigrant status with the help of Ms. McBride at Atlas: DIY. A family court in Brooklyn found that he fit the criteria that year, but upon further review, the federal immigration agency caught a discrepancy they believed was fraud. Romain's uncle had filled out his student visa application incorrectly, saying the young man's parents were alive, so the application was initially denied.

That complicated the appeal process, but Ms. McBride and Romain persisted, finding sufficient evidence of his parents' death, which the government eventually believed. But in Spring 2017, Ms. McBride said, the agency said that death was not akin to

abandonment. And, finally, this winter, the agency added the over-18 stipulation to its notice of intent to deny Romain's application. She submitted an appeal, and they are waiting.

"I am extremely frustrated, I'm confused," Romain said, "but I am always thinking that if the interpretation of those rules can be changed today, the same interpretation can be changed tomorrow — for the better."

A version of this article appears in print on April 18, 2018, on Page A22 of the New York edition with the headline: Reinterpreted Rule Limits Young Immigrants

# EXHIBIT E



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**June 28, 2018**                                         **PM-602-0050.1**

# Policy Memorandum

**SUBJECT:**  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens

## Purpose

On January 25, 2017, the President signed Executive Order 13768, *Enhancing Public Safety in the Interior of the United States*.  The Executive Order set forth the President's immigration policies for enhancing public safety, and it articulated the priorities for the removal of aliens from the United States.

This Policy Memorandum (PM) outlines how U.S. Citizenship and Immigration Services' (USCIS) Notice to Appear (NTA) and referral policies implement the Department of Homeland Security's (DHS) removal priorities, including those identified in Executive Order 13768, and it provides updates to USCIS' guidelines for referring cases and issuing NTAs.  This PM supersedes Policy Memorandum 602-0050, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, dated November 7, 2011.

## Scope

This PM applies to and will be used to guide referrals and the issuance of NTAs by all USCIS employees, unless otherwise specifically provided in this PM or other USCIS policy or guidance documents.

## Authority

Immigration and Nationality Act (INA) §§ 101(a)(43), 103(a), 208, 212, 216, 216A, 237, 239, 240, 242, 244, and 318; Homeland Security Act of 2002 § 402(5); Title 8, Code of Federal Regulations (8 CFR) §§ 2.1, 103, 207.9, 208, 216.3(a), 216.6(a)(5), 236.14(c), and pts. 239 and 244.

**PM-602-0050.1:**  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 2

## Background

Executive Order 13768 emphasizes that enforcement of our immigration laws is critically important to the national security and public safety of the United States.  The Executive Order also provides that the Federal Government will no longer exempt classes or categories of removable aliens from potential enforcement.

On February 20, 2017, former Secretary of Homeland Security John Kelly issued an implementation memorandum, *Enforcement of the Immigration Laws to Serve the National Interest,*[1] which was related to the President's immigration enforcement priorities. The memorandum sets forth guidance for all DHS personnel regarding the enforcement priorities.

The Executive Order and DHS Implementation Memorandum prioritize the removal of aliens described in INA §§ 212(a)(2), (a)(3), (a)(6)(C), 235, and 237(a)(2) and (a)(4), to include aliens who are removable based on criminal or security grounds, fraud or misrepresentation, and aliens subject to expedited removal.  In addition to aliens described in those subsections, the Executive Order and DHS Implementation Memorandum also prioritize removable aliens who, regardless of the basis for removal:

> (a)  Have been convicted of any criminal offense;
> (b)  Have been charged with any criminal offense that has not been resolved;
> (c)  Have committed acts that constitute a chargeable criminal offense;[2]
> (d)  Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;
> (e)  Have abused any program related to receipt of public benefits;
> (f)  Are subject to a final order of removal, but have not departed; or
> (g)  In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

USCIS has authority, under the immigration laws,[3] to issue Form I-862, Notice to Appear, which is thereafter filed with the Immigration Court to commence removal proceedings under section 240 of the INA.[4]  U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) also have authority to issue NTAs.  Accordingly, USCIS must ensure that its issuance of NTAs fits within and supports DHS's overall removal priorities – promoting national security, public safety, and the integrity of the immigration system.  This PM identifies the circumstances under which USCIS issues NTAs or refers cases to ICE.

---

[1] *See* https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

[2] Chargeable criminal offenses include those defined by state, federal, international, or appropriate foreign law.

[3] *See, e.g.*, INA §§ 103(a), 239; 8 CFR §§ 2.1, 239.1.

[4] *Delegation by the Secretary of Homeland Security to the Bureau of Citizenship and Immigration Services,* Delegation Number 0150.1, Paragraph 2(N).  However, international District Directors and officers are not authorized to issue NTAs.

**PM-602-0050.1:** Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 3


This PM will not apply to the use of discretion in adjudicating cases.  Guidance on how the enforcement priorities will affect USCIS' use of discretion in adjudicating cases will be addressed in a separate policy memorandum.


**Policy**

USCIS is updating its NTA policy to better align with enforcement priorities.  It is the policy of USCIS to issue NTAs and Referrals to ICE (RTIs), as outlined below:

I.   National Security Cases
These cases fall under the priorities outlined in Executive Order 13768, and they include aliens engaged in or suspected of terrorism or espionage, or those who are otherwise described in INA §§ 212(a)(3) or 237(a)(4).  In addition, any removable alien who, in the judgment of a USCIS officer, otherwise poses a risk to national security is considered a priority for removal.

This PM does not affect the handling of cases involving national security concerns.[5]  Guidance from the Fraud Detection and National Security Directorate (FDNS)[6] will continue to govern the definition of these cases and the procedures for resolution and NTA issuance.

II.  NTA Issuance Required by Statute or Regulation

USCIS will continue to issue NTAs in the following circumstances:

A.  Termination of Conditional Permanent Resident Status and Denials of Form I-751, Petition to Remove the Conditions of Residence (8 CFR §§ 216.3, 216.4, 216.5).[7]
B.  Termination of Conditional Permanent Resident Status and Denials of Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status (8 CFR § 216.6).
C.  Termination of refugee status by the District Director (8 CFR § 207.9).
D.  Denials of Nicaraguan and Central American Relief Act (NACARA) Section 202 and Haitian Refugee Immigration Fairness Act (HRIFA) adjustment of status applications:
1.  NACARA 202 adjustment denials (8 CFR § 1245.13(m));
2.  HRIFA adjustment denials (8 CFR § 245.15(r)(2)(i)).
E.  Asylum,[8] NACARA Section 203,[9] and Credible Fear cases:[10]

---

[5] National Security Concerns include cases involving Terrorism-Related Inadmissibility Grounds (TRIG) in sections 212(a)(3)(B) and 212(a)(3)(F) of the INA.  *See also* INA § 237(a)(4)(B) (corresponding grounds of deportability).

[6] *See Policy for Vetting and Adjudicating Cases with National Security Concerns* (April 11, 2008).

[7] *See* USCIS memorandum, *Adjudication of Form I-751, Petition to Remove Conditions on Residence Where the CPR Has a Final Order of Removal, Is in Removal Proceedings, or Has Filed an Unexcused Untimely Petition or Multiple Petitions* (Oct. 9, 2009); *see also* USCIS memorandum, *I-751 Filed Prior to Termination of Marriage* (Apr. 3, 2009).

**PM-602-0050.1:**  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 4

1. Asylum referrals (8 CFR § 208.14(c)(1));
2. Termination of asylum or termination of withholding of removal or deportation (8 CFR § 208.24(e));[11]
3. Positive credible fear findings (8 CFR § 208.30(f));
4. NACARA 203 cases, where suspension of deportation or cancellation of removal is not granted and the applicant does not have asylum status or lawful immigrant or nonimmigrant status (8 CFR § 240.70(d));
5. Cases where NACARA 203 was granted to persons who were ineligible to receive suspension of deportation or special rule cancellation of removal at the time that the grant was issued (8 CFR § 246.1).

This PM does not change NTA or notification procedures for Temporary Protected Status (TPS) cases as described in 8 CFR part 244.[12]  In individual TPS cases where USCIS denies an initial TPS application or re-registration or withdraws TPS, *and* the individual has no other lawful immigration status or other authorization to remain in the United States, officers will first follow the procedures in the applicable regulations within 8 CFR part 244, where required.

Once the TPS regulatory provisions have been followed or are found to be non-applicable in the specific case, officers will issue an NTA to such an alien who has no other lawful immigration status or authorization to remain in the United States following the final determination to deny or withdraw TPS, unless there is a sufficient reason to delay issuance of, or to not issue the NTA (e.g., ICE or another appropriate law enforcement agency makes a reasonable request that USCIS not immediately issue the NTA, so as not to disrupt an investigation).  Where the alien already has an unexecuted final order of removal, the officer should not issue another NTA without consulting with local USCIS counsel.

Independent of this PM, if the Secretary terminates a country's TPS designation, certain former beneficiaries who have been granted TPS under that country's designation, but who do not have other lawful immigration status or authorization to remain in the United States, may become a DHS enforcement priority.  In such circumstances, USCIS officers should defer to ICE and CBP regarding the appropriate timing of any NTA issuances to former TPS beneficiaries after the country's TPS designation ends.  However, if USCIS issues an unfavorable decision on a benefit request submitted by, or on behalf of, a former TPS

---

[8] USCIS may issue an NTA when an asylum applicant withdraws his or her asylum application. See also Section VI of this memorandum for other NTA issuance by the Asylum Division in special circumstances not required by statute or regulation.

[9] This memorandum does not apply to the Asylum Division's initiation of rescission proceedings for lawful permanent residents (LPRs) granted LPR status under NACARA 203 by the Asylum Division.

[10] This memorandum does not apply to the Asylum Division's issuance of Form I-863, Notice of Referral to Immigration Judge.

[11] *See* INA § 208(c)(3) describing removal when asylum is terminated.

[12] *See* USCIS memorandum, *Service Center Issuance of Notice to Appear (Form I-862)* (Sept. 12, 2003).

**PM-602-0050.1:**  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 5

beneficiary who is not lawfully present in the United States, officers will follow the NTA guidance in Section V below.

III.  <u>Fraud, Misrepresentation, and Abuse of Public Benefits Cases</u>

Cases presenting substantiated fraud or misrepresentation are among DHS's enforcement priorities.  Aliens falling under INA § 212(a)(6)(C), removable aliens who "have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency,"[13] and removable aliens who have abused any program related to receipt of public benefits are all priorities for removal.[14]

When fraud, misrepresentation, or evidence of abuse of public benefit programs is part of the record,[15] and the alien is removable, USCIS will issue an NTA upon denial of the petition or application, or other appropriate negative eligibility determination (e.g., withdrawal, termination, rescission).  An NTA will be issued against such a removable alien, even if the petition or application is denied for a ground other than fraud, such as lack of prosecution or abandonment, the application or petition is terminated based on a withdrawal by the petitioner/applicant, or where an approval is revoked, so long as the alien is removable and USCIS has determined there is fraud in the record.

USCIS may consider referring groups of cases with articulated suspicions of fraud to ICE prior to adjudication.  USCIS will not refer to ICE individual applications or petitions involving suspected fraud, except as agreed upon by USCIS and ICE.  When USCIS refers a case to ICE for investigation, USCIS will suspend adjudication for 60 days, but they may resume the administrative process should ICE not respond within that timeframe or provide a Case Closure Notice or case status report within 120 days of accepting the referral.  USCIS will ensure proper de-confliction with ICE throughout its administrative process.

While the NTA is not required to include the charge of fraud or misrepresentation (INA §§ 212(a)(6)(C)(i) and/or (ii), 237(a)(1)(A), 237(a)(1)(G), or similar charge), efforts should be made to include these charges whenever evidence in the record supports such a charge. Please consult with USCIS counsel if there are questions determining whether to include a charge of fraud or misrepresentation.

---

[13] *See* section 5(d) of the <u>Executive Order: Enhancing Public Safety in the Interior of the United States</u>.

[14] *See* section 5(d) of the <u>Executive Order: Enhancing Public Safety in the Interior of the United States</u>.  For purposes of USCIS, enforcement priority 5(d) would necessarily include instances where USCIS has established that the alien is inadmissible under INA § 212(a)(6)(C)(i)), as well as when the fraud or willful misrepresentation was committed in connection with any official matter or application before another government agency.

[15] Adjudicators encountering Statement of Findings should follow current operational guidance regarding their review and resolution.

PM-602-0050.1:  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 6

IV. <u>Criminal Cases</u>

Criminal cases fall under the priorities outlined in Executive Order 13768, as follows:

- Aliens described in INA §§ 212(a)(2) or 237(a)(2), Criminal and Related Grounds;
- Removable aliens convicted of any criminal offense;
- Removable aliens charged with any criminal offense that has not been resolved; and
- Removable aliens who committed acts that constitute a chargeable criminal offense.

A. Egregious Public Safety (EPS) Cases and Non-Egregious Public Safety (Non-EPS) Cases

Executive Order 13768 does not contain language regarding Egregious Public Safety (EPS) or Non-Egregious Public Safety (Non-EPS) cases.  However, this PM uses the terminology to assist in triaging cases for investigation and the issuance of NTAs.

An EPS case is defined by USCIS and ICE[16] as a case where information indicates the alien is under investigation for, has been arrested for (without disposition), or has been convicted of, any of the following:

- Murder, rape, or sexual abuse of a minor, as defined in INA § 101(a)(43)(A);
- Illicit trafficking in firearms or destructive devices, as defined in INA § 101(a)(43)(C);
- Offenses relating to explosive materials or firearms, as defined in INA § 101(a)(43)(E);
- Crimes of violence for which the term of imprisonment imposed, or where the penalty for a pending case, is at least one year, as defined in INA § 101(a)(43)(F);
- An offense relating to the demand for, or receipt of, ransom, as defined in INA § 101(a)(43)(H);
- An offense relating to child pornography, as defined in INA § 101(a)(43)(I);
- An offense relating to peonage, slavery, involuntary servitude, and trafficking in persons, as defined in INA § 101(a)(43)(K)(iii);
- An offense relating to alien smuggling, as described in INA § 101(a)(43)(N);
- Human Rights Violators, known or suspected street gang members, or Interpol hits; or
- Re-entry after an order of exclusion, deportation or removal subsequent to conviction for a felony where a Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal, has not been approved.

---

[16] See *Memorandum of Agreement Between United States Citizenship and Immigration Services and United States Immigration and Customs Enforcement On the Issuance of Notices to Appear to Aliens Encountered During an Adjudication* (June 15, 2006).

**PM-602-0050.1:** Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 7

A Non-EPS criminal case is defined by USCIS as a case where information indicates the alien is under investigation for, has been arrested for (without disposition), or has been convicted of any crime not listed above.

1. <u>EPS Cases</u>

Executive Order 13768 and the implementing guidance provide that DHS personnel should take enforcement actions in accordance with applicable law, and they support that DHS personnel have full authority to initiate removal proceedings against any alien who is removable.  As a result, USCIS will issue an NTA against removable aliens in all cases meeting the EPS definition, regardless of the existence of a conviction, if the application or petition is denied and the alien is removable.  USCIS should refer an EPS case to ICE prior to adjudication and before an NTA is issued if there are circumstances that warrant such action.  If the case is referred, ICE will have an opportunity to decide if, when, and how to issue an NTA or detain the alien.  For Form I-90 applications, and any adjudications involving EPS concerns where USCIS has not issued an NTA, USCIS will refer these cases to ICE after adjudication.

If USCIS does not receive notification of the acceptance or declination of an EPS referral to ICE after 60 days, USCIS will resume adjudication of the case.

2. <u>Non-EPS Criminal Cases</u>

USCIS will issue NTAs in all Non-EPS criminal cases if the application or petition is denied and the alien is removable.  Where USCIS does not issue an NTA, USCIS should refer Non-EPS cases to ICE prior to final adjudication if the alien appears inadmissible to or deportable from the United States based upon a criminal offense not included on the EPS list.[17]

3. <u>N-400 Denials</u>

USCIS will issue NTAs on all N-400 cases if the N-400 has been denied on good moral character (GMC) grounds based on the underlying criminal offense, and provided the alien is removable.

V. <u>Aliens Not Lawfully Present in the United States or Subject to Other Grounds of Removability</u>

USCIS will issue an NTA where, upon issuance of an unfavorable decision on an application, petition, or benefit request, the alien is not lawfully present in the United States.

---

[17] A Non-EPS case referred to ICE prior to adjudication will be treated in the same manner as an EPS case referral, subject to the suspense period and notification requirements.

**PM-602-0050.1:** Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 8

For aliens removable under any other grounds not specifically addressed in this PM, USCIS will ensure all grounds for removability supported by the record are addressed and result in the issuance of an NTA, whenever appropriate.

VI. <u>Special Circumstances for NTA Issuance</u>

A. In limited and extraordinary circumstances, USCIS may issue an NTA if a removable alien requests that an NTA be issued, either before or after the adjudication of an application or petition, in order to seek lawful status or other relief in removal proceedings. The request must be made in writing to the USCIS office that has jurisdiction over the case, and USCIS retains discretion to deny such a request.

B. An Asylum Office may issue an NTA in the following situations:
1. An asylum applicant who has been issued an NTA may request issuance for family members not included on the asylum application as dependents for family unification purposes. The request must be made in writing, and USCIS retains discretion to deny such a request.
2. An asylum applicant issued a denial while in lawful immigration status may request that the Asylum Office issue an NTA after he or she falls out of lawful immigration status. The request must be made in writing and USCIS retains discretion to deny such a request.
3. The Asylum Office may issue an NTA after rescinding asylum status, based on a determination that USCIS did not have jurisdiction to grant asylum status, if the applicant does not currently have an outstanding order of removal or is not otherwise in removal proceedings.
4. If the Asylum Office dismisses NACARA 203 because the NACARA applicant was not removable and the applicant subsequently falls out of lawful immigration status, the applicant may request the issuance of an NTA. The request must be made in writing, and USCIS retains discretion to deny such a request.

C. USCIS may issue NTAs in connection with a Form N-400 filing in the following situations, in addition to the situations described above in paragraph IV.A.3:
1. When the applicant may be eligible to naturalize, but is also deportable under INA § 237. Examples include applicants convicted of aggravated felonies prior to November 29, 1990, or applicants convicted of deportable offenses after obtaining lawful permanent resident (LPR) status that do not preclude GMC or otherwise make an applicant ineligible for naturalization; or
2. When it is determined that the applicant was inadmissible at the time of adjustment or admission to the United States, and thus deportable under INA § 237, and ineligible for naturalization under INA § 318.[18]

---

[18] In the Third Circuit *only* (Pennsylvania, New Jersey, Delaware, and the U.S. Virgin Islands), based on the holding in *Garcia v. Att'y Gen.*, 553 F.3d 724 (3d Cir. 2009), if the alien has been an LPR for at least 5 years, the alien

**PM-602-0050.1:**  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 9

Unless USCIS exercises prosecutorial discretion in favor of the alien, as described below in Section VIII, an NTA will be issued in these two situations before adjudication.[19]  If an NTA has been issued in any case while the N-400 is pending, the N-400 will be placed on hold until removal proceedings have concluded.  Once proceedings have concluded, the adjudication of the N-400 will resume.

D.  In cases involving the confidentiality protections at 8 U.S.C. § 1367(a)(2),[20] USCIS must follow the guidelines established in this PM, once the benefit request has been denied.[21]  8 U.S.C. § 1367 does not preclude USCIS from serving an NTA upon the attorney of record or safe mailing address.  However, USCIS cannot serve the NTA on the physical address of the applicant or petitioner unless Section 1367 protections have been terminated.

In following the guidelines established in this PM, USCIS must also comply with the provisions at 8 U.S.C. § 1367(a)(1), which, with limited exception, prohibits DHS employees and contractors from making adverse determinations of admissibility or deportability using information furnished solely by prohibited sources.  Unlike the confidentiality provisions of 8 U.S.C. § 1367(a)(2), which expire once the benefit request has been denied and all opportunities for appeal have been exhausted, this prohibition on adverse determinations of admissibility or deportability using information furnished solely by prohibited sources does not expire upon denial of the benefit petition or application and applies regardless of whether any application or petition has been filed.[22]

---

cannot be placed in removal proceedings for fraud or willful misrepresentation of a material fact at time of adjustment, if USCIS could have learned of the fraud or misrepresentation through reasonable diligence before the 5-year rescission period expired.  Please consult with USCIS counsel if there are questions regarding the applicability of this precedent.

[19] In the Ninth Circuit *only* (Alaska, Arizona, California, Commonwealth of the Northern Mariana Islands (CNMI), Guam, Hawaii, Idaho, Montana, Nevada, Oregon, and Washington), based on the decision in *Yith v. Nielsen*, 881 F.3d 1155 (2018), please consult with counsel before issuing an NTA in these cases.

[20] The confidentiality protections in 8 USC § 1367(a)(2) extend to applicants and petitioners for, and beneficiaries of, benefit requests covered by the following form types: Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, processed under the Violence Against Women Act (VAWA); Form I-485 based on VAWA, T or U nonimmigrant status; Form I-751 under the battered spouse or child waiver; Form I-914, Application for T Nonimmigrant Status; Form I-918, Petition for U Nonimmigrant Status; Form I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse; Form I-485, Application to Register Permanent Residence or Adjust Status, processed under VAWA amendments to the Cuban Adjustment Act; and all related ancillary forms with a VAWA Form I-360, VAWA Cuban Adjustment Act Form I-485, Form I-914, or Form I-918.  These confidentiality protections generally continue indefinitely for individuals granted covered immigration relief or benefits and cover information contained in prior and subsequent applications filed by protected individuals, including petitions for derivative beneficiaries, applications for adjustment of status, and naturalization.

[21] Officers should look to operational guidance for instructions on the handling of cases for which 1367(a)(2) protections have been terminated.

[22] For additional information, see USCIS Policy Memorandum, *Identification and Disclosure of Section 1367 Information*, PM-602-0136 (Aug. 25, 2016), and DHS Instruction No. 002-02-001, *Implementation of Section 1367 Provisions* (Nov. 7, 2013).

PM-602-0050.1:  Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 10

VII. Preservation of Administrative Review

Except as specifically provided by law,[23] the issuance, service, or filing of an NTA to commence removal proceedings does not negate any right to seek administrative review, whether by motion to the USCIS office that issued the unfavorable decision, or by appeal to the USCIS Administrative Appeals Office.  USCIS will continue to conduct its administrative review during the course of removal proceedings.  If USCIS takes favorable action upon motion or appeal, such that an individual is no longer removable, USCIS should advise ICE counsel so that appropriate action can be taken in removal proceedings.

VIII. Exercise of Prosecutorial Discretion

Executive Order 13768 and the implementing guidance provide that DHS personnel should take enforcement actions in accordance with applicable law, and they support that DHS personnel have full authority to initiate removal proceedings against any alien who is removable.  NTAs will be issued in cases where the individual is a priority for removal under this PM, as outlined above, except in very limited circumstances involving the exercise of prosecutorial discretion, as described here.  The Executive Order and implementing guidance also provide that prosecutorial discretion may be exercised on a case-by-case basis in consultation with the head of the relevant field office of the component that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents:  CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, USCIS Field Office Director, Director of the National Benefits Center, International Operations Chief, or Service Center Director.[24] Given the high level of concurrence required, prosecutorial discretion to not issue an NTA should only be exercised on a case-by-case basis after considering all USCIS and DHS guidance, DHS's enforcement priorities, the individual facts presented, and any DHS interest(s) implicated (e.g., federal court litigation-related considerations or deconfliction with law enforcement priorities of other agencies).

To facilitate the exercise of prosecutorial discretion, a Prosecutorial Review Panel must be maintained in each office authorized to issue NTAs. The Prosecutorial Review Panel must include a local supervisory officer[25] and a local USCIS Office of Chief Counsel attorney (to serve in an advisory role for legal sufficiency review) to determine whether to recommend

---

[23] *See, e.g.*, INA 318 (precluding consideration of an application for naturalization if there are pending removal proceedings pursuant to a warrant of arrest (NOTE: this is subject to *Yith* in the Ninth Circuit)); 8 CFR § 244.10(c)(2) (precluding administrative appeal when NTA is issued after certain denials of TPS, but providing for *de novo* determination of TPS eligibility in removal proceedings).

[24] See John F. Kelly, Secretary of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017).

[25] In cases involving Form N-400, the NTA Panel must be represented by at least one local supervisory officer who is an expert in naturalization laws, policies, and procedures.

**PM-602-0050.1:** Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens
Page 11

the exercise of prosecutorial discretion not to issue an NTA in the aforementioned cases.  The Prosecutorial Review Panel will make a recommendation regarding the positive exercise of prosecutorial discretion, as described above.  A Field Office Director, an Associate Service Center Director, the Assistant Center Director of the National Benefits Center, or the Deputy Chief of International Operations must concur with the recommendation to exercise prosecutorial discretion.

**Implementation**

Components should refer to their operational guidance for specific processing of cases in accordance with this memorandum.  Each office must create processes for referrals of cases, both pre- and post-adjudication, and the completion of RTIs.  A document outlining these processes must be sent to the appropriate District Office, Service Center, or International Operations Division Branch within 30 days of the issuance of this memorandum.

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law, or by any individual or other party in removal proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the Field Operations Directorate, Service Center Operations Directorate, or the Refugee, Asylum, and International Operations Directorate.

# EXHIBIT F



**U.S. Department of Homeland Security**
U. S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000

**July 13, 2018**                                    **PM-602-0163**

# Policy Memorandum

SUBJECT:  Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*)
Chapter 10.5(a), Chapter 10.5(b)

**Purpose**

This Policy Memorandum (PM) provides guidance to U.S. Citizenship and Immigration Services
(USCIS) adjudicators regarding the discretion to deny an application, petition, or request without first
issuing a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) if initial evidence is not
submitted or if the evidence in the record does not establish eligibility.

**Previous guidance**

This PM rescinds in its entirety the June 3, 2013 PM titled "Requests for Evidence and Notices of
Intent to Deny" (2013 PM) regarding an adjudicator's discretion to deny an application, petition, or
request without issuing an RFE. This PM incorporates those portions of the 2013 PM which are still
intended to govern USCIS adjudications.

**Scope**

This memorandum applies to, and shall be used, to guide determinations by all U.S. Citizenship and
Immigration Services (USCIS) employees.

**Effective Date**

This updated guidance is effective September 11, 2018 and applies to all applications, petitions, and
requests received after the effective date.

**Authority**

8 CFR 103.2(b)(8).

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.5(a), and 10.5(b)
Page 2

**Background**

The June 3, 2013 PM titled "Requests for Evidence and Notices of Intent to Deny" (2013 PM) addressed policies for the issuance of RFEs and NOIDs when the evidence submitted at the time of filing does not establish eligibility for the benefit sought. While the 2013 PM provided that RFEs should be issued "when the facts and the law warrant," it also stated that an adjudicator should issue an RFE unless there was "no possibility" that the deficiency could be cured by submission of additional evidence. The effect of the "no possibility" policy was that only statutory denials (such as a denial where a nonexistent benefit is requested) would be issued without an RFE or a NOID. This new PM clarifies how those filings, as well as filings lacking required initial evidence, should be treated.

The 2013 PM explained that an RFE is not to be issued when the evidence already submitted establishes eligibility or ineligibility in all respects for the particular benefit requested. However, where the record does not establish eligibility or ineligibility, the 2013 PM limited adjudicators' discretion to adjudicate cases based on the record. Yet, 8 CFR 103.2(b)(8) provides that an adjudicator, under the circumstances described in the regulation, may either deny the application, petition, or request, or issue an RFE or a NOID when the record does not establish eligibility.[1] The 2013 PM's "no possibility" policy limited the application of an adjudicator's discretion. The burden of proof, however, is on the applicant, petitioner, or requestor to establish eligibility.[2] The policy implemented in this PM rescinds the 2013 PM's "no possibility" policy and restores to the adjudicator full discretion to deny applications, petitions, and requests without first issuing an RFE or a NOID, when appropriate. This policy is intended to discourage frivolous or substantially incomplete filings used as "placeholder" filings and encourage applicants, petitioners, and requestors to be diligent in collecting and submitting required evidence. It is not intended to penalize filers for innocent mistakes or misunderstandings of evidentiary requirements.

**Policy**

*Statutory Denials*

Consistent with USCIS practice and regulations, adjudicators will continue issuing statutory denials, when appropriate, without issuing an RFE or a NOID first. This would include any filing in which the applicant, petitioner, or requestor has no legal basis for the benefit/request sought, or submits a request for a benefit or relief under a program that has been terminated. Examples of cases where the issuance of a denial may be appropriate without prior issuance of an RFE or a NOID include, but are not limited to:

---

[1] Per 8 CFR 208.14(d), applications for asylum are not subject to denial pursuant to the provisions at 8 CFR 103.2(b).
[2] Section 291 of the Act, 8 USC 1361; *Matter of Otiende*, 26 I&N Dec. 127, 128 (BIA 2013).

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.5(a), and 10.5(b)
Page 3

- Waiver applications that require a showing of extreme hardship to a qualifying relative, but the applicant is claiming extreme hardship to someone else and there is no evidence of any qualifying relative;

- Family-based visa petitions filed for family members under categories that are not authorized by statute.

Officers should check current policy and the operating procedures for additional guidance, applicable to the particular application, petition, or request.  Additionally, cases in any type of litigation or that are subject to any court order or injunction must be addressed under the protocols governing the litigation.[3]

*Denials Based on Lack of Sufficient Initial Evidence*

If all required initial evidence is not submitted with the benefit request, USCIS in its discretion may deny the benefit request for failure to establish eligibility based on lack of required initial evidence. Examples of filings that may be denied without sending an RFE or a NOID include, but are not limited to:

- Waiver applications submitted with little to no supporting evidence; or

- Cases where the regulations, the statute, or form instructions require the submission of an official document or other form or evidence establishing eligibility at the time of filing and there is no submission. For example, family-based or employment-based categories where an Affidavit of Support (Form I-864), if required, was not submitted with the Application to Register Permanent Residence or Adjust Status (Form I-485).

Officers should check current policy and the operating procedures for additional guidance, applicable to the particular application, petition, or request.  Additionally, cases in any type of litigation or that are subject to any court order or injunction must be addressed under the protocols governing the litigation. Furthermore, certain form instructions or regulations may permit applicants, petitioners, or requestors to file a form before all the required initial evidence is available, or may restrict USCIS' authority to deny based solely on the submission of limited evidence.

---

[3] For example, as of July 13, 2018, due to preliminary injunctions issued by the U.S. District Court for the Northern District of California in *Regents of Univ. of California v. DHS et al.,* No. 3:17-cv-05211 (N.D. Cal. Jan. 9, 2018) and by the U.S. District Court for the Eastern District of New York in *Batalla Vidal v. Nielsen,* 1:16-cv-04756 (E.D.N.Y. Feb. 13, 2018), USCIS is adjudicating Deferred Action for Childhood Arrivals (DACA) requests on the same terms and conditions in place prior to September 5, 2017.  Therefore, this policy memo does not change the RFE and NOID policies and practices that apply to the adjudication of DACA requests while DHS remains enjoined from making changes to the DACA policy.  This policy memorandum will apply to DACA or DACA-related requests, however, if and when DHS is no longer subject to these or any future court orders preventing such changes.

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.5(a), and 10.5(b)
Page 4

*Additional Considerations*

In some cases, particularly where the response to an RFE opens up new lines of inquiry, a follow-up RFE might be warranted. If possible, however, officers should include in a single RFE all the additional evidence they anticipate having to request. The officer's careful consideration of all the apparent gaps in the evidence will minimize the issuance of multiple RFEs or denials for failure to establish eligibility for the benefit sought. In response to an RFE or a NOID, applicants, petitioners, or requestors must submit all of the requested materials together at one time, along with the original RFE or NOID. If only some of the requested evidence is submitted, USCIS will consider this to be a request for a decision on the record. See 8 CFR 103.2(b)(11). Additionally, failure to submit requested evidence which precludes a material line of inquiry will be grounds for denying the request. See 8 CFR 103.2(b)(14).

Apart from RFEs, officers have the discretion to validate assertions or corroborate evidence and information by consulting USCIS or other governmental files, systems, and databases, or by obtaining publicly available information that is readily accessible. See 8 USC 1357(b). For example, an officer may, in the exercise of discretion, verify information relating to a petitioner's corporate structure by consulting a publicly available state business website. As another example, an officer may attempt to corroborate evidence relating to an individual's history of nonimmigrant stays in the United States by searching a nonpublic, U.S. government database. If relevant, any such additional evidence should be placed in the Record of Proceeding according to the National Background, Identity, and Security Check Operating Procedures Handbook (NaBISCOP) and standard operating procedures (SOPs), unless specifically exempted from inclusion, as is the case for classified materials. For details, please refer to AFM Chapter 10.2, Record of Proceeding, the NaBISCOP, and the applicable SOPs.

Under 8 CFR 103.2(b)(16)(i), if a decision adverse to the applicant, petitioner, or requestor is based on derogatory information, and the applicant, petitioner, or requestor is unaware that the information is being considered, generally the officer must advise the applicant, petitioner, or requestor, as applicable, of this information and offer an opportunity for rebuttal before the decision is rendered. Any explanation, rebuttal, or information presented by or on behalf of the applicant, petitioner, or requestor must be included in the record of proceeding. There is an exception for certain classified materials.[4]

---

[4] Under 8 CFR 103.2(b)(16)(ii) and (iv), a determination of statutory eligibility shall be based only on information that is contained in the record of proceeding and disclosed to the individual, except when the information is classified under Executive Order No. 12356 as requiring protection from unauthorized disclosure in the interest of national security and the classifying authority has not agreed in writing to such disclosure. Whenever the Director of USCIS believes he or she can do so consistently with safeguarding both the information and its source, the Director or his or her designee should direct that the individual be given notice of the general nature of the information and an opportunity to offer opposing evidence. The Director's or his or her designee's authorization to use such classified information shall be made a part of the record. A decision based in whole or in part on such classified information shall state that the information is material to the decision. Under 8 CFR 103.2(b)(16)(iii), where an application may be granted or denied in the exercise of discretion, the decision to exercise discretion favorably or unfavorably may be based in whole or in part on classified information not contained in the record and not made available to the applicant, provided the USCIS Director or his or her designee has determined that such

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter 10.5(a), and 10.5(b)
Page 5

**Implementation**

The Adjudicator's Field Manual (AFM) is revised as follows:

☞     (1)  Chapter 10.5(a) is revised as follows:

(a)      General.

* * *

(2)      Considerations Prior to Issuing RFEs.

Initial case review should be thorough. Although the burden of proof is on the applicant, petitioner, or requestor, before issuing an RFE or NOID, an officer may assess whether the information needed is available in USCIS databases or systems. Occasionally, certain evidence or information not submitted with the application, petition, or request may be readily accessible in other USCIS records or otherwise available from external sources. If such information is available in USCIS databases or systems, an officer may obtain the information from these sources rather than issuing an  RFE or a NOID. Adjudicators have the discretion to validate assertions or corroborate evidence and information by consulting USCIS or other governmental files, systems, and databases, or by obtaining publicly available information. 8 USC 1357(b).

An officer should not request evidence that is outside the scope of the adjudication or otherwise irrelevant to an identified deficiency. In general, officers may, but are not required to, issue RFEs or NOIDs, and they retain the discretion to deny a request for ineligibility without issuing an RFE or NOID.

When an RFE is appropriate, it should:

(1) identify the eligibility requirement(s) that has not been established and why the evidence submitted was not sufficient;
(2) identify any missing evidence specifically required by the applicable statute, regulation, or form instruction;
(3) identify examples of other evidence that may be submitted to establish eligibility; and
(4) request that evidence.

The RFE should  ask for all of the additional evidence the officer anticipates having to request and state the deadline for response. The officer's careful consideration of all the apparent gaps in the evidence will minimize the issuance of multiple RFEs or denials for failure to establish eligibility for the benefit sought. In certain instances the evidence provided in response to an RFE may raise eligibility questions that the adjudicator did not identify during initial case review or open up new lines of inquiry. In such a case, a follow-up RFE or a NOID might be warranted. Failure to submit requested evidence which precludes a material line of inquiry, however, will be grounds for denying the request.  8 CFR 103.2(b)(14).

---

information is relevant and is classified under Executive Order No. 12356 as requiring protection from unauthorized disclosure in the interest of national security.

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter
10.5(a), and 10.5(b)
Page 6

*Statutory Denials*

Statutory denials should generally be issued without prior issuance of an RFE or a NOID on any
application, petition, or request that does not have any basis upon which the applicant, petitioner, or
requestor may be approved. This would include any filing in which the applicant, petitioner, or
requestor has no legal basis for the benefit/request sought, or a request for a program that has been
terminated.  Other examples include, but are not limited to:

- Waiver applications that require a showing of extreme hardship to a qualifying relative but the
  applicant is claiming extreme hardship to someone else and there is no evidence of any
  qualifying relative;
- Family-based visa petitions filed for family members under categories that are not provided by
  statute based on the claimed family relationship.

Officers should check the applicable policy and operating procedures for additional guidance, as
applicable to the particular application, petition, or request.  Additionally, cases in any type of litigation
or that are subject to any court order or injunction must be addressed under the protocols governing
the litigation.[5] Furthermore, certain form instructions or regulations may permit applicants, petitioners,
or requestors to file a form before all required initial evidence is available, or may restrict USCIS'
ability to deny based solely on the submission of limited evidence.

*Denials Based on Lack of Sufficient Initial Evidence*

In the case of a filing that lacks initial evidence, the application, petition, or request may be denied
without issuing an RFE or NOID.  Examples of filings in which the issuance of a denial may be
appropriate without prior issuance of an RFE or a NOID include, but are not limited to:

- Waiver applications submitted with little to no supporting evidence; or

- Cases where the regulations, the statute, or form instructions require the submission of an
  official document or other form or evidence establishing eligibility at the time of filing and there
  is no submission. For example, family-based or employment-based categories where an
  Affidavit of Support (Form I-864), if required, was not submitted with the Application to
  Register Permanent Residence or Adjust Status (Form I-485).

---

[5] For example, as of July 13, 2018, due to preliminary injunctions issued by the U.S. District Court for the Northern District
of California in *Regents of Univ. of California v. DHS et al.,* No. 3:17-cv-05211 (N.D. Cal. Jan. 9, 2018) and by the U.S.
District Court for the Eastern District of New York in *Batalla Vidal v. Nielsen*, 1:16-cv-04756 (E.D.N.Y. Feb. 13, 2018),
USCIS is adjudicating Deferred Action for Childhood Arrivals (DACA) requests on the same terms and conditions in place
prior to September 5, 2017.  Therefore, the RFE and NOID policies and practices that were in effect as of September 5,
2017 continue to apply to the adjudication of DACA requests while DHS remains enjoined from making changes to the
DACA policy.  This policy memorandum will apply to DACA or DACA-related requests, however, if and when DHS is no
longer subject to these or any future court orders preventing such changes.

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter
10.5(a), and 10.5(b)
Page 7

\* \* \*

☞     (2)  Chapter 10.5(b) is revised as follows:

\* \* \*

(4) Notice of Intent to Deny (NOID).

A NOID may be based on evidence of ineligibility or on derogatory information known to USCIS, but the applicant, petitioner, or requestor is either unaware of the information or may be unaware of its impact on eligiblity. When an adverse decision is based on derogatory information that is unknown to the applicant, petitioner, or requestor, generally, an opportunity to rebut that information shall be provided in accordance with 8 CFR 103.2(b)(16)(i). In that situation, a NOID provides an applicant, petitioner, or requestor with adequate notice and sufficient opportunity to respond and the opportunity to review and rebut derogatory information of which he/she/it is unaware. While not required in other situations, a NOID also provides an applicant, petitioner, or requestor with adequate notice and sufficient opportunity to respond to an intended denial on other substantive grounds.[6]

When a preliminary decision has been made to deny an application or petition and the denial is not based on lack of initial evidence or a statutory denial as discussed in Chapter 10.5(b), and 8 CFR 103.2(b)(16)(i) applies, the adjudicator must issue a written NOID to the applicant, petitioner, or requestor providing up to a maximum of 30 days to respond to the NOID. The NOID must include the required response date.

\* \* \*

☞     (5)  The *AFM* **Transmittal Memoranda** button is revised by adding, in numerical order, a
      new entry to read:

| **PM-602-0163** July 13, 2018 | **Chapter 10.5(a); and Chapter 10.5(b)** | Amends standards for issuance of certain requests for evidence and notices of intent to deny. |
|---|---|---|

---

[6] Note that this does not apply to filing deficiencies such as signatures, which are subject to the regulations at 8 CFR 103.2(a)(7)(ii) and the policy memorandum, "Signatures on Paper Applications, Petitions, Requests, and Other Documents field with U.S. Citizenship and Immigration Services, PM-602-0134.1, dated February 16, 2018, and effective beginning on March 17, 2018

PM-602-0163
Issuance of Certain RFEs and NOIDs; Revisions to *Adjudicator's Field Manual* (*AFM*) Chapter
10.5(a), and 10.5(b)
Page 8

**Use**

This PM is intended solely for the training and guidance of USCIS personnel in performing their duties
relative to the adjudication of applications and petitions.  It is not intended to, does not, and may not be
relied upon to create any right or benefit, substantive or procedural, enforceable at law or by any
individual or other party in removal proceedings, in litigation with the United States, or in any other
form or manner.

**Contact Information**

If USCIS adjudicators have questions or suggestions regarding this PM, they should direct them
through their appropriate chains of command to the Office of Policy and Strategy.

# EXHIBIT G

**U.S. Department of Justice**

Executive Office for Immigration Review

*Office of the Director*

5107 Leesburg Pike, Suite 2600
Falls Church, Virginia 22041

Director

January 17, 2018

MEMORANDUM TO:   The Office of the Chief Immigration Judge
                 All Immigration Judges
                 All Court Administrators
                 All Immigration Court Staff

FROM:            James R. McHenry III
                 Director

SUBJECT:         Case Priorities and Immigration Court Performance Measures

This memorandum is effective immediately, applies prospectively to all new cases filed and to all immigration court cases reopened, recalendared, or remanded, and serves to rescind the January 31, 2017, memorandum entitled "Case Processing Priorities" and all other prior memoranda establishing case processing or docketing priorities.

## I.      Background

On December 6, 2017, the Attorney General issued a memorandum to all Executive Office for Immigration Review (EOIR) employees outlining several principles to follow to ensure that the adjudication of immigration court cases serves the national interest. It also provided that the Director of EOIR may issue further guidance to ensure the achievement of those principles. Pursuant to 8 C.F.R. § 1003.0(b)(1)(ii) and (iv), the EOIR Director has the authority to "[d]irect the conduct of all EOIR employees to ensure the efficient disposition of all pending cases, including the power, in his discretion, to set priorities or time frames for the resolution of cases and otherwise to manage the docket of matters to be decided by the immigration judges" and to "[e]valuate the performance of the Office of the Chief Immigration Judge (OCIJ) and take corrective action where needed."

Accordingly, pursuant to that authority and in accordance with the Attorney General's principles, this memorandum lays out EOIR's specific priorities and goals in the adjudication of immigration court cases.

## II.    Case Prioritization

EOIR has always designated detained cases as priorities for completion.  In 2014, EOIR began designating other types of "priority" cases for docketing and processing purposes, and those priority designations have been subsequently modified three times—most recently on January 31, 2017.

The repeated changes in case prioritization have caused confusion and created difficulty in comparing and tracking case data over time.  But, most importantly, the frequent shifting priority designations did not enhance docket efficiency.  Not only were cases repeatedly moved to accommodate new priorities without a clear plan for resolving both the new and older cases, but also the designations did not adequately stress the importance of completing all cases in a timely manner.

For example, less than 10% of cases currently pending meet the definition of "priority" outlined in the January 31, 2017, memorandum—a statistic that conveys a potentially mistaken impression regarding the importance of completing the other 600,000-plus pending cases that do not bear a "priority" designation.

Accordingly, to address concerns and confusion, it is appropriate to clarify EOIR's priorities and goals to ensure that the adjudication of cases serves the national interest consistent with the principles outlined by the Attorney General.

All cases involving individuals in detention or custody, regardless of the custodian, are priorities for completion.[1]  Likewise, cases subject to a statutory or regulatory deadline, cases subject to a federal court-ordered deadline, and cases otherwise subject to an established benchmark for completion, including those listed in Appendix A, are also priorities.  As developments warrant, other priority designations may be established as appropriate, and other categories of cases may be tracked regardless of whether they reflect a priority designation.

The designation of a category of cases as priority is an indication of an expectation that such cases should be completed expeditiously and without undue delay consistent with due process.  Because the designations outlined in this memorandum apply prospectively, it is not intended to require the rescheduling of currently-docketed cases.  The designation of priority cases is also not intended to diminish or reduce the significance of other cases.  Indeed, the timely completion of *all* cases consistent with due process remains a matter of the utmost importance for the agency.  Finally, the designation of a case as a priority is not intended to limit the discretion afforded an immigration judge under applicable law, nor is it intended to mandate a specific outcome in any particular case.

---

[1] Cases of aliens in the custody of the Department of Homeland Security and aliens in the care and custody of the Department of Health and Human Services who do not have a sponsor identified were priorities under prior policy and remain so under this new policy.

### III.   Immigration Court Benchmarks and Performance Metrics

Apart from designated case priorities, EOIR's case processing has also involved other types of evaluative measures over time, such as statutory or regulatory deadlines for the completion of certain types of cases, including under the Immigration and Nationality Act (INA), the Government Performance and Results Act (GPRA) of 1993, and the GPRA Modernization Act of 2010.  Although these case completion goals have not previously denoted case priorities *per se*, they do serve as indicators of the importance of completing certain classes of cases in a timely manner.

Historically, EOIR also utilized case completion measures for non-detained cases from FY 2002 to FY 2009, but it eliminated those measures in FY 2010, leading to confusion regarding the extent to which the timely completion of non-detained cases was perceived as a priority for the agency.  The abolition of non-detained case completion benchmarks was also subsequently criticized by both the Department of Justice (DOJ) Office of Inspector General and the Government Accountability Office, both of whom recommended that EOIR reinstate goals for the completion of non-detained cases.  In 2016 and 2017, the House Committee on Appropriations also directed EOIR to establish a goal that the median length of detained cases be no longer than 60 days and the median length of non-detained cases be no longer than 365 days.

Although EOIR has previously stated that case completion goals are statements of agency priorities and has tracked performance relative to those goals, it has not expressly designated cases subject to such measures as priorities, unless they happened to fall into another category that was a priority (*e.g.* detained cases).  This has led to even further confusion regarding the interaction between case priorities and case resolution goals, especially because the overwhelming majority of pending cases in recent years were neither designated as a priority nor subject to a performance goal.

Almost every trial court system utilizes performance measures or case completion metrics to ensure that it is operating efficiently and appropriately.  Some of these are established by statute or regulation whereas others are set by policy; nevertheless, trial court performance measures are an essential and widely-recognized tool for ensuring healthy and effective court operations.

In the federal system, for example, the Civil Justice Reform Act of 1990 requires semiannual reporting of the number of certain types of civil cases and motions pending beyond a particular date with the intent of reducing litigation delays in federal district courts.  Many administrative adjudicatory systems also feature case processing time standards, either by statute,

regulation, or policy.[2]  At the state level, most states have adopted court case processing time standards, many of which follow model standards approved by the American Bar Association (ABA).[3]

In fact, over 25 years ago, the ABA recognized the importance of establishing court performance standards to ensure effective case management and to avoid undue delay; in doing so, it outlined seven essential elements for managing cases, including several that are now being implemented by EOIR such as "[p]romulgation and monitoring of time and clearance standards for the overall disposition of cases," "[a]doption of a trial-setting policy which schedules a sufficient number of cases to ensure efficient use of judge time while minimizing resettings caused by overscheduling," "[c]ommencement of trials on the original date scheduled with adequate advance notice," and "[a] firm, consistent policy for minimizing continuances."[4]  In short, court performance measures and case completion goals are common, well-established, and necessary mechanisms for evaluating how well a court is functioning at performing its core role of adjudicating cases.

EOIR is no exception to the rule that court performance measures are a necessary accountability tool to ensure that a court is operating at peak efficiency, nor is there anything novel or unique about applying performance measures to EOIR's immigration courts.[5]  Rather, a review of such measures is vital to ensure that the immigration court system is performing strongly, that EOIR is adjudicating cases fairly, expeditiously, and uniformly consistent with its mission, and that it is addressing its pending caseload in support of the principles established by the Attorney General.

Accordingly, to ensure that EOIR is meeting these goals, the court-based performance measures outlined in Appendix A to this memorandum will be tracked by EOIR, and court

---

[2] *See, e.g.*, 42 U.S.C. § 1395ff (establishing hearing deadlines for cases before administrative law judges at the Department of Health and Human Services); Fed. Energy Regulatory Comm'n, Summary of Procedural Time Standards for Hearing Cases, https://www.ferc.gov/legal/admin-lit/time-sum.asp (last updated Mar. 10, 2017) (outlining time standards for administrative law judges hearing cases at the Federal Energy Regulatory Commission).

[3] *See Case Processing Time Standards*, Nat'l Ctr. for State Courts, http://www.ncsc.org/cpts (last visited January 9, 2018); *Model Time Standards for State Trial Courts* (Nat'l Ctr. for State Courts 2011), http://www.ncsc.org/Services-and-Experts/Technology-tools/~/media/Files/PDF/CourtMD/Model-Time-Standards-for-State-Trial-Courts.ashx.

[4] *See* Judicial Admin. Div., Am. Bar Ass'n, *Standards Relating to Trial Courts* § 2.51 (vol. II 1992), *available at* https://www.americanbar.org/content/dam/aba/migrated/divisions/Judicial/MO/MemberDocuments/trialcourtstandards.authcheckdam.pdf.

[5] EOIR's other adjudicatory components, the Board of Immigration Appeals and the Office of the Chief Administrative Hearing Office, are also subject to performance measures.

performance in meeting them will be regularly audited.  These goals are intended to help
determine which courts are operating in a healthy and efficient manner, and which courts may be
in need of more specialized attention in the form of additional resources, training, court
management, creative thinking and planning, and/or other action as appropriate.

As published here in Appendix A, these court-based goals are not intended to apply
specifically to any individual employee; rather, these goals apply to the court as a whole, and all
court employees accordingly share responsibility for working together to successfully meet
them.[6]

OCIJ will provide additional "not-to-exceed" guidelines for each goal, as appropriate.
Further, some cases may be subject to more than one goal.  EOIR will also track the clearance
rate (the ratio of new cases filed to cases completed) and the age of existing cases at each court
and may announce future goals for those statistics at a later date.

Many of these measures derive from statutory or regulatory mandates, including the INA;
others derive from EOIR's goals developed under GPRA.  Still others, such as a goal of ensuring
file completion and accuracy, are simply reflections of the standard that a professional
administrative court system should endeavor to attain.  Although many of these goals have
already existed for several years at EOIR, their current designation clarifies that cases subject to
a goal should be considered priority cases and reiterates that the goals themselves reflect
considered policy judgments regarding optimal court performance and functioning that EOIR's
immigration courts should strive to achieve.

EOIR is already meeting, or close to meeting, some of these goals; for instance, the
median length of time a detained case is pending at the immigration court level is currently less
than 60 days.  For other goals, they may appear merely aspirational at first, and the agency is
cognizant that it may take time for them to be fully realized.  Nevertheless, as a professional
administrative court system within the DOJ exercising the Attorney General's delegated
authority, EOIR should strive to become the preeminent administrative adjudicatory agency in
the federal government and to fulfill its mission at the highest level possible.  Further, by making
you aware of these goals, you can begin thinking about how, with these goals in mind, EOIR's
day-to-day activities can be streamlined to improve efficiency while maintaining due process.
Moreover, there is no doubt that as the agency puts into place additional resources, training, and

---

[6] In autumn 2017, following collective bargaining, EOIR and the National Association of Immigration Judges jointly
agreed to remove language from Article 22 of their labor agreement that had limited EOIR's ability to measure and
evaluate immigration judge performance.  Although many of the policy considerations relevant for setting court
performance goals are also relevant for setting performance metrics for individual immigration judges, especially
regarding goals that have existed in some form at EOIR already for several years, the implementation of those metrics
specifically for immigration judges is subject to an ongoing process and is beyond the scope of this memorandum.

more efficient processes, you will continue impress with your dedication to our mission.  As the Attorney General indicated, every employee at EOIR can contribute something to improve the system, and your creative suggestions regarding more effective case management are welcome.

**IV.     Conclusion**

      Thank you for your dedication and professionalism as we work together as a team to ensure that the adjudication of immigration court cases serves the national interest in accordance with the principles outlined by the Attorney General.

      Please contact your Assistant Chief Immigration Judge with any questions you may have concerning this memorandum.

      This guidance is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.  Nothing in this memorandum should be construed as mandating a particular outcome in any specific case.

Attachment

# APPENDIX A

## IMMIGRATION COURT PERFORMANCE MEASURES

1. Eighty-five percent (85%) of all non-status[7] detained removal[8] cases should be completed[9] within 60 days of filing of the Notice to Appear (NTA), reopening or recalendaring of the case, remand from the Board of Immigration Appeals (BIA), or notification of detention.

2. Eighty-five percent (85%) of all non-status non-detained removal cases should be completed within 365 days (1 year) of filing of the NTA, reopening or recalendaring of the case, remand from the BIA, or notification of release from custody.

3. Eight-five percent (85%) of all motions should be adjudicated within 40 days of filing.

4. Ninety percent (90%) of all custody redeterminations should be completed within 14 days of the request for redetermination.

5. Ninety-five percent (95%) of all hearings should be completed on the initial scheduled individual merits hearing date.

6. One hundred percent (100%) of all credible fear reviews should be completed within seven (7) days of the initial determination by an asylum officer that an alien does not have a credible fear of persecution. *See* INA § 235(b)(1)(B)(iii)(III). One hundred percent (100%) of all reasonable fear reviews should be completed within 10 days of the filing of the negative reasonable fear determination as reflected in Form I-863. *See* 8 C.F.R. § 1208.31(g).

7. One hundred percent (100%) of all expedited asylum cases should be completed within the statutory deadline and consistent with established EOIR policy. *See* INA 208(d)(5)(A)(iii); OPPM 13-02.

8. Eighty-five percent (85%) of all Institutional Hearing Program (IHP) removal cases should be completed prior to the alien's release from detention by the IHP custodian.

9. One hundred percent (100%) of all electronic and paper records should be accurate and complete.

---

[7] A status case is (1) one in which an immigration judge is required to continue the case pursuant to binding authority in order to await the adjudication of an application or petition by U.S. Citizenship and Immigration Services, (2) one in which the immigration judge is required to reserve a decision rather than completing the case pursuant to law or policy, or (3) one which is subject to a deadline established by a federal court order.

[8] A "removal" case includes a case in removal proceedings, in addition to any reopened, recalendared, or remanded cases in exclusion or deportation proceedings.

[9] A completed removal case is one in which a final decision has been rendered concluding the case at the immigration court level and encompasses an order of removal, an order of voluntary departure, an order terminating proceedings, or an order granting protection or relief from removal. For other types of cases, a completed case is one in which a final decision has been rendered appropriate for the specific type of case proceeding.

# EXHIBIT H

# Citizenship and Immigration Services Ombudsman

## Ensuring Process Efficiency and Legal Sufficiency in Special Immigrant Juvenile Adjudications

December 11, 2015

For over 25 years, the Special Immigrant Juvenile (SIJ) visa program has provided important long-term immigration relief to certain foreign-born children who are present in this country and in need of protection.  The program serves a small group of children who meet specific requirements, while other USCIS programs – including the asylum, refugee, and Central American Minors (CAM) programs – provide additional forms of relief to children fleeing persecution, violence, and other dangerous country conditions, as well as for children trying to reunite with family in the United States.  I believe that now, more than ever, we should strengthen our resolve to ensure that legal protections available to vulnerable foreign children are not only administered effectively and efficiently, but with the true humanitarian spirit in which they were designed.

Since the Ombudsman's Office first issued recommendations on this topic in 2011, USCIS has made some efforts to improve SIJ adjudications.  In fact, it recently accepted one of the recommendations included here – to consolidate SIJ adjudications. The agency advised it has chosen the National Benefits Center within its Field Operations Directorate for this task.  If implemented with adequate training, this change stands to bring both efficiency and consistency to SIJ adjudications.  However, processing petitions by a single group of officers is not enough to ameliorate the issues our office observed in reviewing this program.  Among other recommendations presented here, USCIS must still issue new regulations and guidance reflective of the current state of the law, and it must stop the practice of issuing overly burdensome requests for documentation regarding underlying juvenile court dispositions.

The recommendations in this report are the result of an in-depth review of USCIS' current policies and practices in the field.  I believe that, once implemented, these reforms will help achieve high quality and consistent SIJ adjudications along with a predictable and fair application process for juvenile applicants and those who serve them.

Sincerely,

Maria Odom
Citizenship and Immigration Services Ombudsman

## RECOMMENDATIONS

The Ombudsman recommends that USCIS:

1) Centralize SIJ adjudications in a facility whose personnel are familiar with the sensitivities surrounding the adjudication of humanitarian benefits for vulnerable populations;

2) Take into account the best interests of the child when applying criteria for interview waivers;

3) Issue final SIJ regulations that fully incorporate all statutory amendments; and

4) Interpret the consent function consistently with the statute by according greater deference to State court findings.

## REASONS FOR THE RECOMMENDATIONS

- Requests for assistance submitted to the Ombudsman show inconsistent application of the standard related to the "express" nature of the consent authority, frequently resulting in requests to review the underlying court documents that have already established the necessary findings (i.e., dependency on a court or State agency; inability to be reunited with the parents due to abuse, neglect, abandonment or similar basis; and that it is in the best interests of the child not to be returned to the country of last residence or citizenship).
- Despite high approval rates and additional training of adjudicators, stakeholders have reported inconsistent interview techniques and focus.
- Existing regulations and guidance do not adequately reflect the latest in statutory amendments.

Citizenship and Immigration Services Ombudsman

## Ensuring Process Efficiency and Legal Sufficiency in Special Immigrant Juvenile Adjudications

### December 11, 2015

*The Citizenship and Immigration Services Ombudsman, established by the Homeland Security Act of 2002, provides independent analysis of problems encountered by individuals and employers interacting with U.S. Citizenship and Immigration Services, and proposes changes to mitigate those problems.*

## EXECUTIVE SUMMARY

Established through the Immigration Act of 1990, the Special Immigrant Juvenile (SIJ) program has undergone a number of legislative amendments in the past 25 years. Currently it protects those children who cannot be reunited with one or both parents due to abuse, neglect, abandonment, or a similar basis under State law.[1] These statutory modifications have had a substantial impact on the SIJ adjudicatory process and on SIJ petitioners. The Ombudsman has brought a number of concerns to the attention of USCIS over the past several years, including overreach in the exercise of its consent function; the use of age-inappropriate interviewing techniques; inconsistent application of legal standards; and petition processing delays.[2] Although training has been developed and made available to improve SIJ adjudications, it has not fully resolved ongoing problems, as reflected in continued stakeholder reports to the Ombudsman as well as in agency actions that do not consistently comport to such training.

The Ombudsman recognizes that the SIJ program presents special challenges to adjudicators who handle these complex adjudications as part of their varied portfolios. The Ombudsman has discussed with USCIS the need for centralization of the SIJ adjudication function in one location. Centralization will improve the quality and consistency in adjudications by specially trained employees dedicated to these and other petitions for protective and/or humanitarian relief. It will support a higher level of compliance with statutory processing timeframes and enhance the integrity of the product line. While USCIS has committed to consolidate the full processing of SIJ petitions, the Ombudsman recommends that SIJ petitioners be treated in a manner consistent with USCIS' treatment of other vulnerable populations, including the use of age-appropriate interviewing practices. In addition, the Ombudsman continues to see examples where USCIS reassessed underlying State court dependency orders. USCIS' statutory consent function does not appropriately extend to a *de novo* review of every underlying fact that supported the Court's findings.

In short, the Ombudsman is recommending that USCIS:

1. Centralize SIJ adjudications in a facility whose personnel are familiar with the sensitivities surrounding the adjudication of humanitarian benefits for vulnerable populations;

---

[1] Immigration and Nationality Act 101(a)(27)(J).

[2] Ombudsman's Annual Reports 2015, pp. 55-59; 2014, pp. 13-15; 2013, pp. 14-16; 2012, pp. 21-22; and 2011, pp. 20-21.

2. Take into account the best interests of the child when applying criteria for interview waivers;
3. Issue final SIJ regulations that fully incorporate all statutory amendments; and
4. Interpret the consent function consistently with the statute by according greater deference to State court findings.


**METHODOLOGY**

In conducting this review, the Ombudsman met with stakeholders nationwide and USCIS Headquarters officials representing the Field Operations Directorate, the Office of Chief Counsel, and the Office of Policy and Strategy to discuss the regulations, policies, and procedures impacting SIJ adjudications. The Ombudsman made site visits to USCIS field offices that perform SIJ adjudications. The Ombudsman also reviewed and sought to resolve stakeholder requests for case assistance submitted to our office over a period of several years. Finally, the Ombudsman requested and received information and data from the Field Operations Directorate regarding SIJ adjudications.


**BACKGROUND**

***Statutory and Regulatory Framework***. By establishing the SIJ classification, Congress has provided immigration relief for children who meet certain qualifying criteria.[3] Generally, to be eligible to apply for SIJ status, a State juvenile court must have previously declared the child to be dependent on the court, or legally committed the child to the custody of a State agency or an appointed individual. In addition, the court must have found that the child cannot be reunited with one or both of the child's parents due to abuse, neglect, abandonment, or a similar basis under State law.[4] An administrative or judicial proceeding must have also determined that it would not be in the best interests of the child to be returned to the child's or parents' country of citizenship or last habitual residence.[5]

Congress has substantially modified the classification since it was created in 1990. For example, in 1997, Congress amended the SIJ definition to safeguard the process from abuse by restricting it to only those juveniles deemed eligible for long-term foster care because of abuse, neglect, or abandonment.[6] The amendment also required the Attorney General (now the Secretary of Homeland Security) to "expressly[7] consent to the dependency order serving as a precondition to the grant of [SIJ] status."[8] With this language, Congress introduced a new requirement – that the Secretary clearly indicate when a court order may serve as a pre-requisite to SIJ eligibility.

---

[3] Immigration Act of 1990, Pub. L. No. 101–649 at § 153(a)(3)(J), 104 Stat 4978 (Nov. 29, 1990). Historically, U.S. government efforts to protect children resulted in a gap for immigrant children who were protected during their childhood but grew into adults with no legal immigration status. *See generally* "Regulating Consent: Protecting Undocumented Immigrant Children from their (Evil) Step-Uncle Sam, or How to Ameliorate the Impact of the 1997 Amendments to the SIJ Law," Angela Lloyd, 15 B.U. Pub. Int. L.J. 237, at 1.

[4] INA § 101(a)(27)(J).

[5] *Id.*

[6] Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 113, 111 Stat. 2440 (Nov. 26, 1997); *see Gao v. Jenifer,* 185 F.3d 548, at 552 (1999).

[7] The term "expressly" is an adverb to describe how one makes something known or indicates clearly and definitively so as to leave no doubts about the action supported by the adverb. American Heritage Dictionary, Merriam-Webster Dictionary.

[8] Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 113, 111 Stat. 2440 (Nov. 26, 1997).

# Citizenship and Immigration Services Ombudsman

Congress modified the statute in this way to limit eligibility by requiring the Secretary "to determine that neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining [immigration] status … rather than for the purpose of obtaining relief from abuse or neglect."[9]  At the same time, Congress expressed the clear delineation between the State court and the Federal immigration adjudicator, stating that "the involvement of the [Secretary] is for the purposes of determining special immigrant juvenile status and not for making determinations of dependency status."[10]

INS (the predecessor of USCIS for this function) issued two policy memoranda in 1998 and 1999, instructing adjudicators to request information to enable them to make independent findings regarding abuse, abandonment, neglect and best interests.[11] This was in stark contrast to SIJ final regulations published in 1993, which recognized that it "would be both impractical and inappropriate for the Service to routinely re-adjudicate judicial or social service agency administrative determinations…."[12]

In 2004, USCIS issued a third policy memorandum, employing a new term of art to describe when the agency takes action to permit a State court order to serve as a pre-requisite for SIJ:

> *Express consent* means that the Secretary… has 'determine[d] that neither the dependency order nor the administrative or judicial determination … was sought primarily for the purpose of obtaining … status … rather than for the purpose of obtaining relief from abuse or neglect [or abandonment].'[citation omitted]  In other words, express consent is an acknowledgement that the request for SIJ classification is bona fide.[13]

The 2004 memorandum also instructed adjudicators to examine State court orders for independent assurance that courts acted in an "informed" way.[14]  At the same time, it instructed adjudicators not to "second-guess" findings made by State courts because "express consent is limited to the purpose of determining [SIJ] status, and not for making determinations of dependency status."[15]  However,

---

[9] H.R. Conf. Rep. 105-405, at 130 (Nov. 13, 1997).

[10] *Id.*

[11] INS Memorandum, "Interim Field Guidance relating to Public Law 105-119 (Sec. 113) amending Section 101(a)(27)(J) of the INA – Special Immigrant Juveniles" (Aug. 7, 1998); INS Memorandum, "Special Immigrant Juveniles - Memorandum #2:  Clarification of Interim Field Guidance" (Jul. 9, 1999); http://www.uscrirefugees.org/2010Website/5_Resources/5_4_For_Lawyers/5_4_2_Special_Immigrant_Juvenile_Status /5_4_2_3_Published_Decisions_and_Memoranda/Cook_Thomas_SpecialImmigrantJuvenilesMemorandum.pdf (accessed Jun. 1, 2015).

[12] "Special Immigrant Status; Certain Aliens Declared Dependent on a Juvenile Court; Final Rule," 58 Fed. Reg. 42843-51, 42847 (Aug. 12, 1993).

[13] USCIS Interoffice Memorandum, "Memorandum #3 -- Field Guidance on Special Immigrant Juvenile Status Petitions" (May 27, 2004); http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/sij_memo_052704.pdf (accessed August 3, 2015).

[14] USCIS Interoffice Memorandum, "Memorandum #3 -- Field Guidance on Special Immigrant Juvenile Status Petitions" (May 27, 2004); http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/sij_memo_052704.pdf (accessed August 3, 2015).

[15] *Id*.

in that memorandum, USCIS instructed adjudicators to give "express consent" only if the adjudicator was aware of the facts that formed the basis for the juvenile court's rulings. This direct instruction led to adjudicators reassessing the facts underlying the juvenile court's findings, contradicting the agency's instruction not to "second-guess" findings made by State courts. Overall, the 2004 memorandum constructed a consent concept that disproportionately amplified the use of "express consent" when trying to clarify which types of orders would serve as a precondition of SIJ status.

The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) contained substantial amendments to the SIJ classification. Among its amendments, TVPRA deleted the requirement to "expressly consent" to State court dependency orders serving "as a precondition to the grant" of SIJ status, and instead requires the Secretary of Homeland Security only to consent to the grant of SIJ status.[16] The previous statutory language had provided no definition of how USCIS could "expressly consent." This contributed to the confusion over whether USCIS should examine the findings of the State court for independent assurance that the court acted in an informed way.[17] By eliminating the "express" nature of the consent requirement, TVPRA recognized State court authority and "presumptive competence"[18] over determinations of dependency, abuse, neglect, abandonment, reunification, and the best interests of children.

***SIJ Adjudication Training.*** SIJ is a complex benefit adjudication, which has undergone substantial legislative changes that supersede existing regulations and written policy guidance. Accordingly, training is essential to ensure that adjudicators have the necessary resources to apply the law correctly and consistently. In early 2014, USCIS held a training session for regional representatives who then provided training and materials to USCIS adjudicators in the field.[19] The new training module includes instruction on when USCIS may consent to grant SIJ, and directs adjudicators to accept court orders containing or supplemented by specific findings of fact. Although the training offers a sample court order that represents the type and extent of factual findings required in a juvenile State court order, it does not clarify what qualifies as a "specific finding of fact." The written training allows adjudicators to issue a Request for Evidence (RFE) "if the record does not reflect that there was a ***sufficient*** factual basis for the court's findings" (emphasis added). In practice, such instruction has led to requests for information that call for exhaustive factual findings instead of verifying whether a State court has made the requisite SIJ findings – even in cases where the State court order provides more information than that offered in the USCIS training sample order.

***Approval and Denial Rates.*** In spite of a growing trend to issue overreaching and overly burdensome requests for additional information, the agency currently approves most SIJ petitions (Figure 1). As discussed in the Ombudsman's 2014 and 2015 Annual Reports to Congress, burdensome RFEs in particular reflect "overly expansive search[es] for records supporting the

---

[16] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) § 235(d)(1), Pub. L. 110-457, 122 Stat. 5044 (2008).

[17] Consent is defined as acquiescence or agreement, or "the act or result of coming into harmony or accord." Express consent, by contrast, implies a higher standard as "positive, direct, unequivocal consent, requiring no inference or implication to supply its meaning." Black's Law Dictionary (Fifth Ed.).

[18] *Gao v. Jenifer*, 185 F.3d 548 (1999) at 556, *citing Holmes Fin. Assocs. v. Resolution Trust Corp.*, 33 F.3d 561, 565 (6th Cir. 1994).

[19] *See generally* Ombudsman's Annual Report 2014, pp. 13-15.

factual findings of State courts, including full court transcripts, and, in some cases, any and all evidence submitted in the underlying proceedings."[20]  While these RFEs rarely lead to denials, they do have an adverse impact on juvenile petitioners and their representatives who must obtain and release potentially protected information.  They also have an adverse impact on legal service providers who must expend limited resources to respond to such inquiries, which impedes the provision of *pro bono* legal services to others, especially to children.

Figure 1.  Special Immigrant Juvenile Status — Receipts, Approvals, RFEs, Notices of Intent to Deny (NOIDs), Denials, FY14 – FY15[21]

| FISCAL YEAR | RECEIPTS | APPROVALS | RFEs | NOIDs | DENIALS |
|---|---|---|---|---|---|
| 2014 Totals | 5,817 | 4,606 | 171 | 89 | 247 |
| 2015 Totals | 6,334 | 5,115 | 332 | 109 | 195 |

## ONGOING CONCERNS REGARDING THE ADJUDICATION OF SIJ PETITIONS AND USCIS EXERCISE OF CONSENT

The Ombudsman continues to observe inconsistencies in USCIS' adjudication of SIJ petitions, its application of legal principles, and the factual evaluations that are conducted under its consent authority.  Adjudicators continue to seek evidence underlying State court dependency orders, which is inconsistent with the statutory scheme and USCIS' own training materials.

***Consenting to SIJ.***  Congress eliminated both the express nature of USCIS consent, and the need for the order to serve as a precondition to the grant of status.  USCIS policy, however, did not keep up with those very significant revisions, relying instead on language that had disappeared from the statute.  As a result, RFEs and NOIDs continue to rely on outdated analytical tools.  While RFEs and NOIDs often state that USCIS is not reviewing the State court process, the practical effect is a *de novo* review of the State court's process and determinations pertaining to the abuse, neglect, or abandonment of the child.  Congress, through statute, did not charge USCIS with determining a child's best interests; whether a child has been abused, abandoned or neglected; or whether reunification with one of more parents is viable.  By statute, that is the role of the State court.  Yet, in its adjudications, USCIS has asked for documentation to assess those findings, has reviewed and second-guessed those findings, and has sought to determine whether the court exercised its dependency jurisdiction in accordance with State law.

Consent is not defined in the statute.  Through policy, USCIS exercises its consent authority by verifying whether SIJ petitions are *bona fide* [22] and whether immigration benefits were the primary

---

[20] Ombudsman's Annual Report 2014, pp. 14-15.

[21]   Data set: Form I-360 Petition for Special Immigrant Juveniles; http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-360-petition-special-immigrant-juveniles (Aug. 28, 2015).

[22] USCIS Memorandum, HQOPS 70/8.5 "Trafficking Victims Protection Reauthorization Act of 2008:  Special Immigrant Juvenile Status Provisions" (Mar. 24, 2009); http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/TVPRA_SIJ.pdf (accessed Jun. 1, 2015)("[T]he consent determination … is an acknowledgement that the request for SIJ classification is bona fide.")

# Citizenship and Immigration Services Ombudsman

purpose for pursuing the State court order.[23]   In cases reviewed by the Ombudsman, USCIS has looked at whether the State court made an "informed decision," properly exercised its jurisdiction as a juvenile court, acted "in accordance with State law," or had a "factual basis" for its findings.[24] This has resulted in requests for documentation that are overly burdensome and intrusive, and some to which a response is difficult – if not impossible – owing to the protected nature of the court documentation.

The Ombudsman has reviewed cases where RFEs and NOIDs requested all court-related filings, evidence, transcripts, and even confidential, sealed hearing documents.  These RFEs and NOIDs often result in an overly expansive review of the petitioner's intentions for seeking a dependency court order and may call into question the necessity of protection and the court's exercise of dependency upon applicable State law.  The State court orders must provide specific findings of fact to enable USCIS to provide the necessary consent; those findings have been spelled out in the trainings as well as applicable guidance.  However, to provide consent, the agency need not request corroboration of every underlying fact that supported those findings, nor should it substitute its application of State law for that of the court's exercise of dependency.

***Evaluating the Primary Purpose of Court Orders.***  As a whole, provisions in the TVPRA were enacted to enhance protections for at-risk children,[25] which was a shift from the 1997 amendments that sought to address problems and limit beneficiaries.[26]  When Congress changed the statutory language for SIJ in 2008, it removed an entire clause that relied upon the limitations enacted in 1997 and replaced it with a simpler function.  USCIS policy should reflect these statutory changes. Rather than retain the elements of "express consent" derived from the 1997 amendments, a proper implementation of the TVPRA language requires that USCIS verify whether State court orders contain the necessary factual findings and whether the State court has articulated the foundation for such findings (i.e., based upon testimony of parties, evidence submitted into the record, and/or statutory citations).  USCIS does not need to evaluate intent for initiating dependency court

---

[23] USCIS Interoffice Memorandum, "Memorandum #3 – Field Guidance on Special Immigrant Juvenile Status Petitions" (May 27, 2004);
http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/sij_memo_052704.pdf (accessed May 27, 2015). "Express consent means that the Secretary … has "determine[d] that neither the dependency order nor the administrative or judicial determination of the alien's best interest was sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence."  USCIS Memorandum, HQOPS 70/8.5 "Trafficking Victims Protection Reauthorization Act of 2008: Special Immigrant Juvenile Status Provisions" (Mar. 24, 2009) ("The consent determination by the Secretary … is an acknowledgement that the request for SIJ classification is bona fide. This means that the SIJ benefit was not 'sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect or abandonment'" (citing H.R. Rep. No. 105-405).)
[24] Information provided through requests for case assistance.
[25] The TVPRA was enacted "to enhance measures to combat trafficking in persons, and other purposes."  The section of the TVPRA in which SIJ language is modified is titled "Permanent Protection for Certain At-Risk Children."  It is included in a larger section titled "Enhancing Efforts to Combat the Trafficking of Children," which contains sub-sections titled "Combating Child Trafficking at the Border and Ports of Entry into the United States," "Combating Child Trafficking and Exploitation in the United States," and "Providing Safe and Secure Placements for Children." The 1997 amendments, by contrast, were incorporated into an appropriations bill "to address several problems encountered in the implementation of the special immigrant juvenile provision…and limit the beneficiaries of this provision."  See William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) § 235, Pub. L. 110-457, 122 Stat. 5044 (2008) and H.R. Rep. No. 105-405, at 130 (1997).
[26] *Id.*

proceedings nor weigh evidence or State laws to determine whether it believes the court made proper findings.

Continuing to apply the "express consent" requirement by requiring "an acknowledgement that [requests are] bona fide,"[27] may lead to a presumption by USCIS that the primary purpose for obtaining a State court order was to obtain an immigration benefit, unless the officer has the ability to review and assess all the underlying facts of the State case.  This primary purpose inquiry relies on a false dichotomy that suggests it is possible that a State court action may only focus on *either* protections against future harm *or* securing immigration benefits, when almost always, the court protections inevitably provide both in tandem.  Securing stability in the form of status in the United States is irrevocably a key aspect of protecting a child from future harm.  As a consequence of the "bona fide" review, "express consent" continues unaltered and USCIS adjudicators have in practice nullified the clause amended by Congress in the TVPRA.

Stakeholders have reported USCIS frequently requires petitioners to be under a continuing jurisdiction of a State court at the time of filing an SIJ petition.[28]  Historically, after having been found dependent on a court, petitioners continued to remain eligible for SIJ status.[29]  The INA requires that an SIJ petitioner must be a person who "has been declared dependent" on a court or "legally committed to" the custody of a State agency or an individual appointed by the court.  A plain language interpretation of "has been declared…or legally committed to [the custody of an agency or individual]" does not require continued active administration by the court – rather, it allows for determinations by the court that continue into the present as well as determinations made during an unspecified period of time prior to filing an SIJ petition.  Congress had, but did not exercise, the ability to restrict and limit eligibility to a person who "is dependent" upon a court within a specified time frame, including "at the time of filing."

USCIS has also interpreted its consent function to include an analysis of whether a court's exercise of dependency is valid.[30]  The Ombudsman has reviewed RFEs and NOIDs that ask applicants to "provide evidence that the court order is valid under State law…"[31]  This implies that a court order is not sufficient "evidence" to demonstrate that a court is issuing a valid order under State laws; or that courts knowingly issue invalid orders, or are otherwise prone to misapply State laws such that USCIS needs to probe the validity of their final product.  By using its own analysis of State law,

---

[27] "[T]he consent determination … is an acknowledgement that the request for SIJ classification is bona fide.  This means that the SIJ benefit was not "sought primarily for the purpose of obtaining the status of an alien lawfully admitted for permanent residence, rather than for the purpose of obtaining relief from abuse or neglect or abandonment."  USCIS Memorandum, HQOPS 70/8.5 "Trafficking Victims Protection Reauthorization Act of 2008: Special Immigrant Juvenile Status Provisions" (Mar. 24, 2009) *citing* H.R. Rep. No. 105-405, at 130 (1997); http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/2009/TVPRA_SIJ.pdf (accessed Jun. 1, 2015).

[28] According to stakeholder reports, USCIS has requested final orders to demonstrate continuing jurisdiction as well as new orders when children are transferred to guardians in other states.

[29] 8 CFR 204.11(a)  ("[A] child who has been adopted or placed in guardianship [sic] situation after having been found dependent upon a juvenile court … will continue to be considered to be eligible for long-term foster care.")

[30] In recent denials USCIS has stated that "since the Petitioner was over the age of 18 at the time the SIJ order was issued, the court did not have continuing, exclusive jurisdiction pursuant to [State law]… USCIS cannot recognize the [court] order as a valid order," and petitioners "have failed to show that [the] dependency order is valid under [] state law."

[31] Information provided through requests for case assistance.

USCIS has now extended its review beyond the factual basis of abuse, abandonment, and neglect, to now include an assessment of the legal basis of a court's action, contrary to the delineation of duties between State court and Federal immigration adjudicators expressed by Congress,[32] and historic policy.[33]  By examining a court's jurisdiction and delineating whether the jurisdiction of the court will be considered valid "for immigration purposes,"[34] USCIS is in effect reviving, in a novel way, the pre-TVPRA requirement to "specifically consent" to a court's exercise of jurisdiction.[35]

*Interviewing practices that are not age-appropriate*.  Through stakeholder engagements and requests for assistance, the Ombudsman has been made aware that some field office adjudicators have engaged in concerning interviewing practices.  These include reliance on U.S. Customs and Border Protection Form I-213, *Record of Deportable/Inadmissible Alien* to question credibility,[36] prolonged interrogation-style interviewing, and inappropriately questioning some applicants on details about family members and abuse, abandonment, or neglect.

USCIS treats inconsistencies between the interview statements and information on the Form I-213 as fraud indicators, resulting in RFEs, NOIDs, and denials of SIJ petitions.[37]  RFEs should only be issued when a petitioner fails to demonstrate "it is more likely than not that each of the required elements has been met."[38]  This preponderance of the evidence standard is generally met when court orders make findings on all of the SIJ-required elements.  Based on the interview process used to produce Form I-213, an RFE should be considered only if a statement entered into a Form I-213 by border officials overcomes the standard of proof that is met through a complete State court order.[39]  Stakeholders report that interviews were previously 20 minutes in duration three years ago

---

[32] "[T]he involvement of the [Secretary] is for the purposes of determining special immigrant juvenile status and not for making determinations of dependency status." H.R. Conf. Rep. 105-405, at 130 (Nov. 13, 1997).

[33] "[E]xpress consent is limited to the purpose of determining [SIJ] status, and not for making determinations of dependency status" USCIS Interoffice Memorandum, "Memorandum #3 -- Field Guidance on Special Immigrant Juvenile Status Petitions" (May 27, 2004); http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/Static_Files_Memoranda/Archives%201998-2008/2004/sij_memo_052704.pdf (accessed August 3, 2015).

[34] Decisions received by the Ombudsman's Office have included variations of the following language: "USCIS cannot recognize the [Court Order] as a valid order for immigration purposes."

[35] "[N]o juvenile court has jurisdiction to determine the custody status or placement of an alien in the actual or constructive custody of the Attorney General unless the Attorney General specifically consents to such jurisdiction" Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-119, § 113, 111 Stat. 2440 (Nov. 26, 1997).

[36] The Record of Deportable/Inadmissible Alien (Form I-213) is a form that is completed by Customs and Border Protection officials at the time a petitioner is apprehended at the U.S. border.

[37] However, "[an] officer should generally limit reliance on records containing statements made by juveniles at the time of initial apprehension by immigration or law enforcement.  Oftentimes juveniles do not share personal accounts of their family life with an unknown adult until they have had the opportunity to form a trusting relationship with that adult.  Additionally, the juvenile court may make child welfare placement, custody and best interests decisions that differ from the juvenile's stated intentions at the time of apprehension."  USCIS Policy Manual, Volume 6: Immigrants, Part H – Special Immigrant Juveniles, at 8.

[38] USCIS Policy Memorandum PM-602-0085, "Requests for Evidence and Notices of Intent to Deny" (Jun. 3, 2013).

[39] "Requiring evidentiary detail from an airport interview not only ignores the reality of the interview process, but would, in effect, create an unprecedented pre-asylum application process."  Singh v. INS, 292 F.3d 1017, 1021 (9th Cir. Cal. 2002); "We hesitate to view statements given during airport interviews as valuable **impeachment** sources because of the conditions under which they are taken and because a newly-arriving alien cannot be expected to divulge every

and some may now exceed an hour.[40]

In asylum interviews, another context where a minor is interviewed as a principal applicant for protective benefits, officers are encouraged to regard applicants as children first and applicants second.  Key guidelines from the Asylum Officers' Basic Training Course were incorporated into the 2014 SIJ Training and should be guiding interview practices.  Of particular importance is guidance that an "officer may encounter gaps or inconsistencies in the child's testimony … [t]he child may be unable to present testimony concerning every fact in support of the claim, not because of a lack of credibility, but owing to age, gender, cultural background, or other circumstances."[41] USCIS should maintain consistent interview practices for all children applying for immigration benefits.

**RECOMMENDATIONS**

The Ombudsman recommends that USCIS:

   1. **Centralize SIJ Adjudications in a Facility Whose Personnel are Familiar with the Sensitivities Surrounding the Adjudication of Humanitarian Benefits for Vulnerable Populations**

The Ombudsman has observed, and stakeholders report, varying interpretation and adjudicatory practices across field offices who receive the cases from the National Benefits Center.  Interview practices also vary among field offices,[42] as do the rates, quality and content of RFEs and NOIDs; the detail of decisions; and timelines for adjudication.  Similar case facts can lead to different outcomes depending on the office with jurisdiction over the petition.

Centralizing SIJ adjudications with specifically trained adjudicators who are familiar with the sensitivities involved in adjudicating humanitarian benefits for vulnerable populations will address a number of these issues and promote USCIS goals of efficiency and uniformity in adjudications. Extending the specialization found in USCIS product lines such as VAWA, T and U visas will ensure those deserving are approved, and those in which fraud is present are properly denied.  In addition, a specialized SIJ team will be better able to protect the integrity of the SIJ program by being able to identify patterns, irregularities and fraud while making well-informed adjudications based upon SIJ-specific knowledge.

Centralizing SIJ adjudications would also help USCIS adhere to the statutorily-required adjudication timeline of 180 days.  Much like other forms of adjudications, SIJ petitions have the potential for paper-based adjudications because an independent fact-finder establishes the crux of SIJ relief rather than an interview.  Ensuring a centralized adjudication process will address varied

---

detail of the persecution he or she sustained." Li v. Ashcroft, 378 F.3d 959, 963 (9th Cir. 2004)(emphasis in original); "A number of federal courts have cautioned adjudicators to keep in mind the circumstances under which an alien's statement to an inspector is taken when considering whether an alien's later testimony is consistent with the earlier statement." *Credible Fear*, USCIS Asylum Officer Basic Training Course (Revised April 14, 2006), at 19.
[40] Information provided to the Ombudsman during stakeholder meetings.
[41] *Guidelines for Children's Asylum Claims*, USCIS Asylum Officer Basic Training Course (Sept. 1, 2009), at 33.
[42] Some field offices exercise interview waivers when appropriate in accordance with training guidelines, while other offices do not.

interview practices across field offices and incorporate a process parallel to other humanitarian forms of relief.

In its 2014 and 2015 Annual Reports, the Ombudsman urged USCIS to centralize SIJ adjudications. In recent communications, USCIS indicated it is working on new procedures to centralize adjudications at a service center facility.  The Ombudsman recognizes this effort and will monitor the implementation of this important change, including the training of staff and the development of interview waiver criteria discussed below.

### 2.  Take into Account the Best Interests of the Child when Applying Criteria for Interview Waivers

In a meeting with the Ombudsman on June 30, 2015, USCIS noted that centralizing adjudications would include waiving certain interviews.  The Ombudsman believes this to be the correct course of action for various reasons, including the size, age and sensitivities of the population.  However, the criteria for assessing which interviews shall be waived should not be created primarily based on the priority interests of the USCIS Fraud Detection and National Security Division (FDNS). Offices adjudicating and addressing humanitarian concerns, such as the Office of the Chief Counsel, the Office of Policy & Strategy, and the Vermont Service Center should be equally involved.  While fraud factors have an undeniable role to play to protect both the American people and the integrity of this program, substantial input from those in the agency responsible for humanitarian benefits will help ensure balanced factors for waiving interviews and development of criteria that include the best interests of vulnerable child petitioners.

### 3.  Issue Final SIJ Regulations that Fully Incorporate All Statutory Amendments

The three policy memoranda, consolidated into the 2004 memorandum, have contributed to inconsistent adjudication regarding the extent of USCIS' consent function.[43]  The SIJ regulations, which have not been updated since 1993, no longer comport with statutory language.  DHS published a Notice of Proposed Rulemaking in September 2011,[44] but no final rules have been published.[45]  To fully comply with the notice and comment requirements of the Administrative Procedure Act, as well as relieve confusion, USCIS must finalize updates to the 1993 regulations through the completion of notice and comment rulemaking.  Addressing the meaningful comments of the regulated community in the issuance of a final rule as soon as possible would help clarify many of the currently problematic adjudicatory practices and clarify some of the issues arising from changes in law, gaps in outdated regulations, and memoranda.

---

[43] "USCIS is using non-legislative rules to muddle through in an extremely technical and sensitive context.  USCIS guidance documents leave individual[s]… on shaky ground[.]" Administrative Law through the Lens of Immigration Law, Jill Family, 64 Admin. L. Rev. 565, at 616 (Summer 2012).
[44] 76 Fed. Reg. 54978.
[45]  A final rule is now projected for April 2016.  *See* http://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201504&RIN=1615-AB81.

Citizenship and Immigration Services Ombudsman

**4. Interpret the Consent Function Consistently with the Statute by According Greater Deference to State Court Findings**

In the SIJ context, Congress determined that the State court is the finder of fact on specific issues and those judgments should be given due deference. The factual findings made by State courts should not be revisited by USCIS, and should be given deference except where there is cause to believe that they are deficient or otherwise in conflict with INA requirements. In other contexts, such as court orders of custody in family petitions, USCIS has not routinely engaged in a review of whether a court was adequately informed, properly applied State law, and properly exercised jurisdiction.[46] USCIS should presume regularity of the State court decisions rather than challenge them, and seek information regarding the consistency of the process or the courts' findings only where there is cause to believe the criteria have not been met. While it is true that in the last two fiscal years the overwhelming majority of petitions have been approved,[47] this same figure could have been achieved without burdensome RFEs, saving the time of adjudicators as well as petitions and the practitioners representing them. Instead, the low rate of denials indicates the overwhelming majority of petitioners in possession of State court orders are eligible and qualified for the status they are ultimately accorded.

**CONCLUSION**

Stakeholders report and the Ombudsman has observed adjudication inconsistencies regarding USCIS' exercise of consent, age-inappropriate interviewing techniques, and delayed processing times for SIJ adjudications. USCIS continues to seek evidence underlying State court dependency orders. The Ombudsman continues to receive reports from stakeholders experiencing difficulties with pending or recently adjudicated petitions. For these reasons, the Ombudsman recommends that USCIS: (1) centralize SIJ adjudication to improve the quality and consistency of decisions; (2) take into account the best interests of the child by applying a generous interview waiver policy; (3) issue updated regulations to incorporate the statute fully, clarify policy guidance and articulate the limitations of USCIS' consent authority; and (4) interpret the consent function fully and consistently with the statute as it now exists. These steps would substantially improve adjudications and end the agency's current practice of seeking evidence underlying State court dependency orders.

---

[46] SIJ orders are similar to criminal orders and court rulings for victims of crime. "The agency must give full faith and credit to the final court decisions just as they do criminal court convictions." 15 B.U. Pub. Int. L.J. 237 at 261.
[47] Testimony of Joseph Langlois, Associate Director, Refugee, Asylum and International Operations, USCIS, before the Homeland Security and Governmental Affairs Committee, July 7, 2015.

# EXHIBIT I

# ICE agents detained an undocumented immigrant moments after she spoke out against them

"You know who we are, you know what we're here for."

ESTHER YU HSI LEE  🐦

MAR 2, 2017, 1:49 PM





DANIELA VARGAS. CREDIT: AP PHOTO/ROGELIO V. SOLIS

Moments after Daniela Vargas—a 22-year-old undocumented immigrant who was brought to the country as a child from Argentina—spoke out against the Trump administration's deportation sweeps at a press conference on Wednesday, federal agents pulled her over and arrested her.

Four agents from the U.S. Immigration and Customs Enforcement agency Immigration pulled over Vargas' car after she left the press conference in Jackson, Mississippi. Agents reportedly told Vargas, "You know who we are, you know what we're here for."

Vargas's attorney Abby Peterson believes that the ICE agency specifically targeted Vargas after she spoke out about her fear of deportation.

"It could be retaliation," Peterson said. "They had been reading about her in the news, they had seen her at this press conference… [maybe] they didn't want to hear it anymore. Maybe I'm mistaken on that, but common sense would certainly imply that's what happened."

Advertisement



Vargas became known to the federal immigration agency last month after she hid in a closet while ICE agents arrested her undocumented brother and father. At the time, the agency temporarily arrested and released her because she said she was protected under the Deferred Action for Childhood Arrivals (DACA) initiative, a program that grants temporary deportation relief and work authorization to people who were brought to the U.S. as children.

Vargas had been a DACA recipient, but her card expired last November. Because of the high cost associated with the process, she reapplied in February and her application is still pending.

Vargas does not have a criminal record, but she has minor traffic violations, including driving without insurance.

ICE Spokesperson Thomas Byrd said that Vargas' detention was "part of routine targeted enforcement operations."

"ICE conducts targeted immigration enforcement in compliance with federal law and agency policy," Byrd said in an email statement. "ICE does not conduct sweeps or raids that target aliens indiscriminately."

Advertisement



The agency will wait for the outcome of Vargas' adjudication process to see if she qualifies for immigration relief before they take further action on her case, an agency spokesperson said.



### The Trump administration has detained a DREAMer, protected from deportation, for the last 5 days



Vargas' arrest came just hours before President Donald Trump took to the Joint Session on Congress and briefly called for bipartisan efforts to work on immigration reform. The Trump administration has expanded the type of criminal offenses punishable by deportation.

Vargas is among a handful of DACA recipients that ICE has arrested in recent days, sparking concerns from immigration advocates that the agency is being too aggressive going after people who have already been vetted and who are supposed to be shielded from immigration enforcement.

Daniel Ramirez was the first known DACA recipient arrested under the Trump administration, when ICE agents came to his house last month to look for his father. The agency claims that Ramirez is a "self-admitted gang member" and has pointed to several of his tattoos as evidence. But Ramirez's lawyers say the government intentionally tampered with documents to make it look like Ramirez was in a gang. He has been detained since February 10.

Other DACA recipients recently arrested include Josue Romero, who was arrested on suspicion of pot possession and later released; Jesus Alonso Arreola Robles, who was accused of smuggling immigrants across the U.S.-Mexico border and is still in detention; and Edwin Santiago Romero, who was held overnight by local police for traffic violations and was later released.

# EXHIBIT J

# OFFICE OF REFUGEE RESETTLEMENT

An Office of the Administration for Children & Families

## Unaccompanied Alien Children Released to Sponsors By State

Published: June 30, 2017

When a child who is not accompanied by a parent or legal guardian is apprehended by immigration authorities, the child is transferred to the care and custody of the Office of Refugee Resettlement (ORR). Federal law requires that ORR feed, shelter, and provide medical care for unaccompanied alien children until it is able to release them to safe settings with sponsors (usually family members), while they await immigration proceedings. These sponsors live in many states.

Sponsors are adults who are suitable to provide for the child's physical and mental well-being and have not engaged in any activity that would indicate a potential risk to the child. All sponsors must pass a background check. The sponsor must agree to ensure the child's presence at all future immigration proceedings. They also must agree to ensure the minor reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

HHS is engaging with state officials to address concerns they may have about the care or impact of unaccompanied alien children in their states, while making sure the children are treated humanely and consistent with the law as they go through immigration court proceedings that will determine whether they will be removed and repatriated, or qualify for some form of relief.

HHS has strong policies in place to ensure the privacy and safety of unaccompanied alien children by maintaining the confidentiality of their personal information. These children may have histories of abuse or may be seeking safety from threats of violence. They may have been trafficked or smuggled. HHS cannot release information about individual children that could compromise the child's location or identity.

The data in the table below shows **state-by-state** data of unaccompanied alien children released to sponsors as of June 30, 2018. ACF will update this data each month. ACF will update this data each month.

**Please note:** ORR makes considerable effort to provide precise and timely data to the public, but adjustments occasionally occur following review and reconciliation. The FY2014 release data posted in the chart below were updated on March 13, 2015. The FY2015 release data were updated May 9, 2016. Questions may be addressed to ORR directly, at 202.401.9246.

**NOTE: This monthly data reflects all UAC referred from the U.S. Department of Homeland Security. It does not delineate the subset of UAC referred under the recently enacted Zero Tolerance, 100 percent prosecution of illegal immigration cases. While we understand the interest in detailed breakdowns of this information, our mission has been and remains to provide every minor transferred to HHS, regardless of the circumstances, with quality and age-appropriate care and a speedy and safe release to a sponsor.**

**View unaccompanied alien children released to sponsors by county (https://www.acf.hhs.gov/orr/resource/unaccompanied-alien-children-released-to-sponsors-by-county)**

| STATE | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2015 (OCTOBER 2014 – SEPTEMBER 2015)* | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2016 (OCTOBER 2015 – SEPTEMBER 2016) | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2017 (OCTOBER 2016 – SEPTEMBER 2017)** | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2018 (OCTOBER 2017 - JUNE 2018) |
|---|---|---|---|---|
| Alabama | 808 | 870 | 598 | 599 |
| Alaska | 2 | 5 | 3 | 0 |
| Arizona | 167 | 330 | 322 | 206 |
| Arkansas | 186 | 309 | 272 | 150 |
| California | 3,629 | 7,381 | 6,268 | 3,753 |
| Colorado | 248 | 427 | 379 | 244 |
| Connecticut | 206 | 454 | 412 | 249 |
| Delaware | 152 | 275 | 178 | 180 |
| District of Columbia | 201 | 432 | 294 | 100 |
| Florida | 2,908 | 5,281 | 4,059 | 3,291 |
| Georgia | 1,041 | 1,735 | 1,350 | 1,015 |

| STATE | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2015 (OCTOBER 2014 – SEPTEMBER 2015)* | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2016 (OCTOBER 2015 – SEPTEMBER 2016) | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2017 (OCTOBER 2016 – SEPTEMBER 2017)** | TOTAL NUMBER OF UAC RELEASED TO SPONSORS IN FY 2018 (OCTOBER 2017 - JUNE 2018) |
|---|---|---|---|---|
| Hawaii | 2 | 4 | 4 | 1 |
| Idaho | 11 | 39 | 11 | 22 |
| Illinois | 312 | 519 | 462 | 369 |
| Indiana | 240 | 354 | 366 | 300 |
| Iowa | 201 | 352 | 277 | 193 |
| Kansas | 245 | 326 | 289 | 236 |
| Kentucky | 274 | 503 | 364 | 282 |
| Louisiana | 480 | 973 | 1,043 | 719 |
| Maine | 4 | 9 | 11 | 15 |
| Maryland | 1,794 | 3,871 | 2,957 | 1,321 |
| Massachusetts | 738 | 1,541 | 1,077 | 640 |
| Michigan | 132 | 227 | 160 | 105 |
| Minnesota | 243 | 318 | 320 | 230 |
| Mississippi | 207 | 300 | 237 | 231 |
| Missouri | 170 | 261 | 234 | 159 |
| Montana | 2 | 0 | 2 | 1 |
| Nebraska | 293 | 486 | 355 | 305 |
| Nevada | 137 | 283 | 229 | 105 |
| New Hampshire | 14 | 25 | 27 | 17 |
| New Jersey | 1,462 | 2,637 | 2,268 | 1,487 |
| New Mexico | 19 | 65 | 46 | 25 |
| New York | 2,630 | 4,985 | 3,938 | 2,192 |
| North Carolina | 844 | 1,493 | 1,290 | 837 |
| North Dakota | 2 | 10 | 3 | 2 |
| Ohio | 483 | 693 | 584 | 433 |
| Oklahoma | 225 | 301 | 267 | 215 |
| Oregon | 122 | 188 | 170 | 167 |
| Pennsylvania | 333 | 604 | 501 | 428 |
| Rhode Island | 185 | 269 | 234 | 184 |
| South Carolina | 294 | 562 | 483 | 391 |
| South Dakota | 61 | 81 | 81 | 72 |
| Tennessee | 765 | 1,354 | 1,066 | 934 |
| Texas | 3,272 | 6,550 | 5,391 | 3,137 |
| Utah | 62 | 126 | 99 | 79 |
| Vermont | 1 | 1 | 0 | 2 |
| Virginia | 1,694 | 3,728 | 2,888 | 1,299 |
| Washington | 283 | 476 | 494 | 363 |
| West Virginia | 12 | 26 | 23 | 17 |
| Wisconsin | 38 | 85 | 94 | 67 |
| Wyoming | 6 | 23 | 14 | 14 |
| Virgin Islands | 0 | 0 | 3 | 0 |
| **TOTAL** | **27,840** | **52,147** | **42,497** | **27,383** |

*The FY2015 numbers have been reconciled.

**The FY2017 numbers have been reconciled.

For more information, please read **ORR's reunification policy (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors)**.

Last Reviewed: August 7, 2018

# EXHIBIT K

Hate Crimes On The Rise In California, Especially Against Latinos

By Lemor Abrams
July 10, 2018 at 9:07 pm

SACRAMENTO (CBS13) — A new Justice Department report shows hate crimes have increased substantially since 2017, for every minority group reported on.

Overall, hate crimes have gone up 17 percent in California, but of the largest jump was against Hispanic and Latino men and women, jumping 52 percent.

*READ THE REPORT: Hate Crime In California 2017.*
*https://cbssacramento.files.wordpress.com/2018/07/hate-crime-in-california-2017.pdf*

So what's behind the spike in hate crimes?

Immigration rights groups blame President Donald Trump's strict policies and vitriolic rhetoric against minorities.

"This rhetoric continues to target immigrant communities and here in California, we know a significant population are Latinos, and therefore not surprising to see, what we see at the national level," said Christopher Sanchez of the Coalition for Humane Immigrant Rights.

Sanchez is referring to hate crimes like the brutal Fourth of July attack of a 91-year old Mexican man in Los Angeles. He was beaten with a brick and told to "go back to his country."

"It's a fairly new phenomenon," said UC Davis Professor Susan Miller.

Miller says perpetrators who commit hate crimes look for people who are vulnerable.

She specializes in the relationship between Jews and Muslims and says historically, most hate crimes in this country have been against Jews.

The study doesn't ignore those religious groups, saying there was a 27 percent increase in anti-Jewish hate crimes, and a 24 percent increase in anti-Muslim hate crimes last year.

Miller believes, Hispanics and Latinos may be increasingly under attack, due to the same disturbed mindset that sparked the Holocaust.

"It's the same syndrome, you have a syndrome of hatred embedded in human personality, if unleashed and encouraged, and if there's a leadership that sparks these feelings, then you have a rise in hate crimes," she said.

She also says the statistics may not capture the entire increase. Earlier this year, a state audit found several large law enforcement agencies in California were not properly tracking hate crimes.